2023-1652

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

J.D. IRVING, LTD.,

Plaintiff-Appellant

v.

UNITED STATES, DEPARTMENT OF COMMERCE,

Defendants-Appellees

---

Appeal from the United States Court of International Trade
in Case No. 1:21-CV-00641
Judge Timothy M. Reif

---

## BRIEF OF PLAINTIFF-APPELLANT
## J.D. IRVING, LIMITED

Walter J. Spak
Jay C. Campbell
WHITE & CASE LLP
701 Thirteenth  Street, NW
Washington, DC 20005
(202) 626-3600

May 22, 2023

Counsel to Plaintiff-Appellant J.D. Irving, Limited

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1652 |
| **Short Case Caption** | J.D. Irving, Ltd. v. US |
| **Filing Party/Entity** | Appellant J.D. Irving, Limited |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.


Date: 05/22/2023

Signature: /s/ Jay C. Campbell

Name: Jay C. Campbell

**FORM 9. Certificate of Interest**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| J.D. Irving, Limited | N/A | J.K. Irving, Limited |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| White & Case LLP | | |
| Cristina M. Cornejo | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

STATEMENT OF RELATED CASES ....................................................................1

JURISDICTIONAL STATEMENT .......................................................................2

STATEMENT OF THE ISSUES............................................................................3

STATEMENT OF THE CASE................................................................................4

I.    LEGAL BACKGROUND ...........................................................................4

    A.    Assessment Rates and Cash Deposit Rates ........................................4

    B.    Congress's Rationale for Requiring Commerce to Conduct Administrative Reviews Only If Requested .........................................6

II.    PROCEDURAL BACKGROUND .............................................................10

    A.    Commerce's Proceedings and Issuance of the *Cash Deposit Instructions* ......................................................................................10

    B.    CIT Proceedings ...............................................................................14

SUMMARY OF THE ARGUMENT .....................................................................20

ARGUMENT .......................................................................................................23

I.    STANDARD OF REVIEW .......................................................................23

II.    ARGUMENT..............................................................................................24

    A.    The CIT Has Jurisdiction under 28 U.S.C. § 1581(i) Because J.D. Irving Challenges Commerce's "Administration and Enforcement" of the *2019 Review Final Results* – Not the Final Results Themselves ............................................................................25

    B.    The CIT Has Jurisdiction under 28 U.S.C. § 1581(i) Because Any Other Procedure Would Be Manifestly Inadequate To Remedy J.D. Irving's Claim..............................................................31

1. Only the CIT has the power to remedy Commerce's unlawful assignment of the 2019 AD Deposit Rate to J.D. Irving through the *Cash Deposit Instructions* ..........................32

2. Only the CIT has the authority to prevent Commerce from continuing to assign AD deposit rates contrary to Congress's intent.....................................................................39

C. The CIT Is Not Barred from Exercising Jurisdiction under 28 U.S.C. § 1581(i)(2)(B) ......................................................................45

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................48

AMERICAS 123196413

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Signature, Inc. v. United States*,
  2007 U.S. App. LEXIS 27709 (Fed. Cir. 2007) ....................................26, 27, 28

*Asociacion Colombiana de Exportadores de Flores v. United States*,
  717 F. Supp. 847 (Ct. Int'l Trade 1989),
  *aff'd* 903 F.2d 1555 (Fed. Cir. 1990)..................................................................45

*Canadian Lumber Trade Alliance v. United States*,
  517 F.3d 1319 (Fed. Cir. 2008) .........................................................................44

*Canadian Wheat Bd. v. United States*,
  637 F. Supp. 2d 1329 (Ct. Int'l Trade 2009) .....................................................44

*Consol. Bearings Co. v. United States*,
  348 F.3d 997 (Fed. Cir. 2003) .....................................................................passim

*Cooper Tire & Rubber Co. v. United States*,
  217 F. Supp. 3d 1373 (Ct. Int'l Trade 2017) .....................................................34

*Cooper Tire & Rubber Co. v. United States*,
  No. 15-00251, 2017 Ct. Intl. Trade LEXIS 131 (Sept. 25, 2017) ......................34

*Dofasco Inc. v. United States*,
  326 F. Supp. 2d 1340 (Ct. Int'l Trade 2004) .....................................................45

*Elkem Metals Co. v. United States*,
  196 F. Supp. 2d 1367 (Ct. Int'l Trade 2002) .....................................................39

*Federal-Mogul Corp. v. United States*,
  822 F. Supp. 782 (Ct. Int'l Trade 1993) ......................................................passim

*Hartford Fire Ins. Co. v. United States*,
  544 F.3d 1289 (Fed. Cir. 2008) ...................................................................25, 31

*Int'l Customs Prods., Inc. v. United States*,
  467 F.3d 1324 (Fed. Cir. 2006) .........................................................................31

*J.D. Irving, Ltd. v. United States,*
  570 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) .....................................................17

*J.D. Irving, Ltd., v. United States,*
  615 F. Supp. 3d 1323 (Ct. Int'l Trade 2023) ....................................................1, 2

*JCM, Ltd. v. United States,*
  210 F.3d 1357 (Fed. Cir. 2000) .........................................................................23

*Juice Farms, Inc. v. United States,*
  68 F.3d. 1344 (Fed. Cir. 1995) ..........................................................................23

*Koyo Seiko Co. v. United States,*
  110 F. Supp. 2d 934 (Ct. Int'l Trade 2000),
  *aff'd* 258 F.3d 1340 (Fed. Cir. 2001)...................................................................5

*MacMillan Bloedel Ltd. v. United States,*
  16 C.I.T. 331 (1992) ..........................................................................................38

*Miller & Co. v. United States,*
  824 F.2d 961 (Fed. Cir. 1987) ......................................................................24, 47

*Mittal Canada Inc. v. United States,*
  414 F. Supp. 2d 1347 (Ct. Int'l Trade 2006) ........................................29, 30, 31

*Norcal/Crosetti Foods, Inc. v. United States,*
  963 F.2d 356 (Fed. Cir. 1992) ...........................................................................24

*Ontario Forests Indus. Ass'n v. United States,*
  444 F. Supp. 2d 1309 (Ct. Int'l Trade 2006) .....................................................39

*Parkdale Int'l, Ltd. v. United States,*
  491 F. Supp. 2d 1262 (Ct. Int'l Trade 2007) ........................................23, 29, 47

*Redes v. United States,*
  828 F. Supp. 978 (Ct. Int'l Trade 1993) ............................................................45

*Sioux Honey Ass'n v. Hartford Fire Ins. Co.,*
  672 F. 3d 1041 (Fed. Cir. 2012) ..........................................................................4

*Tembec, Inc. v. United States,*
  441 F. Supp. 2d 1302 (Ct. Int'l Trade 2006) .....................................................39

ii

*Torrington Co. v. United States*,
    44 F.3d 1572 (Fed. Cir. 1995) .............................................................5

*Transcom, Inc. v. United States*,
    182 F.3d 876 (Fed. Cir. 1999) ............................................................6

*United States v. Hanover Ins. Co. v. United States*,
    82 F.3d 1052 (Fed. Cir. 1996) ..........................................................33

*Valeo N. Am., Inc. v. United States*,
    277 F. Supp. 3d 1361 (Ct. Int'l Trade 2017) ...............................37, 38

*Wanxiang Am. Corp. v. United States*,
    399 F. Supp. 3d 1323 (Ct. Int'l Trade 2019) ...............................29, 30

## STATUTES AND REGULATIONS

19 C.F.R. § 351.212(a).........................................................................4

19 C.F.R. § 351.212(c)......................................................................6, 8

19 C.F.R. § 351.212(c)(1)............................................................passim

19 C.F.R. § 351.213(b) ......................................................................10

19 C.F.R. § 353.22(a)...........................................................................8

19 C.F.R. § 353.22(e)...........................................................................8

19 U.S.C. § 1516a ......................................................27, 28, 29, 38

19 U.S.C. § 1516a(a)......................................................21, 26, 28

19 U.S.C. § 1516a(a)(2)(B)..............................................................25

19 U.S.C. § 1516a(a)(2)(B)(iii)........................................................46

19 U.S.C. § 1516a(b)(3)....................................................................42

19 U.S.C. § 1516a(c)(2) ....................................................................15

19 U.S.C. § 1516a(g)(1).....................................................................46

19 U.S.C. § 1516a(g)(2)................................................17, 44, 45

AMERICAS 123196413

19 U.S.C. § 1516a(g)(2)(B) .......................................................................15

19 U.S.C. § 1516a(g)(3)(B) .......................................................................14

19 U.S.C. § 1516a(g)(5)(C) ..................................................................16, 34

19 U.S.C. § 1516a(g)(6) .......................................................................16, 34

19 U.S.C. § 1675 ...................................................................................29, 46

19 U.S.C. § 1675(a) ...........................................................................passim

19 U.S.C. § 1675(a)(1) (1982 edition) ....................................................6, 7

19 U.S.C. § 1675(a)(2)(C) ...................................................................passim

28 U.S.C. § 1295(a)(5) ................................................................................2

28 U.S.C. § 1581 ................................................................................passim

28 U.S.C. § 1581(i) .............................................................................passim

28 U.S.C. § 1581(i)(1)(B) ..................................................................15, 26

28 U.S.C. § 1581(i)(1)(D) ..................................................................15, 26

28 U.S.C. § 1581(i)(2)(B) ...................................................................passim

28 U.S.C. § 1581(c) ............................................................................passim

28 U.S.C. § 1585 .................................................................................15, 33

28 U.S.C. § 2201(a) ...................................................................................44

28 U.S.C. § 2643(c)(1) ..............................................................................33

28 U.S.C. § 2643(c)(5) ..............................................................................44

Tariff Act of 1930 § 516A(f)(9)................................................................44

Tariff Act of 1930 § 516A(g)....................................................................45

Tariff Act of 1930 § 751(a).........................................................................6

Tariff Act § 751(a)(2) .................................................................................6

AMERICAS 123196413

Tariff Act § 751(a)(2)(C) ................................................................5

Trade Agreements Act of 1979,
    Pub. L. No. 96-39, 93 Stat. 144, 175 (1979) .........................6

Trade and Tariff Act of 1984,
    Pub. L. No. 98-573, 98 Stat. 2948, 3031 (1984) ...................7

Trade and Tariff Act of 1984 ...................................................7, 12

## ADMINISTRATIVE DETERMINATIONS

*Antidumping Duties*,
    54 Fed. Reg. 12742 (Dep't Commerce Mar. 28, 1989)..................5, 8

*Certain Softwood Lumber Products from Canada*,
    83 Fed. Reg. 350 (Dep't Commerce Jan. 3, 2018) ...........................10

## LEGISLATIVE MATERIALS

H.R. REP. NO. 98-725 (2nd Sess. 1984)...............................................7, 40

H.R. REP. NO. 98-1156 (2nd Sess. 1984).............................................7, 41

H. REP. NO. 103-361 (1st Sess. 1993)....................................................42

The Implementation Act for the Agreement between the United States
    of America, the United Mexican States, and Canada (USMCA)
    H.R. 5430,
    accompanying Statement of Administrative Action, at 2, 26 (2020)................34

North American Free Trade Agreement Implementation Act,
    S. Rep. No. 103-189 (1993).............................................................34

S. REP. NO. 100-509 (1988) ..................................................................47

## MISCELLANEOUS

Stephen J. Powell,
    *Expanding the NAFTA Chapter 19 Dispute Settlement System: A
    Way To Declaw Trade Remedy Laws in a Free Trade Area of the
    Americas?*,
    16 LAW & BUS. REV. AM. 217 (2010) ................................................ 35

AMERICAS 123196413

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of this Court, counsel for Plaintiff-Appellant, J.D. Irving, Limited, makes the following statement:

1.     No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate court.

2.     The following action pending before the United States Court of International Trade may be directly affected by the Court's disposition of this appeal: *J.D. Irving, Limited v. United States and U.S. Department of Commerce*, Court No. 22-00256.  J.D. Irving, Limited's appeal in Court No. 22-00256 involves the same parties and legal issues, including the jurisdictional issue raised in the present action.   For this reason, the Court of International Trade stayed proceedings in Court No. 22-00256 pending a final and conclusive resolution of the jurisdictional issue raised in the present action before this Court.

AMERICAS 123196413

# JURISDICTIONAL STATEMENT

The action filed by Plaintiff-Appellant J.D. Irving, Limited ("Appellant" or "J.D. Irving") before the United States Court of International Trade ("CIT"), *J.D. Irving, Ltd. v. United States*, Court No. 21-00641, which resulted in this appeal, contested the antidumping ("AD") duty cash deposit instructions issued by the U.S. Department of Commerce ("Commerce") to U.S. Customs and Border Protection ("CBP") following publication of the final results of the 2019 administrative review of the AD duty order on certain softwood lumber products from Canada. *See* Commerce Cash Deposit Instructions, Message No. 1343410 (A-122-857) (Dec. 9, 2021) ("*Cash Deposit Instructions*"); Appx51-80.

On January 25, 2023, the CIT issued a decision dismissing J.D. Irving's appeal for lack of subject matter jurisdiction pursuant to CIT Rule 12(b)(1). *See J.D. Irving, Ltd., v. United States*, 615 F. Supp. 3d 1323 (Ct. Int'l Trade 2023); Appx1-17. J.D. Irving timely filed a notice of appeal on March 21, 2023. This Court has exclusive jurisdiction over appeals from final decisions of the CIT under 28 U.S.C. § 1295(a)(5).

AMERICAS 123196413

## **STATEMENT OF THE ISSUES**

1.    Is the "true nature" of J.D. Irving's appeal, which contests Commerce's unlawful assignment of an outdated AD cash deposit rate to J.D. Irving through the issuance of cash deposit instructions, a challenge to Commerce's "administration and enforcement" of the final results of an AD administrative review, such that the CIT has jurisdiction under 28 U.S.C. § 1581(i)?

2.    Would review by a United States-Mexico-Canada Agreement ("USMCA") binational panel and participation in Commerce administrative reviews be "manifestly inadequate" to remedy Commerce's unlawful assignment of an AD cash deposit rate, given that USMCA panels are unable to provide injunctive relief or issue binding rulings beyond the particular determination before it, and participation in unnecessary administrative reviews perpetuates, rather than addresses, the legal problem raised by J.D. Irving?

3.    May the CIT exercise jurisdiction over J.D. Irving's action despite the text of 28 U.S.C. § 1581(i)(2)(B), given that J.D. Irving does not contest a Commerce "determination" that is reviewable by a USMCA panel and a USMCA panel would be unable to provide meaningful relief to address Commerce's unlawful assignment of an outdated AD cash deposit rate to J.D. Irving?

AMERICAS 123196413

## STATEMENT OF THE CASE

### I.    LEGAL BACKGROUND

#### A.    Assessment Rates and Cash Deposit Rates

In the United States, AD duties are assessed on a "retrospective" basis. *See* 19 C.F.R. § 351.212(a).  Upon entry of imports subject to an AD duty order, the importer provides CBP with cash deposits, which are calculated based on the foreign producer/exporter's ***estimated rate*** of dumping (*i.e.*, the ***cash deposit rate***). *See Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F. 3d 1041, 1047 (Fed. Cir. 2012) ("{T}he cash deposits collected upon entry are considered estimates of the duties that the importer will ultimately have to pay as opposed to payments of the actual duties.").    After importation, if requested, Commerce conducts an administrative review to determine the foreign producer/exporter's ***actual rate*** of dumping during a (normally) one-year period of review ("POR") (*i.e.*, ***assessment rate***).  19 U.S.C. § 1675(a).  Upon conclusion of the review, Commerce instructs CBP to assess final AD duties on imports entered during the POR at the assessment rate, and to collect deposits for estimated AD duties on entries going forward at the new cash deposit rate. *See* 19 U.S.C. § 1675(a)(2)(C).

If a review is not requested of a particular foreign producer/exporter, Commerce, in accordance with its authority under § 1675(a)(2)(C), instructs CBP to assess AD duties on imports of subject merchandise from the foreign producer/exporter at the AD cash deposit rate that applied upon entry of the

AMERICAS 123196413

merchandise, and to continue to apply the current AD cash deposit rate to imports from that foreign producer/exporter going forward. *See* 19 C.F.R. § 351.212(c)(1); *Antidumping Duties*, 54 Fed. Reg. 12742, 12756 (Dep't Commerce Mar. 28, 1989) (final rule) (explaining that the absence of "a timely request for review constitutes a determination under section 751 of the dumping margin for the entries made during the review period").

Section 751(a)(2)(C) of the Tariff Act requires Commerce to use the same dumping margin as the basis for both the assessment rate and cash deposit rate, stating: "The determination under {§ 1675(a)} shall be the basis for the assessment of . . . antidumping duties on entries of merchandise covered by the determination ***and*** for deposits of estimated duties." 19 U.S.C. § 1675(a)(2)(C) (emphasis added); *see also Koyo Seiko Co. v. United States*, 110 F. Supp. 2d 934, 942 (Ct. Int'l Trade 2000) (noting that 19 U.S.C. § 1675(a)(2)(C) "requires that both the deposit rate and the assessment rate be derived from the same dumping margin differential"), *aff'd* 258 F.3d 1340, 1342 (Fed. Cir. 2001); *Torrington Co. v. United States*, 44 F.3d 1572, 1578 (Fed. Cir. 1995) ("Section 1675(a)(2) . . . requires that PUDD, the difference between foreign market value and United States price, serve as the basis for both assessed duties and cash deposits of estimated duties."). Consequently, the AD cash deposit rate in effect must reflect

AMERICAS 123196413

the same dumping margin as the assessment rate determined for the most recent period.

Commerce's authority to implement 19 C.F.R. § 351.212(c), derives from Section 751(a)(2) of the Tariff Act. *See Federal-Mogul Corp. v. United States*, 822 F. Supp. 782, 787–88 (Ct. Int'l Trade 1993); *Transcom, Inc. v. United States*, 182 F.3d 876, 880 (Fed. Cir. 1999) (quoting *Federal-Mogul*, 822 F. Supp. at 787–88). Accordingly, 19 U.S.C. § 1675(a)(2)(C)'s requirement – that the current AD deposit rate must be based on the same dumping margin used for the assessment rate determined for the most recent period – applies equally to unreviewed foreign producers/exporters that receive assessment and deposit rates by operation of law under 19 C.F.R. § 351.212(c)(1). *See Federal-Mogul*, 822 F. Supp. at 787–88.

**B.   Congress's Rationale for Requiring Commerce to Conduct Administrative Reviews Only If Requested**

Originally, Commerce was required under Section 751(a) of the Tariff Act of 1930, as amended ("Tariff Act"), 19 U.S.C. § 1675(a), to conduct administrative reviews of ***all*** foreign producers/exporters subject to AD orders. *See* Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144, 175 (1979), *codified at* 19 U.S.C. § 1675(a)(1) (1982 edition) ("At least once during each 12-month period beginning on the anniversary of the date of publication of . . . an antidumping duty order . . . , the administering authority . . . shall . . . review and determine . . . the amount of any antidumping duty, and . . . shall publish the results of such review,

AMERICAS 123196413

together with notice of any duty to be assessed, estimated duty to be deposited, or investigation to be resumed in the Federal Register.").

That changed with Congress's enactment of the Trade and Tariff Act of 1984, which amended 19 U.S.C. § 1675(a) to require Commerce to conduct an administrative review of a foreign producer/exporter only "if a request for such a review has been received." Trade and Tariff Act of 1984, Pub. L. No. 98-573, 98 Stat. 2948, 3031 (1984), *codified at* 19 U.S.C. § 1675(a)(1) (1988 edition). The corresponding legislative history explains that the "purpose of amending the annual review requirement {was} to reduce the administrative burden on the Department of Commerce of automatically reviewing every outstanding order even though circumstances do not warrant it or parties to the case are satisfied with the existing order." H.R. REP. NO. 98-725, at 22–23 (2nd Sess. 1984). Congress intended for the request-for-review requirement to "limit{} the burden on petitioners and respondents, as well as the administering authority." H.R. REP. NO. 98-1156, at 181 (2nd Sess. 1984); *see also Federal-Mogul*, 822 F. Supp. at 788 (citing H.R. Report 98-1156 and Congress's "express purpose" for "the 1984 amendment").

On March 28, 1989, Commerce published amended regulations to implement the provisions of the Trade and Tariff Act of 1984 concerning AD duties, including the amendment to 19 U.S.C. § 1675(a). *See Antidumping Duties*,

AMERICAS 123196413

54 Fed. Reg. 12742 (Dep't Commerce Mar. 28, 1989) (final rule). Commerce added 19 C.F.R. § 353.22(a), which permitted interested parties – including U.S. producers, foreign producers/exporters, and importers – to request administrative reviews under 19 U.S.C. § 1675(a). *See id.* at 12778; *see also* 19 C.F.R. § 353.22(a) (1990). Under the authority of § 1675(a)(2)(C), Commerce also added 19 C.F.R. § 353.22(e) (*Automatic assessment of duty*), which specified the legal consequence of interested parties ***not*** requesting an administrative review of a particular foreign producer/exporter subject to an AD duty order. *See Antidumping Duties*, 54 Fed. Reg. at 12778–79; *see also* 19 C.F.R. § 353.22(e) (1990); *Federal-Mogul*, 822 F. Supp. at 787–88. Section 353.22(e)(1) stated:

> For orders, if the Secretary does not receive a timely request {for review}, the Secretary, without additional notice, will instruct the Customs Service to assess antidumping duties on the merchandise . . . at rates equal to the cash deposit of, or bond for, estimated antidumping duties required on that merchandise at the time of entry, . . . ***and to continue to collect the cash deposits previously ordered.***

(emphasis added). In the preamble to 19 C.F.R. § 353.22(e), Commerce noted that the absence of "a timely request for review ***constitutes a determination under section 751 of the dumping margin for the entries made during the review period.***" *Antidumping Duties*, 54 Fed. Reg. at 12756 (emphasis added).

The 1990 regulatory provisions described above, first promulgated by Commerce in 1989, remain in effect today under 19 C.F.R. §§ 351.212(c)

AMERICAS 123196413

(*Automatic assessment of antidumping and countervailing duties if no review is requested*) and 351.213(b) (*Request for administrative reviews*).

In *Federal-Mogul*, the CIT held that Congress's purpose for amending 19 U.S.C. § 1675(a) to require reviews only upon request would be undermined if Commerce later were to change arbitrarily an AD cash deposit rate to which interested parties had consented (by not requesting a review):

> ***In making a decision whether or not to request an administrative review of certain entries, the parties rely on the cash deposit rate <u>then in force</u> for those entries.*** If the ITA is allowed to arbitrarily change this cash deposit rate for ***unreviewed*** firms, which are ***presumably unreviewed because the parties are happy with assessments <u>and future cash deposits</u> being made at that cash deposit rate***, in many cases the parties will be required to request administrative reviews of all entries of the subject merchandise.

*Federal-Mogul*, 822 F. Supp. at 788 (emphases added).  In the absence of certainty about the AD deposit rate that would apply (until completion of an administrative review for a subsequent period), importers, foreign producers, and domestic producers alike would feel compelled to request reviews to protect their interests, which would "have the effect of increasing the number and complexity of administrative reviews thereby defeating the express purpose of the 1984 amendment." *Id.*

## II.   PROCEDURAL BACKGROUND

### A.   Commerce's Proceedings and Issuance of the *Cash Deposit Instructions*

The AD duty order on certain softwood lumber products from Canada ("*Softwood Lumber from Canada*") was published on January 3, 2018.  *See Certain Softwood Lumber Products from Canada*, 83 Fed. Reg. 350 (Dep't Commerce Jan. 3, 2018).  Accordingly, requests for administrative reviews under the AD duty order may be submitted in January of each year, the anniversary month of the order's publication.  *See* 19 C.F.R. § 351.213(b).

"In making a decision whether or not to request an administrative review of certain entries, the parties rely on the cash deposit rate then in force for those entries."  *Federal-Mogul*, 822 F. Supp. at 788.  In January 2021, when review requests for the 2020 POR were due in the *Softwood Lumber from Canada* AD proceeding, J.D. Irving's AD cash deposit rate was 1.57%.  *See* Appx227-28. (assigning a 1.57% AD cash deposit rate to J.D. Irving as a "Non-Selected Company").  No party – neither J.D. Irving nor a domestic producer – requested an AD review of J.D. Irving for the 2020 POR.  *See* Appx126, 130 (omitting J.D. Irving from the list of Canadian producers/exporters subject to the year-2020 AD review).  Consequently, in accordance with 19 C.F.R. § 351.212(c)(1), Commerce instructed CBP to assess AD duties on J.D. Irving's year-2020 entries at the AD cash deposit rate applicable upon entry of the merchandise, and to continue to use

AMERICAS 123196413

1.57% as the company's AD cash deposit rate going forward (the "2020 AD Deposit Rate"). *See* Appx140, 142, 164 (stating, "you are to liquidate all entries . . . and assess antidumping duties on merchandise entered . . . at the cash deposit rate in effect on the date of entry" and "you shall continue to collect cash deposits of estimated antidumping duties for the merchandise at current rates").

On May 20, 2021, nearly four months after the deadline to request reviews for the 2020 POR, Commerce issued the preliminary results in the administrative review under the *Softwood Lumber from Canada* AD proceeding for the 2019 POR ("2019 AD Review"). *See* Appx167. J.D. Irving was subject to the 2019 AD Review, but, like hundreds of other Canadian producers/exporters, was not selected as a mandatory respondent. *See* Appx168-69. Consequently, in accordance with its practice, Commerce assigned such "Non-Selected Companies" the weighted average of the mandatory respondents' preliminary dumping margins, 12.05%. *See* Appx167. Commerce also indicated that, upon issuance of the final results in the 2019 AD Review, the final "Non-Selected Companies Rate" would serve as both (1) the rate at which *final AD duties* would be assessed on imports of subject merchandise from Non-Selected Companies with entry dates during the 2019 POR (*i.e.*, the assessment rate) and (2) the rate at which cash deposits for *estimated AD duties* would be calculated for imports of subject merchandise from Non-Selected

AMERICAS 123196413

Companies (including J.D. Irving) going forward (*i.e.*, the "2019 AD Deposit Rate"). *See* Appx167-68.

On July 8, 2021, J.D. Irving submitted a case brief in the 2019 AD Review. *See* Appx94. J.D. Irving argued that the 2019 AD Deposit Rate could not lawfully replace the company's current AD cash deposit rate for a more recent period: the 2020 AD Deposit Rate. *See* Appx98, 101–04. Citing legislative history to the Trade and Tariff Act of 1984, J.D. Irving explained that replacing the 2020 AD Deposit Rate with the 2019 rate would violate Congress's intent for amending 19 U.S.C. § 1675(a) to require administrative reviews only upon request, and also would violate 19 C.F.R. § 351.212(c)(1), which Commerce issued to implement § 1675(a)(2)(C). *See* Appx99, 103-04.

On November 23, 2021, Commerce issued the final results in the 2019 AD Review ("*2019 Review Final Results*"), amending the Non-Selected Companies Rate to 11.59%. *See* Appx82, 83. Commerce also announced that it would assign J.D. Irving the 2019 AD Deposit Rate, even though the company was already subject to the 2020 AD Deposit Rate. *See* Appx175-76.

On December 9, 2021, Commerce issued *Cash Deposit Instructions* to implement the final results of the 2019 AD Review. *See* Appx51. The *Cash Deposit Instructions* directed CBP to replace J.D. Irving's 2020 AD Deposit Rate (1.57%) with the 2019 AD Deposit Rate (11.59%), which was ten percentage

12

points higher.  *See*Appx53.  The *Cash Deposit Instructions* directed CBP to apply the 2019 AD Deposit Rate to imports of subject merchandise from J.D. Irving with entry dates on or after December 2, 2021.  *See* Appx53.

On August 3, 2022, eight months after Commerce had replaced J.D. Irving's 2020 AD Deposit Rate with the 2019 AD Deposit Rate, Commerce issued the final results in the administrative review for the 2020 POR (the "2020 AD Review"). *See* Appx204.  In doing so, Commerce announced that it would direct CBP to update AD cash deposit rates for Canadian exporters under review from 2019 rates (11.59% for non-selected companies) to 2020 rates (4.76% for non-selected companies), but leave J.D. Irving subject to the 2019 AD Deposit Rate – even though J.D. Irving already had been assigned a dumping rate for 2020 (1.57%) by operation of law based on the parties' consensus that 1.57% accurately reflected the company's dumping margin for 2020 such that a 2020 review of J.D. Irving was unnecessary.  *See* Appx205, 207.

In summary:

- ***In January 2021***, when J.D. Irving's AD cash deposit rate was 1.57%, neither J.D. Irving nor petitioner requested a year-2020 AD administrative review of J.D. Irving, signifying agreement that 1.57% reflected J.D. Irving's most current dumping margin in 2020.

AMERICAS 123196413

- ***On April 16, 2021***, Commerce directed CBP to assess final AD duties on J.D. Irving's imports entered during the 2020 POR at the AD cash deposit rates that applied upon entry, including, most recently, the 1.57% rate.  Commerce also instructed CBP to continue to use 1.57% as J.D. Irving's AD cash deposit rate (the 2020 AD Deposit Rate).

- ***On December 9, 2021***, Commerce issued the contested *Cash Deposit Instructions*, directing CBP to replace J.D. Irving's 2020 AD Deposit Rate (1.57%) with the 2019 AD Deposit Rate (11.59%).

- ***On August 3, 2022***, Commerce issued the final results in the 2020 AD Review, announcing that it would direct CBP to update AD cash deposit rates for Canadian exporters under review from 2019 rates (11.59%) to 2020 rates (4.76%), while leaving J.D. Irving subject to the 2019 AD Deposit Rate (11.59%).

### B.    CIT Proceedings

J.D. Irving attempted to appeal the *2019 Review Final Results* to the CIT and invoke the court's jurisdiction under 28 U.S.C. § 1581(c).  Because Commerce's AD determination concerns merchandise from Canada, a party to the USMCA, on December 21, 2021, J.D. Irving provided notice of its intent to commence judicial review of the *2019 Review Final Results* at the CIT, as required by 19 U.S.C. § 1516a(g)(3)(B).  Appx107-10.  On December 28, 2021, however, other interested

AMERICAS 123196413

parties requested binational panel review of the *2019 Review Final Results* under Article 10.12 of the USMCA, thereby transferring review of Commerce's determination to a USMCA panel. *See* Appx117; *see also* 19 U.S.C. § 1516a(g)(2)(B) (granting exclusive jurisdiction of certain Commerce final determinations to a binational panel when requested by an interested party).

On December 30, 2021, J.D. Irving commenced the underlying action at the CIT, contesting Commerce's *Cash Deposit Instructions*, which unlawfully replaced J.D. Irving's 2020 AD Deposit Rate with the 2019 AD Deposit Rate.[1] In its Complaint, J.D. Irving explained that the CIT had jurisdiction under 28 U.S.C. § 1581(i), because review by a USMCA panel of J.D. Irving's legal claim in the context of the appeal of the *2019 Review Final Results* would be manifestly inadequate to provide relief.[2] *See* Appx33-37. J.D. Irving explained that, unlike the CIT, USMCA binational panels lack equitable or injunctive powers. *See* Appx35-36 (citing, *e.g.*, 28 U.S.C. § 1585 (granting the CIT "all the powers in law and equity of . . . a district court of the United States"); 19 U.S.C. § 1516a(c)(2)

---

[1] On September 9, 2022, J.D. Irving commenced an appeal at the CIT contesting the AD cash deposit instructions issued by Commerce to implement the final results of the 2020 AD Review. *See J.D. Irving, Ltd. v. United States*, Court No. 22-00256; Appx209-25. In that appeal, like here, J.D. Irving seeks to invoke the CIT's jurisdiction under 28 U.S.C. § 1581(i). *See* Appx209-13.

[2] Alternatively, J.D. Irving asserted that the CIT had jurisdiction under 28 U.S.C. § 1581(i)(1)(B) and (D), because the action relates to the "administration and enforcement" of "tariffs, duties, fees or other taxes on the importation of merchandise for reasons other than the raising of revenue . . . ." Appx36-37.

15

(authorizing the CIT to enjoin the liquidation of entries covered by a Commerce determination); 19 U.S.C. § 1516a(g)(5)(C) & (6) (indicating that USMCA panels lack the power to enjoin the liquidation of entries or provide injunctive relief)). Consequently, USMCA panels lack the power to provide the necessary relief for J.D. Irving's legal claim:  *i.e.*, an injunction ordering Commerce to instruct CBP (1) to reinstate retroactively J.D. Irving's lawful 2020 AD Deposit Rate and (2) to refund cash deposits paid in excess of the lawful 2020 AD Deposit Rate.  *See* Appx34-36, 49.  In contrast, the CIT has the power to provide such injunctive relief, and has provided such relief in setting aside an unlawful AD cash deposit rate. *See* Appx34.

J.D. Irving also sought relief in the form of a binding ruling to prevent Commerce from committing the same legal error – *i.e.*, unlawfully prioritizing a dumping rate calculated in a completed administrative review over a dumping rate established by operation of law under 19 C.F.R. § 351.212(c)(1) for a more recent period – in a future review. *See* Appx49; Appx179-83.  For this reason, J.D. Irving moved for expedited consideration of its appeal.  *See* Appx178.  J.D. Irving explained that, in the absence of a CIT ruling on the merits, neither J.D. Irving nor any other interested party would be able to make an informed decision of whether to request a year-2021 AD review of J.D. Irving, contrary to Congress's express purpose for amending 19 U.S.C. § 1675(a) to require Commerce to conduct

AMERICAS 123196413

administrative reviews only upon request.  *See* Appx179-80.  The parties would not know whether the AD assessment rate applicable to J.D. Irving's entries made during the latter portion of 2021 would be 1.57% (the 2020 dumping rate) or 11.59% (the 2019 dumping rate); nor would parties know whether the AD cash deposit rate applicable to J.D. Irving's entries going forward would be the 2020 rate or the 2019 rate.  *See* Appx180.  In light of this uncertainty, J.D. Irving was compelled to request an AD review for the 2021 period (contrary to Congress's intent), and needed a CIT ruling on the merits before expiration of the deadline to withdraw requests for review (in early June 2022).  *See* Appx179-80.

On March 4, 2022, Defendant United States (the "Government") filed a motion to dismiss J.D. Irving's appeal pursuant to CIT Rules 12(b)(1) and 12(b)(6).  *See* Appx188.  Defendant raised three grounds for dismissal:  (1) the CIT lacked subject matter jurisdiction under 28 U.S.C. § 1581(i); (2) J.D. Irving lacked standing for failure to demonstrate an injury in fact; and (3) J.D. Irving failed to state a claim for which relief could be granted because the statute, 19 U.S.C. § 1516a(g)(2), bars the CIT from exercising jurisdiction over determinations subject to USMCA binational panel review.  *See* Appx188-89.

On May 2, 2022, the CIT denied J.D. Irving's motion for expedited consideration.  *J.D. Irving, Ltd. v. United States*, 570 F. Supp. 3d 1349 (Ct. Int'l Trade 2022); Appx19-20.  In doing so, however, the court stated that, "should the

AMERICAS 123196413

court rule in plaintiff's favor subsequent to the deadline {for withdrawal of requests for a 2021 AD review}, plaintiff still will be entitled to the full relief that it requests – the reinstatement of the 1.59% {(*sic*)} cash deposit rate as well as a refund, plus interest, of any excess cash deposits provided for entries made on or after December 2, 2021" (the date on which the 2019 AD Deposit Rate (11.59%) became effective).  Appx25.

Nearly nine months later on January 25, 2023, the CIT granted Defendant's motion to dismiss, concluding that the court lacked jurisdiction under 28 U.S.C. § 1581(i) to entertain J.D. Irving's legal claim.  *See* Appx9.  First, the CIT held that subject matter jurisdiction to hear J.D. Irving's action "is or could have been available" under 28 U.S.C. § 1581(c).  *See* Appx10-11.  The court considered that the "true nature" of J.D. Irving's action was a challenge to the *2019 Review Final Results*, as opposed to the *Cash Deposit Instructions*, because there was no inconsistency between the final results and Commerce's cash deposit instructions. *See id*.  In reaching this outcome, however, the CIT failed to acknowledge that J.D. Irving was challenging the legality of Commerce's **assignment** of the 2019 AD Deposit Rate (11.59%), not Commerce's **calculation** of that rate or any aspect of the 2019 Review Final Results' effect on entries of subject imports covered by the review.  In other words, J.D. Irving was contesting Commerce's "administration and enforcement" of the *2019 Review Final Results*.

AMERICAS 123196413

Second, while recognizing that USMCA panels lack the authority to grant the relief sought by J.D. Irving (retroactive reinstatement of the lawful AD cash deposit rate), the CIT nevertheless found that J.D. Irving could obtain adequate relief by participating in administrative reviews to obtain refunds of any overpaid AD cash deposits. *See id.* Appx12-14. Thus, in the CIT's view, § 1581(i) jurisdiction was unavailable because J.D. Irving failed to "meet its burden to demonstrate the manifest inadequacy of the relief available 'either in this court under 28 U.S.C. § 1581(c) or before a binational panel' pursuant to Article 10.12 of the USMCA." Appx11. In reaching this decision, the CIT did not explain how participation in administrative reviews could remedy J.D. Irving's legal claim: *i.e.*, Commerce's unlawful assignment of an outdated AD cash deposit rate to J.D. Irving contrary to 19 U.S.C. § 1675(a) and Congressional intent. Nor did the CIT explain how either USMCA panel review or participation in administrative reviews could prevent Commerce from repeating the same legal error going forward – compelling J.D. Irving to participate in administrative reviews even when all parties are satisfied with the company's most recent dumping rate, contrary to Congress's intent.

Because the CIT found that it lacked jurisdiction under §1581(i), the court declined to address the Government's other arguments for dismissal, namely lack

AMERICAS 123196413

of standing and failure to state a claim upon which relief could be granted.  *See* Appx9.

J.D. Irving commenced its appeal to this Court on March 21, 2023.

## SUMMARY OF THE ARGUMENT

This case concerns whether the CIT retains jurisdiction under 28 U.S.C. § 1581(i) to hear a novel legal claim regarding Commerce's policy for assigning AD cash deposit rates that J.D. Irving first raised in an administrative review – even though Commerce's final results in that review are now before a USMCA binational panel.  The answer is "yes."  The CIT retains jurisdiction for two reasons.  First, the "true nature" of J.D. Irving's action concerns Commerce's implementation of the final results of an administrative review, as opposed to the final results themselves.  Second, neither USMCA panel review nor any administrative procedure is capable of providing meaningful relief for J.D. Irving's legal claim.  Only the CIT has the injunctive power to order Commerce to reinstate J.D. Irving's lawful AD deposit rate retroactively, and only the CIT can issue a binding ruling so that Commerce terminates its unlawful policy for assigning AD deposit rates going forward.

The core of J.D. Irving's action is a challenge to a general Commerce policy, pursuant to which Commerce prioritizes outdated AD deposit rates calculated in completed administrative reviews over current AD deposit rates established for

20

more recent periods pursuant to the parties' agreement.  Commerce implements this policy – which is inconsistent with the statute and Congressional intent – through the issuance of AD cash deposit instructions to CBP.

Although J.D. Irving raised this legal issue in the 2019 AD Review, and Commerce responded in its final determination, the "true nature" of J.D. Irving's action relates to Commerce's "administration and enforcement" of the *2019 Review Final Results* – not the final results themselves.  J.D. Irving submits that Commerce unlawfully assigned it the AD cash deposit rate calculated in the 2019 AD Review (11.59%), because Commerce already had assigned J.D. Irving an AD deposit rate determined for the 2020 period of review (1.57%) by virtue of the parties' agreement.  J.D. Irving does not challenge Commerce's calculation of the 11.59% rate itself; nor does J.D. Irving challenge application of that rate to its imports entered during the 2019 period of review.  Rather, Appellant contests Commerce's general policy implemented through the *Cash Deposit Instructions* issued to CBP.  Cash deposit instructions relate to Commerce's "administration and enforcement" of the *2019 Review Final Results* and are not a reviewable determination under 19 U.S.C. § 1516a(a) or 28 U.S.C. § 1581(c).  Consequently, the CIT retains jurisdiction to hear J.D. Irving's challenge to the *Cash Deposit Instructions* under 28 U.S.C. § 1581(i), notwithstanding a USMCA binational panel's pending review of the *2019 Review Final Results*.

AMERICAS 123196413

Second, only the CIT can provide adequate relief for J.D. Irving's legal claim. J.D. Irving seeks (1) an injunction order requiring Commerce to reinstate J.D. Irving's lawful AD cash deposit rate retroactively and (2) a binding ruling to prevent Commerce from continuing to misinterpret the statute in a manner that compels J.D. Irving to request AD administrative reviews that would otherwise be unnecessary, contrary to Congress's intent. The CIT has the statutory authority to provide such relief (and has provided the very injunctive relief J.D. Irving seeks); USMCA panels do not. In fact, the trade court acknowledged that USMCA panels lack this authority, instead holding that J.D. Irving could seek adequate relief through participation in Commerce administrative reviews. Participation in reviews, however, fails to provide any relief at all. Administrative reviews do not address prior AD cash deposit rates that were unlawfully assigned; they establish new AD deposit rates for entries of subject merchandise going forward. Absent the injunctive relief sought by J.D. Irving, Commerce's illegal action – the assignment of an outdated and unlawful AD deposit rate – would be unaddressed entirely, escaping judicial review. Furthermore, participation in unnecessary reviews perpetuates – rather than remedies – the legal problem raised by J.D. Irving. Appellant seeks an end to Commerce's unlawful policy for assigning AD deposit rates so that the company can decline to participate in administrative reviews when all parties are satisfied with its existing AD deposit rate. Requiring

AMERICAS 123196413

J.D. Irving to participate in unnecessary administrative reviews would achieve the opposite. That is not relief.

In establishing that USMCA binational panels have exclusive jurisdiction to review certain Commerce determinations, *see* 28 U.S.C. § 1581(i)(2)(B), Congress could not have intended to deprive claimants of the ability to obtain meaningful relief that otherwise would have been available at the CIT. *See Parkdale Int'l, Ltd. v. United States*, 491 F. Supp. 2d 1262, 1270 (Ct. Int'l Trade 2007) ("{M}atters not clearly provided for in § 1581(a)-(h) were intended to fall into § 1581(i) so that no one would be denied an avenue of relief in this general subject matter area."). If permitted to stand, the CIT's decision below would deny Appellant J.D. Irving the opportunity to pursue any relief from Commerce's unlawful policy for the assignment of AD deposit rates.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews the CIT's decision to dismiss a case for lack of jurisdiction *de novo*. *See Juice Farms, Inc. v. United States*, 68 F.3d. 1344, 1345 (Fed. Cir. 1995). In other words, the Court "reviews the trial court's subject matter jurisdiction ruling as a legal determination without deference." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1001 (Fed. Cir. 2003) (citing *JCM, Ltd. v. United States*, 210 F.3d 1357, 1359 (Fed. Cir. 2000)).

AMERICAS 123196413

## II.   ARGUMENT

"Section 1581(i) jurisdiction may not be invoked when jurisdiction under another subsection of § 1581 *is or could have been available*, unless the remedy provided under that other subsection would be manifestly inadequate." *Norcal/Crosetti Foods, Inc. v. United States*, 963 F.2d 356, 359 (Fed. Cir. 1992) (quoting *Miller & Co. v. United States*, 824 F.2d 961, 963 (Fed. Cir. 1987)).  Here, the CIT may exercise § 1581(i) jurisdiction to hear J.D. Irving's challenge to Commerce's unlawful *Cash Deposit Instructions* for three reasons.  First, because the "true nature" of J.D. Irving's action is a challenge to Commerce's "administration and enforcement" of the *2019 Review Final Results* – as opposed to a challenge to the final results themselves – no other subsection of § 1581 is or could have been available.  Second, if another subsection of 1581 were available through USMCA panel review or Commerce administrative reviews, such review or procedure would be manifestly inadequate to remedy J.D. Irving's legal claim.  Third, 28 U.S.C. § 1581(i)(2)(B), which provides for exclusive USMCA binational panel review of certain agency determinations, does not deprive the CIT of jurisdiction, because J.D. Irving does not contest a reviewable "determination"; nor would a USMCA panel be able to provide meaningful relief for Commerce's unlawful assignment of an outdated AD cash deposit rate to J.D. Irving.

AMERICAS 123196413

**A.  The CIT Has Jurisdiction under 28 U.S.C. § 1581(i) Because J.D. Irving Challenges Commerce's "Administration and Enforcement" of the *2019 Review Final Results* – Not the Final Results Themselves**

In determining whether jurisdiction "is or could have been available" under another subsection of 28 U.S.C. § 1581, the court "look{s} to the true nature of the action . . . ." *Hartford Fire Ins. Co. v. United States*, 544 F.3d 1289, 1293 (Fed. Cir. 2008).  Although J.D. Irving raised the issue of Commerce's intention to assign it the 2019 AD Deposit Rate in its case brief submitted in the 2019 AD Review, and Commerce responded in the *2019 Final Review Results*, the "true nature" of J.D. Irving's claim is a challenge to the *Cash Deposit Instructions*. Because Commerce's cash deposit instructions are not a reviewable determination under 19 U.S.C. § 1516a(a)(2)(B), jurisdiction under subsection 1581(c) is unavailable.  Consequently, the CIT can entertain J.D. Irving's appeal of the *Cash Deposit Instructions* under 28 U.S.C. § 1581(i).

In *Consol. Bearings*, an importer contested Commerce liquidation instructions directing CBP to assess AD duties at the cash deposit rate in effect at the time of entry.  *See* 348 F.3d at 1001.  Seeking the CIT's residual jurisdiction under 28 U.S.C. § 1581(i), the importer argued that it should have been assigned the AD assessment rate determined by Commerce in the final results of an administrative review – even though the importer did not participate in that review. *See id.*  The Government countered that the CIT lacked jurisdiction because the

importer could have participated in the administrative review to receive the desired AD assessment rate, which would have made jurisdiction under subsection 1581(c) available. *See id.* at 1002. This court disagreed with the Government. The court observed that the importer did not actually challenge the final results of the administrative review, but rather contested Commerce's liquidation instructions – which is "a challenge to the 'administration and enforcement' of those final results." *Id.* at 1002. Liquidation instructions are not a reviewable determination under 19 U.S.C. § 1516a(a) or 28 U.S.C. § 1581(c). Consequently, the court held that the CIT had jurisdiction under § 1581(i). *See Consol. Bearings*, 348 F.3d at 1002–03; *see also* 28 U.S.C. § 1581(i)(1)(B) & (D) (granting the CIT jurisdiction over actions contesting Commerce's "administration and enforcement" of the final results of administrative reviews).

Similarly, in *Am. Signature*, an importer challenged Commerce liquidation instructions that failed to apply (retroactively) corrected dumping rates issued by Commerce in amended preliminary and final determinations of an AD investigation, invoking the CIT's jurisdiction under 28 U.S.C. § 1581(i). *See Am. Signature, Inc. v. United States*, 2007 U.S. App. LEXIS 27709, *3–4 (Fed. Cir. 2007). The Government argued that the importer should have appealed Commerce's final AD determination pursuant to 28 U.S.C. § 1581(c), particularly because Commerce had addressed the substantive issue – whether to apply

(retroactively) amended AD cash deposit rates – in that final determination. *See id.* at *5. This court disagreed, holding that the "true nature" of the importer's claim was a challenge to Commerce's liquidation instructions and that the CIT had jurisdiction under § 1581(i). *See id.* at *5–6 (citing *Consol. Bearings*, 348 F.3d at 1002–03). In doing so, the court concluded that the "true nature of {the importer's} claim remained a challenge to Commerce's liquidation instructions" even though Commerce had addressed the underlying legal issue in the final AD determination. *See id.* ("The mere fact that Commerce addressed the implementation of antidumping rates in its final determination does not make the implementation itself a reviewable determination under § 1516a.").

The principles articulated by the court in *Consol. Bearings* and *Am. Signature* apply here. The "true nature" of J.D. Irving's action is not a challenge to the *2019 Review Final Results*. J.D. Irving does not contest Commerce's calculation of either the final assessment rate or the final cash deposit rate determined for non-selected companies in the 2019 AD Review (11.59%). Nor does J.D. Irving contest any determination affecting imports covered by the 2019 POR. Rather, J.D. Irving challenges Commerce's unlawful assignment of the 2019 AD Deposit Rate to the company (because J.D. Irving already had been assigned a 2020 AD Deposit Rate). Commerce assigns AD deposit rates to subject producers/exporters via cash deposit instructions issued to CBP. Consequently, the

27

"true nature" of J.D. Irving's action is a challenge to the *Cash Deposit Instructions.* Like liquidation instructions, cash deposit instructions pertain to Commerce's implementation – or "administration and enforcement" – of final review results. Moreover, the "true nature" of J.D. Irving's action remains a challenge to Commerce's *Cash Deposit Instructions* even though Commerce addressed whether the 2019 AD Deposit Rate should be applied to J.D. Irving in the final determination of the 2019 AD Review. *See Am. Signature*, 2007 U.S. App. LEXIS 27709 at *5 –6 ("The mere fact that Commerce addressed the implementation of antidumping rates in its final determination does not make the implementation itself a reviewable determination under §1516a."). Because cash deposit instructions are not a reviewable determination under 19 U.S.C. § 1516a(a) or 28 U.S.C. § 1581(c), the CIT has jurisdiction to entertain J.D. Irving's challenge to Commerce's *Cash Deposit Instructions* under § 1581(i).

Below, the CIT held that the "true nature" of J.D. Irving's action is a challenge to the *2019 Review Final Results* because the *Cash Deposit Instructions* were consistent with those final results (with respect to the AD cash deposit rate assigned to J.D. Irving). *See* Appx10-11. Notably, however, the CIT did not account for this court's decisions in *Consol. Bearings* or *Am. Signature*. Instead, the CIT relied upon three prior decisions by the CIT, none of which supports the trade court's conclusion. *See id.* (citing *Parkdale Int'l, Ltd. v. United States*, 491

F. Supp. 2d 1262, 1269 (Ct. Int'l Trade 2007); *Wanxiang Am. Corp. v. United States*, 399 F. Supp. 3d 1323, 1331 & n.11 (Ct. Int'l Trade 2019); *Mittal Canada Inc. v. United States*, 414 F. Supp. 2d 1347, 1353 (Ct. Int'l Trade 2006)).

In particular, in *Parkdale*, the CIT concluded that:

> {W}here the core of a dispute is within § 1581(i), i.e., it relates to a general issue of administration and enforcement policy as to the matters listed in § 1581(i)(1)-(3), § 1581(i) should function according to its terms, unless it is *clear* that another provision of § 1581 applies.

491 F. Supp. 2d at 1268. There, the CIT found jurisdiction under § 1581(i) to review an importer's challenge to Commerce liquidation instructions even though the importer could have raised the issue in an administrative review. *See id.* at 1268–69. The trade court observed that the importer's complaint related to a Commerce policy regarding the AD assessment rate to be applied to unreviewed resellers (the "*Reseller Policy*") – not to any entries covered by the review. *See id.*

> Even assuming, arguendo, . . . {the court reasoned,} . . . that Commerce's response to a case brief could have been construed as part of a determination under 19 U.S.C. § 1516a, application of the *Reseller Policy* was not part of the actual § 1675 review of entries and 28 U.S.C. § 1581(c) jurisdiction is at best unclear.

*Id.* at 1269. Finding jurisdiction under § 1581(i), the CIT concluded that, "{a}t the heart of this case is a claim challenging a general administrative policy setting general liquidation instructions, not a 19 U.S.C. § 1675 determination upon review of entries." *Id.* at 1269.

AMERICAS 123196413

Similarly here, J.D. Irving contests a general Commerce policy. J.D. Irving does not challenge Commerce's *2019 Review Final Results* with respect to any entries covered by the review. Nor does J.D. Irving challenge Commerce's calculations of dumping rates in the review. Rather, J.D. Irving contests Commerce's general policy pertaining to the assignment of AD cash deposit rates, a policy that Commerce implements through the issuance of cash deposit instructions to CBP. Therefore, the "true nature" of J.D. Irving's action is a challenge to Commerce's *Cash Deposit Instructions*, and jurisdiction appropriately lies under 28 U.S.C. § 1581(i).

The other two cases cited by the CIT fail to support the conclusion that the "true nature" of J.D. Irving's action involves Commerce's final determination in the 2019 AD Review. *Wangxian Am.* is inapposite because the case does not involve a challenge to Commerce liquidation or cash deposit instructions. *See* 399 F. Supp. 3d at 1325. Rather, *Wangxian Am.* addressed a challenge to a Commerce memorandum addressed to CBP that neither affected the legal rights of the parties nor constituted a new agency determination. *See id.* at 1329, 1331. *Mittal Canada*, in turn, does not indicate that the CIT has jurisdiction under 28 U.S.C. § 1581(i) to review a challenge to liquidation instructions ***only when*** those instructions are inconsistent with Commerce's final determination. *See* 414 F. Supp. 2d at 1352–53. In finding § 1581(i) jurisdiction, the *Mittal Canada* Court

30

also examined whether the true nature of plaintiff's appeal was a challenge to Commerce's final results in the review (there, a changed circumstances review) or Commerce's liquidation instructions. *See id.* at 1353. Here, as explained above, the true nature of J.D. Irving's action is a challenge to Commerce's *Cash Deposit Instructions*; consequently, the CIT has jurisdiction under § 1581(i).

### B. The CIT Has Jurisdiction under 28 U.S.C. § 1581(i) Because Any Other Procedure Would Be Manifestly Inadequate To Remedy J.D. Irving's Claim

This court has "consistently held that to prevent circumvention of the administrative processes crafted by Congress, jurisdiction under subsection 1581(i) may not be invoked if jurisdiction under another subsection of section 1581 is or could have been available, ***unless*** the other subsection is shown to be ***manifestly inadequate***." *Hartford Fire*, 544 F.3d at 1292(emphasis added) (citing *Int'l Customs Prods., Inc. v. United States*, 467 F.3d 1324, 1327 (Fed. Cir. 2006)). Here, J.D. Irving does not seek to circumvent the judicial or administrative procedures afforded by Congress. Rather, J.D. Irving has no choice but to seek judicial review of Commerce's *Cash Deposit Instructions* by the CIT under § 1581(i) because neither USMCA panel review nor the administrative review process can provide adequate relief for its legal claim: that Commerce unlawfully replaced its 2020 AD Deposit Rate with a 2019 rate, contrary to the statute and Congress's intent. Only the CIT has the authority (1) to order Commerce to

31

reinstate J.D. Irving's lawful AD cash deposit rate retroactively and (2) to prevent Commerce from continuing to misinterpret the statute in a manner that compels J.D. Irving to request AD administrative reviews that would otherwise be unnecessary, contrary to Congress's intent. Anything less would be a manifestly inadequate remedy.

> **1.    Only the CIT has the power to remedy Commerce's unlawful assignment of the 2019 AD Deposit Rate to J.D. Irving through the *Cash Deposit Instructions***

Review by a USMCA panel of the *2019 Review Final Results* would be manifestly inadequate to remedy J.D. Irving's legal claim because such panels lack the equitable or injunctive power to order Commerce to reinstate the company's lawful AD deposit rate retroactively. Recognizing this, the CIT held that J.D. Irving nevertheless could obtain an adequate remedy by participating in AD administrative reviews. This is wrong, however, because J.D. Irving's participation in administrative reviews would do nothing to address Commerce's unlawful assignment of an AD cash deposit rate.

J.D. Irving has raised a novel legal issue in its Complaint to the CIT. J.D. Irving does not contest Commerce's calculation of the Non-Selected Companies Rate in the 2019 AD Review that will be used to assess final AD duties on J.D. Irving's imports of softwood lumber with entry dates during the 2019 POR. Nor does J.D. Irving contest Commerce's calculation of the Non-Selected Companies

AMERICAS 123196413

Rate for purposes of establishing the AD cash deposit rate. Rather, J.D. Irving argues that, because it already had been assigned a 2020 AD Cash Deposit Rate by operation of law under 19 U.S.C. § 1675(a)(2)(C) and 19 C.F.R. § 351.212(c)(1), it was unlawful for Commerce to assign J.D. Irving the AD cash deposit rate calculated in the 2019 AD Review in the first place. *See* Appx46-48. The only adequate remedy for an unlawfully assigned AD cash deposit rate is a retroactive reinstatement of the lawful AD deposit rate. Leaving the unlawful 2019 AD Deposit Rate in place would permit Commerce's legal error to escape judicial review without remedy.

The CIT has the authority to provide the necessary relief; USMCA panels do not. "Like district courts, . . . the Court of International Trade has the inherent power to determine the effect of its judgments and issue injunctions to protect against attempts to attack or evade those judgments." *United States v. Hanover Ins. Co. v. United States*, 82 F.3d 1052, 1054 (Fed. Cir. 1996); 28 U.S.C. § 1585 (granting the CIT "all the powers in law and equity of . . . a district court of the United States"); 28 U.S.C. § 2643(c)(1) ("{T}he Court of International Trade may . . . order any . . . form of relief that is appropriate in a civil action, including, but not limited to, declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition.").

33

In *Cooper Tire*, for example, the CIT exercised its injunctive power to set aside an unlawful AD cash deposit rate and require Commerce to reinstate the lawful AD deposit rate retroactively. *See Cooper Tire & Rubber Co. v. United States*, 217 F. Supp. 3d 1373, 1377, 1384 (Ct. Int'l Trade 2017) ("*Cooper Tire I*") (holding that the AD cash deposit rate assigned to plaintiff was unlawful); *Cooper Tire & Rubber Co. v. United States*, No. 15-00251, 2017 Ct. Intl. Trade LEXIS 131, at *8–10 (Sept. 25, 2017) ("*Cooper Tire II*") (issuing an injunction ordering Commerce to apply the lawful AD cash deposit rate retroactively and to instruct CBP to refund excess cash deposits). Furthermore, the trade court acknowledged that it had the authority to grant the required relief when it denied J.D. Irving's motion for expedited consideration. *See* Appx25.

USMCA panels, in contrast, lack injunctive or equitable powers. *See* 19 U.S.C. § 1516a(g)(5)(C) & (6) (indicating that USMCA panels lack the power to enjoin the liquidation of entries or provide injunctive relief); *see also* North American Free Trade Agreement Implementation Act, S. Rep. No. 103-189, at 47, 220 (1993) (noting that provisions for injunctive relief that apply to the U.S. Court of International Trade "shall not apply" to NAFTA panels); The Implementation Act for the Agreement between the United States of America, the United Mexican States, and Canada (USMCA) H.R. 5430, accompanying Statement of Administrative Action, at 2, 26 (2020) (noting that the laws and regulations

34

relating to dispute settlement of antidumping and countervailing duty cases are already in conformity with the obligations of the USMCA agreement); Stephen J. Powell, *Expanding the NAFTA Chapter 19 Dispute Settlement System: A Way To Declaw Trade Remedy Laws in a Free Trade Area of the Americas?*, 16 LAW & BUS. REV. AM. 217, 232 (2010) (noting that treaty "{p}arties did not give such panels the equity powers that would be necessary to enforce their own decisions"). Lacking injunctive and equitable powers, a USMCA panel would be unable to order Commerce to reinstate retroactively the lawful 2020 AD Deposit Rate. Consequently, review by a USMCA panel would fail to provide meaningful relief for J.D. Irving's legal claim.

Recognizing this, the CIT did ***not*** find that J.D. Irving could obtain an adequate remedy through USMCA panel review of the *2019 Review Final Results*. Instead, the CIT held that § 1581(i) jurisdiction was unavailable because J.D. Irving could challenge Commerce's collection of cash deposits at the 2019 AD Deposit Rate through participation in one or more administrative reviews (covering import entries for which J.D. Irving tendered cash deposits at the 2019 AD Deposit Rate). *See* Appx12-13. Participation in reviews, however, fails to provide ***any*** relief for J.D. Irving's legal claim.

J.D. Irving seeks its day in court to demonstrate that Commerce unlawfully replaced its 2020 AD Deposit Rate with a 2019 rate, contrary to the statute and

AMERICAS 123196413

Congress's intent. Requiring J.D. Irving to participate in AD reviews would fail to address this legal problem. Respondents and importers participate in reviews so that final AD duties are assessed on imports entered during the POR at the respondent's actual dumping rate – as opposed to the estimated dumping rate (*i.e.*, the deposit rate) that applied at the time of entry. *See* 19 U.S.C. § 1675(a)(2)(C). The review procedure, however, would not cure Commerce's assignment of an unlawful AD deposit rate. In an administrative review, Commerce merely establishes a new AD deposit rate (*i.e.*, estimated dumping rate) for entries of subject imports going forward, *see* 19 U.S.C. § 1675(a)(2)(C); Commerce does not retroactively correct a prior AD deposit rate that was unlawfully assigned. Consequently, absent the injunctive relief sought by J.D. Irving, the illegality of the 2019 AD Deposit Rate would be left unaddressed. Commerce's ultimate liquidation of entries to which the 2019 AD Deposit Rate was applied does not remedy Commerce's unlawful assignment of that deposit rate in the first place.

Consider, for example, the following scenario. Commerce conducts an administrative review and calculates a final dumping rate for the respondent subject producer of 5%. Despite this, in a move that would clearly be unlawful, Commerce instructs CBP to collect AD cash deposits at a rate of 1,000%. Although the importer could participate in an administrative review to obtain refunds of overpaid AD cash deposits, CBP's ultimate liquidation of the importer's

entries at a lawful AD assessment rate would fail to remedy Commerce's unlawful assignment of the 1,000% deposit rate.  Commerce was able to assign an unlawful AD deposit rate without consequence, despite the resulting harm to the importer and exporter (with the importer being forced to tender cash deposits at the unlawful 1,000% rate to continue purchasing from the exporter, and the exporter's lost U.S. sales due to the prohibitively high 1,000% rate).  J.D. Irving's situation is no different.

The CIT concluded that J.D. Irving's participation in administrative reviews would not be manifestly inadequate simply because of "the availability of a *preferred* or *more desirable* remedy" (*i.e.*, J.D. Irving's request for a court-ordered injunction).  *See* Appx15.  The CIT's reasoning, however, is unsound.  J.D. Irving does not seek a court-ordered injunction because that remedy is more desirable than participation in reviews.  J.D. Irving seeks an injunction because participation in reviews would fail to remedy Commerce's unlawful assignment of the 2019 AD Deposit Rate at all.  J.D. Irving's participation in reviews would be "manifestly inadequate" to provide relief from Commerce's illegal action.

Citing *Valeo*, the CIT also held that requiring J.D. Irving to pay cash deposits at the 2019 AD Deposit Rate while it participates in administrative reviews would not render the relief manifestly inadequate, because "the payment of cash deposits 'is an ordinary consequence of the statutory scheme.'"  Appx14

(citing *Valeo N. Am., Inc. v. United States*, 277 F. Supp. 3d 1361, 1366 (Ct. Int'l Trade 2017) (quoting *MacMillan Bloedel Ltd. v. United States*, 16 C.I.T. 331, 333 (1992)).  J.D. Irving's claim, however, is that Commerce unlawfully assigned J.D. Irving the 2019 AD Deposit Rate ***in violation of*** the statutory scheme.  This legal claim requires a remedy – one that neither USMCA panels nor Commerce administrative reviews can provide.  Furthermore, whereas in *Valeo* the trade court found that the plaintiffs could "make the identical claim in a case under 19 U.S.C. § 1516a" after Commerce issued its final determination in the underlying AD investigation, requiring J.D. Irving to participate in reviews would mean that Commerce's unlawful assignment of the 2019 AD Deposit Rate would escape judicial review entirely.  *Valeo*, 277 F. Supp. 3d at 1365.

The trade court also cited *Valeo* for the proposition that "exposure to cash deposits is *not a recognized harm . . . .*"  Appx14.  In *Valeo*, however, the CIT made this assertion in the context of finding that the plaintiffs failed to demonstrate that the court had jurisdiction to review their claim under 28 U.S.C. § 1581(i) before Commerce issued the final determination in the underlying antidumping investigation.  *See Valeo*, 277 F. Supp. 3d at 1365–66 n.6.  The *Valeo* Court did ***not*** hold that the tendering of AD cash deposits at an unlawfully assigned rate would fail to constitute an injury in fact.  In other cases, the CIT has recognized that the payment of antidumping or countervailing duty cash deposits constitutes

AMERICAS 123196413

injury in fact.  *See*, *e.g.*, *Ontario Forests Indus. Ass'n v. United States*, 444 F. Supp. 2d 1309, 1323–24 (Ct. Int'l Trade 2006); *Tembec, Inc. v. United States*, 441 F. Supp. 2d 1302, 1312 (Ct. Int'l Trade 2006); *see also Elkem Metals Co. v. United States*, 196 F. Supp. 2d 1367, 1371 (Ct. Int'l Trade 2002) ("Probable economic injury suffices to establish standing.").  Here, as both the exporter and importer, J.D. Irving is suffering economic injury by virtue of being subject to an unlawful AD cash deposit rate that is ten percentage points higher than its lawful AD deposit rate.[3]

Contrary to the CIT's decision below, neither USMCA panel review nor Commerce administrative reviews can provide meaningful relief for J.D. Irving's legal claim.  Consequently, the CIT has jurisdiction under 28 U.S.C. § 1581(i).

### 2.    Only the CIT has the authority to prevent Commerce from continuing to assign AD deposit rates contrary to Congress's intent

J.D. Irving not only seeks a retroactive reinstatement of the lawful 2020 AD Deposit Rate.  J.D. Irving also seeks a binding court ruling to prevent Commerce from continuing to misinterpret 19 U.S.C. § 1675(a).  Absent a binding ruling to this effect, J.D. Irving will be compelled to request unnecessary administrative reviews, contrary to Congress's intent.  USMCA panel decisions do not provide

---

[3] For this reason, J.D. Irving has standing to contest Commerce's *Cash Deposit Instructions* because the company is "adversely affected or aggrieved by agency action within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702.

AMERICAS 123196413

binding precedent, and participation in Commerce reviews perpetuates – rather than addresses – the legal problem.  Consequently, any purported relief from USMCA panel review or Commerce administrative reviews would be manifestly inadequate.

Commerce's practice is to prioritize (1) an AD cash deposit rate calculated in the most recently completed administrative review over (2) an AD cash deposit rate established by operation of 19 C.F.R. § 351.212(c)(1) for a subsequent period of review.  In other words, when Commerce completes an administrative review, it assigns the reviewed respondent the AD deposit rate calculated in that review, even if the respondent already has an AD deposit rate determined for a more recent period in accordance with § 351.212(c)(1) (*i.e.*, because all parties agreed the prevailing AD deposit rate reflected the respondent's dumping margin for the most recent period).

 J.D. Irving's principal legal argument on the merits is that Commerce's practice is inconsistent with 19 U.S.C. § 1675(a) in two respects.  First, Commerce's practice contravenes Congress's express purpose for amending 19 U.S.C. § 1675(a) to require administrative reviews only upon request, which was to reduce the burden on Commerce, respondents, and petitioners alike from having to participate in reviews even when parties are satisfied with existing dumping rates.  *See* Appx43-44, 46-47; H.R. REP. NO. 98-725, at 22-23 (2nd Sess.1984);

AMERICAS 123196413

H.R. REP. NO. 98-1156, at 181 (2ⁿᵈ Sess. 1984).  Contrary to Congress's intent, Commerce's practice compels parties to request administrative reviews that otherwise would be unnecessary due to parties' satisfaction with existing dumping rates.  *See Federal-Mogul*, 822 F. Supp. at 788 (finding that allowing Commerce to "arbitrarily change {the} cash deposit rate . . . {then in force} . . . for unreviewed firms . . . . will have the effect of increasing the number and complexity of administrative reviews thereby defeating the express purpose of the 1984 amendment . . . {to Section 751(a) of the Act}").  Second, Commerce's practice is inconsistent with 19 U.S.C. § 1675(a)(2)(C) (and the implementing regulation, 19 C.F.R. § 351.212(c)(1)), which requires Commerce to assign an AD deposit rate reflecting the same dumping margin on which the AD assessment rate for the most recent period of review is based.  *See* Appx47-48.

J.D. Irving seeks a binding court ruling that Commerce discontinue its unlawful practice, so that J.D. Irving will not be compelled to participate in unnecessary administrative reviews going forward.[4]  USMCA panel decisions,

---

[4] In fact, this scenario already has occurred with respect to the 2021 AD Review. Because of the uncertainty surrounding J.D. Irving's AD deposit rate caused by Commerce's unlawful practice, J.D. Irving was compelled to request an AD review of its entries for the 2021 period of review.  For this reason, J.D. Irving moved that the CIT consider its appeal on an expedited basis, so that the company could make an informed decision of whether to continue to participate before the deadline to withdraw requests for review in early June 2022.  *See* Appx178-80.  Although the CIT denied J.D. Irving's motion for expedited consideration, it also stated that, "should the court rule in plaintiff's favor subsequent to the deadline . . . {for

41

however, are binding only "with respect to the particular matter between the Parties that is before the panel."  USMCA Ch. 10, Art. 10.12, ¶9; *see also* 19 U.S.C. § 1516a(b)(3) ("a court of the United States is not bound by, but may take into consideration, a final decision of a binational panel or extraordinary challenge committee convened pursuant to article 1904 of the Agreement or article 10.12 of the USMCA)"); H. Rep. No. 103-361, at 83 , (1st Sess. 1993) ("The intent of this provision is to make clear that a panel or committee decision is binding only with respect to the particular matter before that panel and does not constitute binding precedent on U.S. courts or other binational panels.").  Consequently, even if a USMCA panel were to hold that Commerce's practice is unlawful, Commerce could disregard the panel's holding and continue to prioritize AD deposit rates calculated for earlier periods over current AD deposit rates established by virtue of the parties' consent.  Consequently, USMCA panel review of J.D. Irving's legal claim would be manifestly inadequate.

The CIT disagreed with this argument, reasoning that, "because a panel decision with respect to any legal issue lacks precedential effect, a panel decision as to any legal issue before it would be manifestly inadequate."  Appx16.  The

---

withdrawal of requests for a 2021 AD review} . . . , plaintiff still will be entitled to the full relief that it requests – the reinstatement of the {1.57}% cash deposit rate as well as a refund, plus interest, of any excess cash deposits provided for entries made on or after December 2, 2021" (the date on which the 2019 AD Deposit rate (11.59%) had become effective).  Appx25.

trade court is wrong.  Take the *2019 Review Final Results*, for example.  In the appeal of that determination before the USMCA panel, parties will make arguments (including legal arguments) concerning the AD assessment rates to be applied to subject imports covered by the 2019 AD Review.  USMCA panel review will not be manifestly inadequate, because, if their arguments are successful, the parties will receive the relief they seek:  changes to the AD assessment rates.

In stark contrast, a USMCA panel's endorsement of J.D. Irving's legal claim would not provide any relief at all.  The USMCA panel would be unable to require Commerce to reinstate retroactively J.D. Irving's lawful AD deposit rate.  Nor would the panel be able to prevent Commerce from maintaining its unlawful practice of replacing agreed-upon AD deposit rates (established under 19 C.F.R. § 351.212(c)(1)) with outdated AD deposit rates calculated in completed administrative reviews for earlier periods.  As a result, Commerce's unlawful assignment of the 2019 AD Deposit Rate to J.D. Irving would be left unremedied, and J.D. Irving would be compelled to participate in administrative reviews even when all parties are satisfied with its existing dumping rate, contrary to Congress's

43

intent. Only the CIT has the power to provide adequate relief for J.D. Irving's legal claim – both retroactively and prospectively.[5]

J.D. Irving's participation in administrative reviews – the alternative remedy deemed adequate by the CIT – would also be manifestly inadequate to provide prospective relief. The CIT "has repeatedly found section 1581(i) jurisdiction in cases where . . . the review that the plaintiff seeks to prevent will have already occurred by the time relief under another provision of section 1581 is available,

---

[5] Appellant acknowledges that U.S. law bars the CIT from granting "declaratory relief" in cases involving antidumping and countervailing duty orders covering goods from a USMCA country (*i.e.*, 28 U.S.C. § 2643(c)(5) ("In any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade country (as defined in section 516A(f)(9) of the Tariff Act of 1930), as determined by the administering authority, the Court of International Trade may not order declaratory relief."); 28 U.S.C. § 2201(a) (same). "Declaratory relief" means prospective relief, which would govern parties' rights in any future dispute concerning the same issue. *See Canadian Wheat Bd. v. United States*, 637 F. Supp. 2d 1329, 1343 (Ct. Int'l Trade 2009). Read in the context of 19 U.S.C. § 1516a(g)(2), which mandates USMCA panel review of agency determinations when requested by interested parties, Congress's purpose for enacting 28 U.S.C. § 2643(c)(5) was apparently to prevent the CIT from usurping the ability of a USMCA panel to decide issues in future appeals of antidumping or countervailing duty determinations involving merchandise from Canada or Mexico. This policy is undisturbed in situations (such as here) where the declaratory relief addresses an issue that a USMCA panel is unable to remedy in the first place. For example, in *Canadian Lumber Trade Alliance*, this court affirmed the CIT's declaratory judgment that CBP must not apply the Byrd Amendment to goods from Canada or Mexico subject to antidumping or countervailing duty orders – an issue a NAFTA panel would have been unable to remedy. *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1325 (Fed. Cir. 2008). Nor is Commerce's unlawful practice of prematurely terminating agreed-upon AD deposit rates in violation of 19 U.S.C. § 1675(a) particular to antidumping or countervailing duty proceedings involving goods from Canada or Mexico.

rendering such relief manifestly inadequate." *Dofasco Inc. v. United States*, 326 F. Supp. 2d 1340, 1346 (Ct. Int'l Trade 2004) (citing, *e.g.*, *Associacao dos Industriais de Cordoaria e Redes v. United States*, 828 F. Supp. 978, 983 (Ct. Int'l Trade 1993); *Asociacion Colombiana de Exportadores de Flores v. United States*, 717 F. Supp. 847, 850 (Ct. Int'l Trade 1989), *aff'd* 903 F.2d 1555 (Fed. Cir. 1990)), *aff'd* 390 F.3d 1370 (Fed. Cir. 2004). Similarly here, J.D. Irving seeks the freedom to decline to participate in unnecessary administrative reviews when all parties are satisfied with its existing AD deposit rate. Participation in unnecessary reviews perpetuates – rather than remedies – the legal problem raised by J.D. Irving.

### C. The CIT Is Not Barred from Exercising Jurisdiction under 28 U.S.C. § 1581(i)(2)(B)

The CIT's jurisdictional statute states that subsection 1581(i) "shall not confer jurisdiction over an antidumping or countervailing duty **determination** which is reviewable by . . . a binational panel under section 516A(g) of the Tariff Act of 1930 (19 U.S.C. 1516a(g))." 28 U.S.C. § 1581(i)(2)(B) (emphasis added). Section 1516a(g)(2), in turn, states that, "{i}f {USMCA} binational panel review of a **determination** is requested{,} . . . (A) the **determination** is not reviewable under {§ 1516a(a)}, and (B) no court of the United States has power or jurisdiction to review the **determination** on any question of law or fact . . . ." 19 U.S.C. § 1516a(g)(2) (emphasis added). Neither provision, however, deprives the CIT of

AMERICAS 123196413

jurisdiction to review J.D. Irving's challenge to the *Cash Deposit Instructions* under 28 U.S.C. § 1581(i) – for two reasons.

First, J.D. Irving does ***not*** challenge a Commerce "determination" that is reviewable by a USMCA panel, such as the *2019 Review Final Results* (for which USMCA panel review has been requested). *See* 19 U.S.C. § 1516a(a)(2)(B)(iii) & 1516a(g)(1) (treating a "final determination under section 1675" as a "determination" reviewable by a USMCA panel). Rather, J.D. Irving contests Commerce's *Cash Deposit Instructions*, which are not identified by the statute as an agency determination reviewable by a binational panel. *See* 19 U.S.C. § 1516a(a)(2)(B)(iii) & 1516a(g)(1). Unlike the appeals of the *2019 Review Final Results* before the USMCA panel, J.D. Irving's appeal does ***not*** concern the final dumping rates calculated by Commerce in the 2019 AD Review or the subject imports covered by the review. Rather, J.D. Irving challenges Commerce's *Cash Deposit Instructions*, which impermissibly direct CBP to replace J.D. Irving's AD cash deposit rate for 2020 with a dumping rate calculated in the 2019 AD Review, contrary to 19 U.S.C. § 1675(a) and 19 C.F.R. § 351.212(c)(1).

Second, both provisions must be interpreted in accord with this court's § 1581(i) jurisprudence, which holds that "Section 1581(i) jurisdiction may not be invoked when jurisdiction under another subsection of § 1581 is or could have been available, ***unless*** the remedy provided under that other subsection would be

manifestly inadequate." *Miller & Co.*, 824 F.2d at 963 (emphasis added).  Here, as established above, review by a USMCA panel would be manifestly inadequate to provide meaningful relief for J.D. Irving's legal claim.  Whereas the legislative history of 28 U.S.C. § 1581(i)(2)(B) indicates that Congress intended to "assure that a litigant cannot invoke the CIT's 'residual jurisdiction' . . . for the purpose of circumventing the binational panel system{,}" S. REP. NO. 100-509, at 35 (1988), J.D. Irving does not seek to circumvent the procedures prescribed by Congress for review.  Rather, J.D. Irving seeks to invoke the CIT's jurisdiction under 28 U.S.C. § 1581(i) because this is the only path available for obtaining meaningful relief – both retroactively and prospectively.  Congress did not intend for USMCA panel review to deprive litigants of meaningful relief for valid legal claims.  *See Parkdale Int'l*, 491 F. Supp. 2d at 1271 ("{M}atters not clearly provided for in § 1581(a)-(h) were intended to fall into § 1581(i) so that no one would be denied an avenue of relief in this general subject matter area.").  This is why Congress established the CIT's § 1581(i) jurisdiction in the first place.

47

## **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

For the foregoing reasons, the trade court wrongly decided to grant the Government's motion to dismiss J.D. Irving's action for lack of subject matter jurisdiction under 28 U.S.C. § 1581(i).  Therefore, J.D. Irving respectfully requests that the Court reverse the CIT's decision and hold that the trade court shall exercise jurisdiction under § 1581(i) to hear J.D. Irving's action.

Respectfully submitted,


/s/ Jay C. Campbell
Walter J. Spak
Jay C. Campbell

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to J.D. Irving, Limited


May 22, 2023

AMERICAS 123196413

**ADDENDUM**

*J.D. Irving, Ltd.  v. United States*

**615 F. Supp. 3d 1323**

**(Appx1-17)**

[ECF No. 27], the Report, the Objections and all related pleadings, the factual record, the applicable law, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. The Report [ECF No. 37] is **REJECTED**.

2. Plaintiff's Motion for Remand [ECF No. 10] is **DENIED**.

**DONE AND ORDERED** in Ft. Lauderdale, Florida, this 18th day of July, 2022.



---

**J.D. IRVING, LIMITED, Plaintiff,**

**v.**

**UNITED STATES and U.S. Department of Commerce, Defendants.**

**Slip Op. 23-10**

**Court No. 21-00641**

United States Court of International Trade.

January 25, 2023

**Background:** Canadian producer filed suit against United States, challenging instructions that Department of Commerce issued to Customs and Border Protection to collect cash deposits on producer's entries at 11.59% rate assigned in prior administrative review of antidumping duty order covering softwood lumber products from Canada. Government moved to dismiss.

**Holdings:** The Court of International Trade, Reif, J., held that:

(1) subject matter jurisdiction could have been available under provision of Court's jurisdictional statute for judicial review of antidumping duties, as basis to preclude jurisdiction under residual jurisdiction provision, and

(2) relief available to producer was not manifestly inadequate, as precluded subject matter jurisdiction under residual jurisdiction provision.

Motion granted.

**1. Customs Duties ⟜10.1**

The binational panel review process of the United States–Mexico–Canada Agreement replaces the forum — not the remedies — available to the parties for purposes of reviewing antidumping and countervailing duty determinations issued by the United States, Canada, and Mexico. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(g).

**2. Customs Duties ⟜84(1)**

Whether court has subject matter jurisdiction to hear action is threshold inquiry.

**3. Customs Duties ⟜84(1)**

Residual jurisdictional provision allows Court of International Trade to take jurisdiction over designated causes of action founded on other provisions of law. 28 U.S.C.A. § 1581(i).

**4. Customs Duties ⟜84(1)**

The scope of the residual jurisdictional provision is strictly limited, and jurisdiction under this provision may not be invoked when jurisdiction under another subsection of the Court of International Trade's jurisdictional statute is or could have been available, unless the relief provided under that other subsection would be manifestly inadequate. 28 U.S.C.A. §§ 1581, 1581(i).

**5. Customs Duties ⟜84(1)**

To determine whether jurisdiction is or could have been available under another subsection of the Court of International Trade's jurisdictional statute, as required for the Court to have jurisdiction under

the residual jurisdiction provision, the Court is required to look to the true nature of the action. 28 U.S.C.A. §§ 1581, 1581(i).

### 6. Customs Duties ⟳84(1)

To determine whether the relief provided under another subsection of the Court of International Trade's jurisdictional statute would be manifestly inadequate, as required for the Court to have jurisdiction under the residual jurisdiction provision, the Court evaluates whether such relief would constitute an exercise in futility, or would be incapable of producing any result; failing utterly of the desired end through intrinsic defect; useless, ineffectual, in vain. 28 U.S.C.A. §§ 1581, 1581(i).

### 7. Customs Duties ⟳84(7)

The party that seeks to invoke the Court of International Trade's jurisdiction bears the burden of demonstrating manifest inadequacy, as required for the Court to have jurisdiction under the residual jurisdiction provision. 28 U.S.C.A. § 1581(i).

### 8. Customs Duties ⟳84(1)

Challenge to Department of Commerce's final results was true nature of Canadian producer's challenge to instructions that Commerce issued to Customs and Border Protection to collect deposits on producer's entries at 11.59% rate assigned in prior administrative review of antidumping duty order covering softwood lumber products from Canada, and thus, subject matter jurisdiction could have been available under provision of Court of International Trade's jurisdictional statute for judicial review of antidumping duties, as basis to preclude jurisdiction under residual jurisdiction provision; Commerce's instructions were consistent with its final results, and there was no discrepancy between Commerce's final results determination and its instructions. Tariff Act of 1930 §§ 516A, 751, 19 U.S.C.A. §§ 1516a, 1675; 28 U.S.C.A. §§ 1581(c), 1581(i).

### 9. Customs Duties ⟳84(1)

Binational review panel under United States–Mexico–Canada Agreement (USMCA) had authority to rule on lawfulness of final determination by Department of Commerce and to remand such determination for further action, and thus, declaratory relief available to Canadian producer was not manifestly inadequate, as precluded subject matter jurisdiction under residual jurisdiction provision of Court of International Trade's jurisdictional statute, in producer's challenge to Commerce's instructions to Customs and Border Protection to collect cash deposits on producer's entries at 11.59% rate assigned in prior administrative review of antidumping duty order covering softwood lumber products from Canada; producer was interested person capable of participating in panel proceedings. Tariff Act of 1930 § 516A, 19 U.S.C.A. §§ 1516a(g), 1516a(g)(7)(A); 28 U.S.C.A. § 1581(i).

### 10. Customs Duties ⟳84(1)

Although binational review panel under United States–Mexico–Canada Agreement (USMCA) lacked equitable powers, Canadian producer had ability to initiate additional administrative challenges to attempt to obtain refund for any excess cash deposits made in accordance with Department of Commerce's instructions to Customs and Border Protection to collect cash deposits at rate assigned in prior administrative review of antidumping duty order covering softwood lumber products from Canada, and thus, relief available to producer was not manifestly inadequate, as precluded subject matter jurisdiction under residual jurisdiction provision, in producer's challenge to instructions; producer could obtain refund plus interest for any excess payment, and producer was not entitled to more desirable remedy. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(g); 28 U.S.C.A. §§ 1581(c), 1581(i).

Jay C. Campbell, White and Case LLP, of Washington, D.C., argued for plaintiff J.D. Irving, Limited. With him on the brief were Walter J. Spak and Cristina M. Cornejo.

Kelly A. Krystyniak, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendants United States and the U.S. Department of Commerce. With her on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Claudia Burke, Assistant Director. Of counsel on the briefs was Paul K. Keith, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

## OPINION

REIF, Judge:

J.D. Irving, Limited ("plaintiff" or "J.D. Irving") brings the instant action to "contest[ ] the antidumping duty ("AD") cash deposit instructions issued by the U.S. Department of Commerce ("Commerce") to U.S. Customs and Border Protection [("Customs")] following publication of the final results of the 2019 administrative review of the AD duty order on certain softwood lumber products from Canada." Compl. ¶ 1, ECF No. 4; *see* Cash Deposit Instructions for Certain Softwood Lumber from Canada, Message No. 1343410 (A-122-857) (Dec. 9, 2021) (Compl. Attach. 1) ("Commerce's Cash Deposit Instructions"); *Certain Softwood Lumber Products from Canada: Antidumping Duty Order and Partial Amended Final Determination* ("*Softwood Lumber Order*"), 83 Fed. Reg. 350 (Dep't of Commerce Jan. 3, 2018). The United States and Commerce (collectively, "defendants") move to dismiss the instant action pursuant to Rules 12(b)(1) and 12(b)(6) of the U.S. Court of International Trade ("USCIT" or the "Court"). *See* Def.'s Mot. to Dismiss ("Defs. Br."), ECF No. 16; Def.'s Reply in Support of Its Mot. to Dismiss ("Defs. Reply Br."), ECF No. 18; *see also* Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss ("Pl. Br."), ECF No. 17. For the reasons discussed below, the court grants defendants' motion to dismiss for lack of subject matter jurisdiction pursuant to USCIT Rule 12(b)(1).

## BACKGROUND

J.D. Irving is a Canadian producer and exporter of merchandise subject to the Softwood Lumber Order, as well as the importer of record of that merchandise. Compl. ¶ 8. Commerce published the Softwood Lumber Order on January 3, 2018. *See Softwood Lumber Order*, 83 Fed. Reg. 350.

On April 1, 2019, Commerce initiated a first administrative review ("AR 1") of the Softwood Lumber Order. *Certain Softwood Lumber Products from Canada: Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 12,209, 12,209-10 (Dep't of Commerce Apr. 1, 2019) (initiation notice). AR 1 covered entries of subject merchandise made between June 30, 2017, and December 31, 2018. *Certain Softwood Lumber Products from Canada: Final Results of Antidumping Duty Administrative Review; 2017-2018* ("*AR 1 Final Results*"), 85 Fed. Reg. 76,519, 76,519-20 (Dep't of Commerce Nov. 30, 2020). J.D. Irving was not selected as a mandatory respondent in this review. Accordingly, upon the publication of the AR 1 Final Results on November 30, 2020, Commerce assigned to J.D. Irving the non-selected companies' assessment rate of 1.57%. *See id.* at 76,520-21. Pursuant to section 751(a)(2)(C) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675(a)(2)(C) (2018),[1] Commerce instruct-

---

**1.** References to the U.S. Code are to the 2018    edition. Further citations to the Tariff Act of

ed Customs to collect at this 1.57% rate cash deposits on J.D. Irving's entries made on or after the publication date of the AR 1 Final Results. *See id.* at 76,520.

On March 10, 2020, Commerce initiated a second administrative review ("AR 2") of the Softwood Lumber Order. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 13,860, 13,862 (Dep't of Commerce Mar. 10, 2020) (initiation notice). AR 2 covered entries made between January 1, 2019, and December 31, 2019. *Certain Softwood Lumber Products from Canada: Final Results of Antidumping Duty Administrative Review, 2019* ("*AR 2 Final Results*"), 86 Fed. Reg. 68,471, 68,471-73 (Dep't of Commerce Dec. 2, 2021). J.D. Irving was not selected as a mandatory respondent in this review. Upon the publication of the AR 2 Final Results on December 2, 2021, Commerce assigned to J.D. Irving the non-selected companies' assessment rate of 11.59%. *See id.* at 68,472-73. Commerce instructed Customs to collect at this 11.59% rate cash deposits on J.D. Irving's entries made on or after December 2, 2021, the publication date of the AR 2 Final Results. *See id.* at 68,473; Commerce's Cash Deposit Instructions.

Following Commerce's initiation of an AR 2 on March 10, 2020, and *prior* to Commerce's publication of the AR 2 Final Results on December 2, 2021, Commerce initiated a third administrative review ("AR 3") of the Softwood Lumber Order. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 12,599, 12,601 (Dep't of Commerce Mar. 4, 2021) (initiation notice). On March 4, 2021, Commerce initiated an AR 3, which covered entries made between January 1, 2020, and December 31, 2020. *Id.*

In contrast with AR 1 and AR 2, no party requested that Commerce review J.D. Irving's entries that would have been subject to an AR 3. *See id.* at 12,603; Compl. ¶ 17. Accordingly, Commerce instructed Customs to liquidate J.D. Irving's entries that would have been subject to an AR 3 at the 1.57% rate then in effect, which had been assigned to J.D. Irving in the AR 1 Final Results. *See* Automatic Liquidation Instructions for Certain Softwood Lumber Products for the Period 01/01/2020 Through 12/31/2020, Message No. 1106404 (A-122-857) (Apr. 16, 2021) (Compl. Attach. 7) ("Automatic Liquidation Instructions"); *AR 1 Final Results*, 85 Fed. Reg. at 76,520; 19 C.F.R. § 351.212(c)(1)(i). In addition, Commerce instructed Customs to continue to collect cash deposits on J.D. Irving's entries at this 1.57% rate. *See* 19 C.F.R. § 351.212(c)(1)(ii) ("If [Commerce] does not receive a timely request for an administrative review . . . [Commerce] . . . will instruct [Customs] to . . . continue to collect the cash deposits previously ordered."); Automatic Liquidation Instructions; Cash Deposit Instructions for Certain Softwood Lumber Product from Canada, Message No. 0343402 (A-122-857) (Dec. 8, 2020).

On January 31, 2022, J.D. Irving requested that Commerce review J.D. Irving's entries subject to a fourth administrative review ("AR 4") of the Softwood Lumber Order. *See* Letter from White & Case LLP, to Sec'y of Commerce re: Certain Softwood Lumber Products from Canada: Request for Administrative Review for J.D. Irving, Limited, Pub. Doc. No. 4207148-01 (A-122-857) (Jan. 31, 2022). On March 9, 2022, Commerce initiated an AR 4, which covers entries made between January 1, 2021, and December 31, 2021. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed.

---

1930, as amended, are to the relevant por-        tions of Title 19 of the U.S. Code.

Reg. 13,252, 13,252-54 (Dep't of Commerce Mar. 9, 2022) (initiation notice).

Plaintiff alleges in the instant action that "Commerce acted arbitrarily and in a manner inconsistent with Congress'[ ] intent when it replaced" the 1.57% cash deposit rate assigned to J.D. Irving following its decision not to request an AR 3, with the 11.59% rate assigned to J.D. Irving in connection with the earlier AR 2. Compl. ¶ 27. According to plaintiff, Commerce's decision to replace the 1.57% rate with the 11.59% rate "calculated for an *earlier* period . . . injects uncertainty into the review-request process" and contravenes 19 U.S.C. § 1675 as well as Commerce's regulations. *Id.* ¶ 19 (emphasis in original).

Plaintiff filed its complaint on December 30, 2021, asserting that the court has subject matter jurisdiction under 28 U.S.C. § 1581(i) to hear the instant action. *Id.* ¶ 2. In its complaint, plaintiff alleges that "[n]ormally, the court would have jurisdiction to review [plaintiff's] claim — and to grant the relief [that plaintiff] seeks — under 28 U.S.C. § 1581(c)." *Id.* ¶ 4. However, on December 28, 2021 — two days prior to plaintiff's filing of the complaint — other interested parties requested binational panel review of the AR 2 Final Results pursuant to Article 10.12 of the United States–Mexico–Canada Agreement ("USMCA"),[2] thereby providing a binational panel with "exclusive review" of the AR 2 Final Results pursuant to 19 U.S.C. § 1516a(g)(2). *Id.* ¶ 5; *see* Letter from McDermott Will & Emery LLP et al., to USMCA Secretariat, U.S. Sec'y, re: Request for Panel Review of Second Affirmative Antidumping Duty Administrative Review of Certain Softwood Lumber Prod-

ucts from Canada (Dec. 28, 2021) (Compl. Attach. 5) ("Request for Panel Review").

On March 4, 2022, defendants moved to dismiss the instant action, to which plaintiff responded in opposition on March 14, 2022. *See generally* Defs. Br.; Pl. Br.; Defs. Reply Br. On May 2, 2022, the court denied plaintiff's motion to expedite the briefing and consideration of the instant action. *J.D. Irving, Ltd. v. United States*, 46 CIT ——, 570 F. Supp. 3d 1349 (2022).

## LEGAL FRAMEWORK

### I. Binational panel review under the United States–Mexico–Canada Agreement

On July 1, 2020, the USMCA entered into force, superseding the North American Free Trade Agreement ("NAFTA"). *See supra* note 2; United States–Mexico–Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020). Article 10.12 of the USMCA, "like NAFTA Article 1904, provides a dispute settlement mechanism for purposes of reviewing antidumping and countervailing duty determinations issued by the United States, Canada, and Mexico." *Procedures and Rules for Article 10.12 of the United States–Mexico–Canada Agreement* ("*USMCA Procedures and Rules*"), 86 Fed. Reg. 70,045, 70,045 (Dep't of Commerce Dec. 9, 2021). The procedures and rules set forth in Article 10.12 of the USMCA are "virtually unchanged" from those in Article 1904 of the NAFTA. *Id.*

Article 10.12 of the USMCA provides that a binational panel "may uphold a final determination" by Commerce "or remand [the determination] for action not inconsistent with the panel's decision." USMCA,

---

**2.** United States–Mexico–Canada Agreement, art. 10.12 ¶¶ 2, 8, 9, July 1, 2020, Off. of the U.S. Trade Rep., https://ustr.gov/trade-agreements/free-trade-agreements/unitedstates-mexico-canada-agreement/agreement-between; Annex II, Rules of Procedure for Article 10.12 (Binational Panel Reviews) ("*Art. 10.12 Rules of Procedure*"), R. 76 ¶ 1, Off. of the U.S. Trade Rep., https://ustr.gov/sites/default/files/files/agreements/usmca/AnnexIIRulesProcedureUSMCABinational Panels.pdf (last visited Jan. 20, 2022).

art. 10.12 ¶ 8. In addition, "[t]he decision of a panel . . . shall be binding on the involved Parties with respect to the particular matter . . . that is before the panel." *Id.* ¶ 9. Further, and pursuant to Article 10.12 ¶ 14 of the USMCA, the USMCA Free Trade Commission has adopted Rules of Procedure that are "applicable to all binational panel reviews under the USMCA." *USMCA Procedures and Rules*, 86 Fed. Reg. at 70,045; *see* USMCA, art. 10.12 ¶ 14. Rule 12 provides that "panel review shall be limited to . . . the allegations of error of fact or law . . . that are set out in the Complaints filed in the panel review. . . ." *Art. 10.12 Rules of Procedure*, R. 12(a). Rule 77 provides that subsequent to a panel decision that remands to Commerce a challenged determination, Commerce shall "give notice of the action taken pursuant to a remand of the panel by filing . . . a Determination on Remand within the time specified by the panel." *Id.* R. 77 ¶ 1.

[1] 19 U.S.C. § 1516a(g) codifies into U.S. law the binational panel review process set forth in Article 10.12 of the USMCA. 19 U.S.C. § 1516a(g)(2) provides:

(2) EXCLUSIVE REVIEW OF DETERMINATION BY BINATIONAL PANELS. If binational panel

review of a determination is requested pursuant to . . . article 10.12 of the USMCA, then . . . —

(A) the determination is not reviewable under [19 U.S.C. § 1516a(a)], and

(B) no court of the United States has power or jurisdiction to review the determination on any question of law or fact by an action in the nature of mandamus or otherwise.

19 U.S.C. § 1516a(g)(2)(A)–(B). "[T]he binational panel process replaces the forum — not the remedies — available to the parties." *Bldg. Sys. de Mexico, S.A. de C.V. v. United States*, 44 CIT ——, ——, 476 F. Supp. 3d 1401, 1410 (2020); *see* S. Rep. No. 100-509, at 31 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 2395, 2426 ("Because binational panels act as a substitute for U.S. courts in deciding whether a determination is consistent with U.S. law, the Committee intends binational panel decisions to be implemented in the same manner that court decisions are implemented under current law.").

Several exceptions to the exclusive review of a determination by a binational panel are set forth in 19 U.S.C. § 1516a(g)(3) and (4).[3] Further, the statute

---

**3.** 19 U.S.C. § 1516a(g)(3) provides:

(3) EXCEPTION TO EXCLUSIVE BINATIONAL PANEL REVIEW

(A) In general. A determination is reviewable under [19 U.S.C. § 1516a(a)] if the determination sought to be reviewed is —

(i) a determination as to which neither the United States nor the relevant FTA country requested review by a binational panel pursuant to . . . article 10.12 of the USMCA;

(ii) a revised determination issued as a direct result of judicial review, commenced pursuant to [19 U.S.C. § 1516a(a)], if neither the United States nor the relevant FTA country requested review of the original determination;

(iii) a determination issued as a direct result of judicial review that was commenced pursuant to [19 U.S.C.

§ 1516a(a)] prior to the entry into force of the . . . USMCA;

(iv) a determination which a binational panel has determined is not reviewable by the binational panel;

(v) a determination as to which binational panel review has terminated pursuant to article 10.13 of the USMCA; or

(vi) a determination as to which extraordinary challenge committee review has terminated pursuant to article 10.13 of the USMCA.

19 U.S.C. § 1516a(g)(A)(i)–(vi). Further, 19 U.S.C. § 1516a(g)(4) provides for certain exceptions with respect to actions that raise constitutional issues. *See Mitsubishi Elecs. Indus. Canada, Inc. v. Brown*, 20 C.I.T. 313, 316, 917 F. Supp. 836, 838 (1996). There is no indication — nor do the parties assert — that any of the foregoing exceptions apply with respect to the instant action.

defines "determination" with reference to the "[r]eviewable determinations" enumerated in 19 U.S.C. § 1516a(a)(2)(B), as including "a final determination . . . by [Commerce] . . . under section 1675" of Title 19 of the U.S. Code — *i.e.*, Commerce's final results with respect to the administrative review of an AD or CVD order. 19 U.S.C. § 1516a(a)(2)(B)(iii); 19 U.S.C. § 1675; *cf. Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1304, 1309-10 (Fed. Cir. 2004) (stating that reviewable determinations under 19 U.S.C. § 1516a(a)(2)(B) include Commerce's "final results" of an administrative review).

## II. Subject matter jurisdiction of the Court under 28 U.S.C. § 1581(i)

**[2–4]** Whether a court has subject matter jurisdiction to hear an action is a "threshold" inquiry. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). 28 U.S.C. § 1581(i) is the Court's "residual" jurisdictional provision, *Fujitsu Gen. Am., Inc. v. United States*, 283 F.3d 1364, 1371 (Fed. Cir. 2002) (citing *Conoco, Inc. v. United States Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1584 n.4 (Fed. Cir. 1994)), which allows the Court to "take jurisdiction over designated causes of action founded on other provisions of law." *Norcal/Crosetti Foods, Inc. v. United States*, 963 F.2d 356, 359 (Fed. Cir. 1992) (citation omitted). The Court previously has stated that 28 U.S.C. § 1581(i) constitutes "a Congressional fail-safe device" and that "[i]f the circumstances of a case are sufficiently unusual so that one may presume that Congress could not have provided for such a case under the general language of 19 U.S.C. § 1516a . . . 28 U.S.C. § 1581(i) is available to afford a means of vindication of statutory rights." *Hylsa, S.A. de C.V. v. United States*, 21 C.I.T. 222, 227-28, 960 F. Supp. 320, 324 (1997), *aff'd sub nom. Hylsa, S.A. v. Tuberia Nat., S.A.*, 135 F.3d 778 (Fed. Cir. 1998). However, the "scope" of 28 U.S.C. § 1581(i) is "strictly limited," *Norcal/Crosetti*, 963 F.2d at 359, and jurisdiction under this provision "may not be invoked when jurisdiction under another [sub]section of § 1581 *is or could have been available*, unless the relief provided under that other subsection would be manifestly inadequate." *Consol. Bearings Co. v. United States*, 25 C.I.T. 546, 549, 166 F. Supp. 2d 580, 583 (2001) (emphasis in original) (quoting *Ad Hoc Comm. of Fla. Producers of Gray Portland Cement v. United States*, 22 C.I.T. 902, 906, 25 F. Supp. 2d 352, 357 (1998)) (internal quotation marks omitted).

**[5–7]** To determine whether jurisdiction "is or could have been available" under another subsection of 28 U.S.C. § 1581, the Court is required to "look to the true nature of the action." *Hartford Fire Ins. Co. v. United States*, 544 F.3d 1289, 1292-93 (Fed. Cir. 2008); *cf. Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1355 (Fed. Cir. 2006) ("[A] party may not expand a court's jurisdiction by creative pleading."); *Sunpreme Inc. v. United States*, 892 F.3d 1186, 1191, 1193-94 (Fed. Cir. 2018) (concluding that the plaintiff's "characterization of its appeal . . . [was] unavailing" in view of the nature of the relief that the plaintiff sought in its complaint and, consequently, that the court lacked jurisdiction under 28 U.S.C. § 1581(i)). Further, to determine whether the relief provided under another subsection would be "manifestly inadequate," the Court evaluates whether such relief would constitute an "exercise in *futility*, or [would be] 'incapable of producing any result; failing utterly of the desired end through intrinsic defect; useless, ineffectual, [in] vain.'" *Hartford Fire*, 544 F.3d at 1294 (emphasis in original) (quoting OxFORD ENGLISH DICTIONARY (2d ed. 1989)). The party that seeks to invoke the Court's jurisdiction "bears the burden of demon-

strating manifest inadequacy." *Intercontinental Chems., LLC v. United States*, 44 CIT ——, ——, 483 F. Supp. 3d 1232, 1241 (2020) (citing *Miller & Co. v. United States*, 824 F.2d 961, 964 (Fed. Cir. 1987)).

With respect to the binational review process set forth in Article 10.12 of the USMCA, 28 U.S.C. § 1581(i)(2) provides that the Court's jurisdictional statute "shall *not* confer jurisdiction over [a] . . . determination which is reviewable by . . . a binational panel under [19 U.S.C. § 1516a(g)]." 28 U.S.C. § 1581(i)(2)(B) (emphasis supplied). The legislative history of 28 U.S.C. § 1581(i)(2) indicates that Congress amended the Court's jurisdictional statute to "assure that a litigant *cannot* invoke the CIT's 'residual jurisdiction' . . . for the purpose of circumventing the binational panel system." S. Rep. 100-509, at 35 (emphasis supplied). The legislative history indicates further that Congress intended for the amendment to "clarify" the "precise scope of the 'residual jurisdiction' authority" with respect to determinations that are "reviewable" by a binational panel so that it is clear that the Court's residual jurisdiction does not apply to those determinations. *Id.*; H.R. Rep. 103-361, 86 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 2552, 2636. Consequently, if a determination is reviewable by a binational panel, 28 U.S.C. § 1581(i) "shall not confer jurisdiction" over the determination. 28 U.S.C. § 1581(i)(2)(B); *see* 19 U.S.C. § 1516a(g); *Bhullar v. United States*, 27 C.I.T. 532, 544, 259 F. Supp. 2d 1332, 1341-42 (2003), *aff'd*, 93 F. App'x 218 (Fed. Cir. 2004).

## DISCUSSION

### I. Positions of the parties

Defendants argue that the court lacks subject matter jurisdiction under 28 U.S.C. § 1581(i) to hear the instant action. *See* Defs. Br. at 6-10. To start, defendants contend that jurisdiction "is or could have been available" under 28 U.S.C. § 1581(c).

*Id.* at 10. According to defendants, the instant action concerns a "[d]etermination that would have been properly reviewable pursuant to section 1581(c), but for a request for binational panel review of the determination." *Id.* at 1, 10; *see* Request for Panel Review. Defendants argue also that plaintiff characterizes inaccurately the instant action as involving a challenge to Commerce's Cash Deposit Instructions. *See* Defs. Reply Br. at 4. According to defendants, plaintiff "attempts to create a distinction where none exists: Commerce's instructions to [Customs] implementing Commerce's determination [in the AR 2 Final Results] are not — in and of themselves — a separate determination." *Id.*

Defendants contend further that the relief provided to plaintiff under 28 U.S.C. § 1581(c) would not be "manifestly inadequate." Defs. Br. at 9; *see* Defs. Reply Br. at 4. Defendants argue that the "true nature" of the instant action is "twofold": (1) "a challenge to the issue [that J.D. Irving] raised in [AR 2] — that Commerce ruled upon and that is now on review with a binational panel"; and (2) "a challenge to the cash deposit rate currently being applied to [J.D. Irving's] new entries" made on or after December 2, 2021. Defs. Reply Br. at 4. Defendants maintain that plaintiff can obtain a remedy that is not manifestly inadequate through a favorable binational panel decision as to Commerce's determination in the AR 2 Final Results and "any additional administrative review challenges" with respect to the cash deposits collected on J.D. Irving's entries made on or after December 2, 2021. *Id.* Consequently, defendants argue that the court lacks subject matter jurisdiction under 28 U.S.C. § 1581(i) and should dismiss the instant action. *See* Defs. Br. at 6-10.

Plaintiff argues that the court has subject matter jurisdiction under 28 U.S.C. § 1581(i) to hear the instant action. *See* Pl.

Br. at 1-2. Plaintiff argues that subject matter jurisdiction "is or could have been available" under 28 U.S.C. § 1581(c). Compl. ¶ 5; *see* Pl. Br. at 7; *Intercontinental Chems.*, 44 CIT at ——, 483 F. Supp. 3d at 1236 (citation omitted). Plaintiff maintains separately that the Court has jurisdiction over the instant action because the action involves "a challenge to Commerce's 'administration and enforcement' of [the AR 2 Final Results] through its issuance of Cash Deposit Instructions to [Customs] . . . for which jurisdiction lies under 28 U.S.C. § 1581(i)(1)(D)." Pl. Br. at 9 (citations omitted).

Plaintiff contends further that any relief provided under 28 U.S.C. § 1581(c) would be "manifestly inadequate" because the binational panel "lack[s] equitable or injunctive powers" to order "Commerce to instruct [Customs] to reinstate J.D. Irving's lawful AD cash deposit rate retroactively as of December 2, 2021." *Id.* at 6 (citing Compl. ¶¶ 2-7), 13 n.4, 14; *see* Oral Arg. Tr. at 13:02-08, ECF No. 23. Consequently, plaintiff argues that it "could not obtain meaningful relief through USMCA binational panel review of the [AR 2 Final Results]," as the binational panel "would be unable to order Commerce to instruct [Customs] to reinstate J.D. Irving's [AR 3] AD cash deposit rate *retroactively*, depriving J.D. Irving of relief from Commerce's unlawful decision to replace [the AR 3] rate with an AD cash deposit rate for [AR 2]." Pl. Br. at 8 (emphasis in original). Plaintiff contends also that the relief provided through a challenge in one or more ARs to the cash deposit rate applied to J.D. Irving's entries made on or after December 2, 2021, would be manifestly inadequate because the court would not be able to provide plaintiff with its requested injunctive relief while a binational panel decision would not even have precedential effect. *See id.* at 7-8; Oral Arg. Tr. at 13:02-08, 16:01-09, 21-25; *cf.* 19 U.S.C. § 1516a(b)(3). Consequently, plaintiff argues that the court has subject matter jurisdiction under 28 U.S.C. § 1581(i) and should deny defendants' motion to dismiss. *See* Pl. Br. at 1-2.

## II. Analysis

The court concludes that it lacks subject matter jurisdiction under 28 U.S.C. § 1581(i) to hear the instant action and grants defendants' motion to dismiss pursuant to USCIT Rule 12(b)(1). Accordingly, the court does not address defendants' motion with respect to plaintiff's standing or defendants' motion to dismiss pursuant to USCIT Rule 12(b)(6) for failure to state a claim, as dismissal for lack of subject matter jurisdiction renders these issues moot. *See Intercontinental Chems.*, 44 CIT at ——, 483 F. Supp. 3d at 1235; *MS Solar Invs., LLC v. United States*, Slip Op. 22-140, 605 F.Supp.3d 1372, 1375–76 (CIT 2022) (quoting *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)).

### A. Whether subject matter jurisdiction to hear the instant action "is or could have been available" under 28 U.S.C. § 1581(c)

[8] The court concludes that subject matter jurisdiction to hear the instant action "is or could have been available" under 28 U.S.C. § 1581(c), *but for* the decision by interested parties to request binational panel review of the AR 2 Final Results pursuant to Article 10.12 of the USMCA. *Intercontinental Chems.*, 44 CIT at ——, 483 F. Supp. 3d at 1236 (citation omitted); *see* Request for Panel Review. 28 U.S.C. § 1581(c) provides the Court with subject matter jurisdiction with respect to "any civil action commenced under [19 U.S.C. § 1516a]." 28 U.S.C. § 1581(c). Further, 19 U.S.C. § 1516a(a)(2)(B)(iii) provides that "[a] final determination . . . by [Commerce] . . . under [19 U.S.C. § 1675]" constitutes

a "[r]eviewable determination[ ]" under 28 U.S.C. § 1581(c). 19 U.S.C. § 1516a(a)(2)(B)(iii). Commerce published the AR 2 Final Results pursuant to 19 U.S.C. § 1675. *See AR 2 Final Results*, 86 Fed. Reg. at 68,472-73; 19 U.S.C. § 1675(a)(1). Therefore, as noted, subject matter jurisdiction to hear the instant action, which involves plaintiff's challenge to Commerce's determination in the AR 2 Final Results, not the "administration and enforcement" of that determination as those relate to Commerce's Cash Deposit Instructions — "could have been available" under 28 U.S.C. § 1581(c). *See AR 2 Final Results*, 86 Fed. Reg. 68,471 and accompanying Issues and Decision Memorandum (Dep't of Commerce Nov. 23, 2021) at 41-42; Compl. ¶ 5.

The instant action involves a challenge to Commerce's determination in the AR 2 Final Results notwithstanding plaintiff's characterization of the challenge as relating to Commerce's Cash Deposit Instructions. *See* Pl. Br. at 8-9. The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has stated that the Court is required to "look to the true nature of the action" to determine whether jurisdiction would be available under another subsection of 28 U.S.C. § 1581. *Hartford Fire*, 544 F.3d at 1293. The Court has applied this guidance in the context of disputes similar to that in the instant case as to whether the "true nature" of an action involves a final determination by Commerce or Commerce's instructions to Customs with respect to the "administration and enforcement" of such a determination. *See, e.g., Mittal Canada, Inc. v. United States*, 30 C.I.T. 154, 414 F. Supp. 2d 1347 (2006); *Wanxiang Am. Corp. v. United States*, 43 CIT ——, 399 F. Supp. 3d 1323 (2019); *Parkdale Int'l, Ltd. v. United States*, 31 C.I.T. 720, 725, 491 F. Supp. 2d 1262, 1269 (2007) ("The general rule appears to be that liquidation instructions lead to § 1581(i) jurisdiction *unless*

*they directly implement* a 19 U.S.C. § 1516a determination, such as the final results of an administrative review under § 1675." (emphasis supplied)). In these decisions, the Court has concluded that the "true nature" of an action involves Commerce's instructions to Customs in circumstances in which the instructions are *inconsistent with* or *contain a legal error that is distinct from* Commerce's determination. *Compare Mittal Canada*, 30 C.I.T. at 160-61, 414 F. Supp. 2d at 1353 (stating that the action concerned whether "Commerce's liquidation instructions contravene[d] the Final Results" and, consequently, that the plaintiff "ha[d] defined its claim such that the Court ha[d] jurisdiction" under 28 U.S.C. § 1581(i)), *with Wanxiang*, 43 CIT at —— & n.11, 399 F. Supp. 3d at 1331 & n.11 (concluding that the contested guidance of Commerce "reiterated — … rather than deviat[ed] from — the results of the administrative reviews" and, consequently, that the plaintiff could have brought the action under 28 U.S.C. § 1581(c)), *and Intercontinental Chems.*, 44 CIT at ——, 483 F. Supp. 3d at 1240 ("Plaintiff argues that the issue is with the liquidation instructions, but these instructions are based — and not inconsistently — on the Final Results; the underlying issue is therefore not with the liquidation instructions but with the Final Results.").

No inconsistency is present here. Commerce's Cash Deposit Instructions are consistent with Commerce's determination in the AR 2 Final Results. The record does not indicate that there is any "discrepancy" between Commerce's determination in the AR 2 Final Results with respect to the cash deposit rate assigned to J.D. Irving and Commerce's instructions to Customs. *Intercontinental Chems.*, 44 CIT at ——, 483 F. Supp. 3d at 1240. Rather, Commerce's instructions implement the AR 2 Final Results in accordance with Com-

merce's determination. *See id.* Accordingly, the "true nature" of plaintiff's challenge in the instant action involves Commerce's determination in the AR 2 Final Results, *not* Commerce's instructions to Customs. *Hartford Fire*, 544 F.3d at 1293.

Consequently, subject matter jurisdiction for this Court to hear plaintiff's challenge with respect to the AR 2 Final Results "could have been available" under 28 U.S.C. § 1581(c), *but for* the binational panel review that now is underway. *Intercontinental Chems.*, 44 CIT at ——, 483 F. Supp. 3d at 1236 (citation omitted); *see* Request for Panel Review.

**B. Whether the relief provided to plaintiff would be "manifestly inadequate"**

The court concludes next that plaintiff does not meet its burden to demonstrate the manifest inadequacy of the relief available "either in this court under 28 U.S.C. § 1581(c) or before a binational panel" pursuant to Article 10.12 of the USMCA. *Hylsa v. United States (Hylsa II)*, 22 CIT 44, 46 (1998), *dismissed sub nom. HYLSA, S.A. de C.V. v. United States*, 185 F.3d 881 (Fed. Cir. 1999), *and dismissed sub nom. HYLSA, S.A. de C.V. v. United States*, 185 F.3d 881 (Fed. Cir. 1999); *see Miller & Co.*, 824 F.2d at 963 ("[T]he party asserting § 1581(i) jurisdiction has the burden to show how [the] remedy would be manifestly inadequate."); S. Rep. 100-509, at 35 (indicating that Congress "amend[ed] [28 U.S.C. § 1581(i)] to clarify that [this] section may not be used to review an antidumping or countervailing duty determination which is reviewable by the CIT under section [19 U.S.C. § 1516a(a)] or by a

binational panel under [19 U.S.C. § 1516a(g)]"). In the instant action, plaintiff requests the following relief with respect to its challenge to Commerce's determination: (1) declaratory relief as to the lawfulness of the cash deposit rate assigned to J.D. Irving; and (2) the retroactive reinstatement of the 1.57% rate and the refund of excess cash deposits collected on entries made on or after December 2, 2021. *See* Compl. at 17. The court addresses each request in sequence.

**1. Plaintiff's request for declaratory relief**

[9] The court addresses first plaintiff's request for declaratory relief. *See id.* The binational panel has the authority to reach a decision as to the lawfulness of Commerce's determination with respect to the cash deposit rate assigned to J.D. Irving.[4] Article 10.12 ¶ 8 of the USMCA provides that "[t]he panel may uphold a final determination [by Commerce] . . . or remand it for action not inconsistent with the panel's decision." USMCA, art. 10.12 ¶ 8. Further, 19 U.S.C. § 1516a(g)(7)(A) provides that "[i]f a determination is referred to a binational panel . . . and the panel . . . makes a decision remanding the determination . . . [Commerce] . . . shall, within the period specified by the panel . . . take action not inconsistent with the decision of the panel." 19 U.S.C. § 1516a(g)(7)(A). On January 11, 2022, plaintiff filed a Notice of Appearance before the binational panel. Letter from White & Case LLP, to USMCA Secretariat, U.S. Sec'y, re: USMCA Panel Review — USA-CDA-2021-10.12-04 — Notice of Appearance (Jan. 11, 2022); *Art. 10.12 Rules of Procedure*, R. 45 ¶ 1(d)(iii). As

---

**4.** The parties do not dispute that the binational panel has the authority to reach a decision with respect to the lawfulness of Commerce's determination; plaintiff argues instead that binational panels lack powers in equity and that the panel "would be unable to order Commerce to instruct [Customs] to reinstate

J.D. Irving's . . . cash deposit rate *retroactively*" should the panel reach a decision in plaintiff's favor. Pl. Br. at 8 (emphasis in original), 11 ("The USMCA's mere ability to review the same legal issue, however, does not mean the panel can provide adequate relief."); *see* Defs. Br. at 9-10.

such, plaintiff is entitled as an "interested person" to participate in the proceedings before the panel and bring the same challenge that J.D. Irving brought as a respondent before Commerce. *Art. 10.12 Rules of Procedure*, Rs. 5, 45 ¶ 1, 61 ¶¶ 1-2. Upon a favorable panel decision with respect to such a challenge to the lawfulness of Commerce's determination, the panel would have the authority to remand the determination to Commerce, which would then be required to "take action not inconsistent with" the panel's decision. *See* USMCA, art. 10.12 ¶ 8; 19 U.S.C. § 1516a(g)(7)(A). Consequently, the relief available to plaintiff through binational panel review with respect to its request for declaratory relief is not manifestly inadequate.

## 2. Plaintiff's request to reinstate retroactively the cash deposit rate of 1.57% and to refund excess cash deposits

[10] The court addresses next plaintiff's request to reinstate retroactively the cash deposit rate of 1.57% and to refund excess cash deposits collected on entries made on or after December 2, 2021. *See* Compl. at 17. Plaintiff contends that only "injunctive relief" provided by this Court would constitute an adequate remedy with respect to the refund of excess cash deposits collected on entries made on or after December 2, 2021 — plaintiff's second request. Pl. Br. at 8. Plaintiff notes that binational panels lack the powers in equity that this Court possesses and that the panel "would be unable to order Commerce to instruct [Customs] to reinstate

J.D. Irving's . . . cash deposit rate *retroactively*" with respect to entries made on or after December 2, 2021. *Id.* at 8 (emphasis in original), 11.

The court does not find this argument persuasive. Plaintiff retains the recourse to obtain an adequate remedy with respect to its request, as "eventually review [of plaintiff's challenge] could be had at the conclusion of administrative proceedings, either in this court under 28 U.S.C. § 1581(c) or before a binational panel." *Hylsa II*, 22 CIT at 46; *see Sunpreme*, 892 F.3d at 1191 (stating that when adequate "relief is prospectively and realistically available under another subsection of 1581, invocation of [28 U.S.C. § 1581(i)] is incorrect" (quoting *Chemsol, LLC v. United States*, 755 F.3d 1345, 1354 (Fed. Cir. 2014) (internal quotation marks omitted)); *Jerlian Watch Co. v. U.S. Dep't of Com.*, 597 F.2d 687, 692 (9th Cir. 1979) ("It is true that injunctive and declaratory relief [are] . . . more desirable remed[ies] in plaintiffs' view, but 'the mere fact that more desirable remedies are unavailable [due to lack of jurisdiction] does not mean that existing remedies are inadequate.'" (citation omitted)). An alternative remedy is available to plaintiff through its challenge in one or more ARs to the collection of cash deposits on plaintiff's entries made on or after December 2, 2021, at the contested rate of 11.59%.[5] *See Capella Sales & Services Ltd. v. United States*, 40 CIT ——, ——, 180 F. Supp. 3d 1293, 1303 (2016) ("An interested party may challenge the cash deposit rate by requesting [that] Commerce conduct an

---

**5.** J.D. Irving would be entitled to bring such a challenge in an AR 4 with respect to the cash deposit rate applied to J.D. Irving's entries made between December 2, 2021, and December 31, 2021, as these dates occurred during the fourth period of review of the Softwood Lumber Order. *See Softwood Lumber Order*, 83 Fed. Reg. 350; *AR 2 Final Results*, 86 Fed. Reg. 68,471. For entries made between January 1, 2022, and December 31,

2022 — the fifth period of review — J.D. Irving would be entitled to bring such a challenge in an AR 5. *See Softwood Lumber Order*, 83 Fed. Reg. 350; *AR 2 Final Results*, 86 Fed. Reg. 68,471. For entries made between January 1, 2023, and December 31, 2023 — the sixth period of review — J.D. Irving would be entitled to bring such a challenge in an AR 6. *See Softwood Lumber Order*, 83 Fed. Reg. 350; *AR 2 Final Results*, 86 Fed. Reg. 68,471.

administrative review of its entries that were subject to that cash deposit rate." (citing 19 U.S.C. § 1675(a)(1))). Should plaintiff bring such a challenge (or challenges) before Commerce, following Commerce's publication of the final results of the respective AR, plaintiff would be entitled to appeal to this Court any determination with which plaintiff might disagree.[6] *See Valeo N. Am., Inc. v. United States*, 41 CIT ——, ——, 277 F. Supp. 3d 1361, 1365 (2017).

Three considerations demonstrate that this alternative remedy would not be manifestly inadequate with respect to plaintiff's requested relief. First, the alternative remedy would "produc[e]" an adequate "result" with respect to plaintiff's challenge to the cash deposit rate applied to its entries made on or after December 2, 2021. *Hartford Fire*, 544 F.3d at 1294 (citation omitted) (internal quotation marks omitted). The Federal Circuit has held that a remedy is "manifestly inadequate" if the remedy constitutes an "exercise in futility, or [is] 'incapable of producing any result; failing utterly of the desired end through intrinsic defect; useless, ineffectual, [in] vain.'" *Id.* (emphasis omitted). Plaintiff states that its challenge concerns "[t]he deposit rate applie[d] to [J.D. Irving's] entries *going forward*" — *i.e.*, the rate applied to entries made on or after December 2, 2021. Oral Arg. Tr. at 12:17-18 (emphasis supplied); *see* Pl. Br. at 13-14; *Sunpreme*, 892 F.3d at 1193. Plaintiff is entitled to challenge in one or more ARs the cash deposit rate applied to entries made on or after December 2, 2021. *See Capella Sales*, 40 CIT at ——, 180 F. Supp. 3d at 1303. Should plaintiff bring such a challenge (or challenges), plaintiff "can be made whole" and receive its re-quested refund "if [plaintiff's] claims are ultimately successful." *Valeo*, 41 CIT at —— n.6, 277 F. Supp. 3d at 1365 n.6. The availability to plaintiff of a refund plus interest for any overpaid cash deposits indicates that this alternative remedy neither is futile nor "incapable of producing any result" with respect to plaintiff's "desired end." *Hartford Fire*, 544 F.3d at 1294 (citation omitted) (internal quotation marks omitted); *see* 19 U.S.C. § 1673f(b)(2), 1677g(a); 19 C.F.R. § 351.212. Moreover, this alternative remedy is not manifestly inadequate notwithstanding that plaintiff would be required to participate in administrative proceedings — as well any potential appeals or panel reviews — prior to obtaining such relief. *See Valeo*, 41 CIT at ——, 277 F. Supp. 3d at 1365 ("Neither the burden of participating in the administrative proceeding nor the business uncertainty caused by such a proceeding is sufficient to constitute manifest inadequacy." (citations omitted)); *MacMillan Bloedel Ltd. v. United States*, 16 C.I.T. 331, 332 (1992); *cf. Int'l Custom Prod., Inc. v. United States*, 467 F.3d 1324, 1327 (Fed. Cir. 2007) ("[D]elays inherent in the statutory process do not render [a remedy] manifestly inadequate." (citing *Am. Air Parcel Forwarding Co. v. United States*, 718 F.2d 1546, 1551 (Fed. Cir. 1983))).

The second consideration that supports the court's conclusion is that plaintiff's payment of cash deposits at the contested rate of 11.59% while plaintiff participates in administrative proceedings — as well as any potential appeals, including panel reviews — would not render the alternative remedy manifestly inadequate. *See Int'l Custom Prod.*, 467 F.3d at 1327 ("[M]ere

---

**6.** Moreover, should interested parties request binational panel review with respect to the final results of one or more such ARs pursuant to Article 10.12 of the USMCA, J.D. Irving would be entitled as an "interested person" to bring its challenge before the respective panel. *See* 19 U.S.C. § 1516a(g)(8)(A)(i); *Art. 10.12 Rules of Procedure*, Rs. 5, 38 ¶ 1(b), 45 ¶ 1.

allegations of financial harm ... do not make the remedy established by Congress manifestly inadequate." (citations omitted) (internal quotation marks omitted)). This conclusion is consistent with the court's decision in *Valeo*, 41 CIT ——, 277 F. Supp. 3d 1361. In *Valeo*, the court held that it lacked jurisdiction under 28 U.S.C. § 1581(i) to hear the plaintiffs' challenge to Commerce's preliminary determination in an AD investigation of certain aluminum foil from China. *See id.* at ——, 277 F. Supp. 3d at 1363. The court stated that the plaintiffs sought relief through the court's exercise of jurisdiction under 28 U.S.C. § 1581(i) so that the plaintiffs' "imports [would] not [be] subject to the collection of cash deposits in the interim period between the publication of the preliminary determination and the final determination." *Id.* at ——, 277 F. Supp. 3d at 1366 (citation omitted). However, the court concluded that the remedy available through the exercise of jurisdiction under 28 U.S.C. § 1581(c) *subsequent to* Commerce's publication of the final determination was not manifestly inadequate, as the plaintiffs would receive a refund for any overpaid cash deposits if they prevailed. *See id.* Further, the court explained that "exposure to cash deposits is *not a recognized harm* that would render the available relief ... manifestly inadequate," *id.* at —— n.6, 277 F. Supp. 3d at 1365-66 n.6 (emphasis supplied) (citing *MacMillan*, 16 C.I.T. at 333), as the payment of cash deposits "is an ordinary consequence of the statutory scheme." *Id.* at ——, 277 F. Supp. 3d at 1366; *cf. Shanghai Tainai Bearing Co. v. United States*, 46 CIT ——, ——, 582 F. Supp. 3d 1299, 1310 (2022) ("America's retroactive system, financially inconvenient as it may be, is the course adopted by Congress and committed to Commerce and Customs to enforce." (citation omitted)).

The third consideration that supports the court's conclusion is that the alternative remedy is not manifestly inadequate

notwithstanding plaintiff's assertion that this remedy would "fall[ ] well short of [a] remedy that this Court has the authority to provide." Oral Arg. Tr. at 13:09-10. Contrary to plaintiff's argument, that this Court possesses the powers in equity to provide plaintiff with its requested injunctive relief does not render the alternative remedy "manifestly inadequate." *Id.*; *see* 28 U.S.C. § 2643(c)(1) ("[T]he Court of International Trade may ... order any ... form of relief that is appropriate in a civil action, including, but not limited to, declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition.").

To support its argument, plaintiff points to the *Cooper Tire* decision, in which the court issued an injunction ordering Commerce to reinstate a cash deposit rate with respect to the plaintiff's entries. *See* Pl. Br. at 7-8 (citing *Cooper Tire & Rubber Co. v. United States*, 41 CIT ——, ——, 217 F. Supp. 3d 1373, 1377, 1384 (2017)), 12. However, the *Cooper Tire* court exercised its discretion to issue such injunctive relief in view of the unusual circumstances presented in that case. *See generally Cooper Tire*, 41 CIT ——, 217 F. Supp. 3d 1373; *Cooper Tire & Rubber Co. v. United States*, Slip Op. 17-130, 2017 WL 4250812 (CIT Sept. 25, 2017). The court concluded that Commerce assigned unlawfully to the plaintiff a cash deposit rate that "was unrelated to [the plaintiff's] future antidumping duty liability" and stated that the plaintiff was entitled to its requested remedy — *i.e.*, for the court to "order [Commerce] on remand to determine [the plaintiff's] AD cash deposit rate the same as all other separate rate respondents." *Cooper Tire*, 41 CIT at ——, 217 F. Supp. 3d at 1380, 1383. Nonetheless, the court explained that the plaintiff had not yet "sought injunctive or other equitable relief as to the implementation of the remedy it is pursuing." *Id.* at ——, 217 F. Supp. 3d at 1383. Accordingly, the

plaintiff moved subsequently for a preliminary injunction and the court ordered the parties to "consult with the objective of producing an agreed-upon proposed injunction for the Court's consideration." *See Cooper Tire*, Ct. No. 15-00251, Pls.' Mot. for Prelim. Inj. (May 10, 2017), ECF No. 49, *and* Order (May 15, 2017), ECF No. 51. The parties complied with the court's order and filed a proposed injunction, which the court issued thereafter. *See Cooper Tire*, Ct. No. 15-00251, Order (June 1, 2017), ECF No. 53.

Plaintiff's assertion and reference to *Cooper Tire* with respect to this Court's powers in equity also do not provide a legal basis to conclude that the availability of a *preferred* or *more desirable* remedy — *i.e.*, a court-issued injunction — renders an alternative form of relief "manifestly inadequate." *See Am. Air Parcel*, 718 F.2d at 1551. This conclusion is consistent with the decision of the U.S. Court of Appeals for the Second Circuit ("Second Circuit") in *J. C. Penney Co. v. U.S. Treasury Dep't (J. C. Penney II)*, 439 F.2d 63 (2d Cir. 1971).[7] In *J. C. Penney*, the plaintiff, an importer of television sets from Japan, sought to challenge in district court the decision of the U.S. Treasury Department to conduct an investigation as to whether the imported merchandise had been sold at less than fair value. *See id.* at 64; *J. C. Penney Co. v. U.S. Dep't of Treasury (J. C. Penney I)*, 319 F. Supp. 1023 (S.D.N.Y. 1970). The district court "dismiss[ed] the plaintiff's complaint for lack of subject matter juris-

diction" and concluded that the plaintiff "must seek its relief against the government in the [U.S.] Customs Court." *J. C. Penney II*, 439 F.2d at 64-65; *see J. C. Penney I*, 319 F. Supp. at 1028-31. On appeal, the plaintiff contended that the district court had jurisdiction over the action on the basis that "no adequate relief may be obtained in" the Customs Court. *J. C. Penney II*, 439 F.2d at 68. The plaintiff argued that the Customs Court lacked the equitable power to provide the plaintiff with its requested relief, including the "power to require the holding of a hearing" with respect to the plaintiff's challenge. *Id.*; *cf. Flintkote Co., Glens Falls Div. v. United States*, 82 Cust. Ct. 305, 306, 467 F. Supp. 626, 628 (1979). The Second Circuit rejected the plaintiff's argument and concluded that "an adequate remedy [was] available . . . in the Customs Court" through "the obtaining of refunds of special dumping duties which may have been improperly assessed and paid." *J. C. Penney*, 439 F.2d at 68. The court stated further that "[t]hough it may be true that the ordering of a hearing would be a more desirable form of relief from [the plaintiff's] point of view than the obtaining of refunds, the mere fact that more desirable remedies are unavailable does not mean that existing remedies are inadequate." *Id.*; *see Jerlian Watch*, 597 F.2d at 692. Similarly, in the instant action the mere existence of a potential remedy that plaintiff might prefer or find "more desirable" — *i.e.*, a court-issued injunction —

---

**7.** The Second Circuit decided *J. C. Penney* prior to the establishment of the U.S. Court of International Trade and the enactment of 28 U.S.C. § 1581(i). *See* Customs Courts Act of 1980. Pub. L. No. 96-417, 94 Stat. 1727 (1980) (codified as amended in scattered sections of 28 U.S.C.). The enactment of 28 U.S.C. § 1581(i) "transferred the subject matter jurisdiction of the district courts [with respect to the enumerated civil actions] to the Court of International Trade." *Am. Air Parcel*,

718 F.2d at 1551 n.4 (citing *United States v. Uniroyal, Inc.*, 69 C.C.P.A. 179, 187 n.9, 687 F.2d 467, 475 n.9 (1982)); *see* H.R. Rep. No. 96-1235, at 33 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 3729, 3745 ("Section 201 of H.R. 6394 added a new section 1581(i) to Title 28, U.S.C . . . . to eliminate the confusion which currently exists as to the demarcation between the jurisdiction of the federal district courts and the Court of International Trade.").

does not render the alternative remedy manifestly inadequate.

Moreover, the alternative remedy is not "manifestly inadequate" notwithstanding plaintiff's argument that a Court decision with respect to plaintiff's challenge would have precedential effect while a panel decision would not. *See* Oral Arg. Tr. at 16:01-09, 21-25; 19 U.S.C. § 1516a(b)(3). Plaintiff's argument proves too much. Applying plaintiff's reasoning, because a panel decision with respect to any legal issue lacks precedential effect, a panel decision as to any legal issue before it would be manifestly inadequate. *See* 19 U.S.C. § 1516a(b)(3). In a similar way, plaintiff's reasoning would lead to the conclusion that the Court's subject matter jurisdiction exists under 28 U.S.C. § 1581(i) with respect to *any* determination for which panel review is requested. This conclusion, in turn, would contravene the intent of Congress in amending 28 U.S.C. § 1581(i) to "assure that a litigant cannot invoke the CIT's 'residual jurisdiction' . . . for the purpose of circumventing the binational panel system." S. Rep. 100-509, at 35; *see* H.R. Rep. 103-361, at 86.

## CONCLUSION

In *The Jungle Book*, the 1967 animated film based on the 1894 novel by Rudyard Kipling,[8] Mowgli, a young orphan, is found abandoned in the jungle and rescued by Bagheera, a black panther. Two wolves, Raksha and Rama, adopt Mowgli and raise him along with their own cubs. Over ten years, Mowgli — known affectionately as "man-cub" — learns the ways of his forest (which Kipling likely based on the forests in the vicinity of the city of Seoni in Madhya Pradesh, India), but Mowgli's animal guardians realize that he must return eventually to be with other humans.

One night, Akela, the leader of the wolf pack, announces that Shere Khan, a Bengal tiger who does not especially care for humans, has appeared in the jungle. The pack reaches the difficult decision that Mowgli must leave the forest and return to human society.

Akela: "Shere Khan will surely kill the boy and all who try to protect him. Now, are we all in agreement as to what must be done?"

[Wolves nod].

Akela: "Now it is my unpleasant duty to tell the boy's father. Rama! Come over here, please."

Rama: "Yes, Akela?"

Akela: "The council has reached its decision. Man-cub can no longer stay with the pack. He must leave at once."

Rama: "Leave?"

Akela: "I am sorry, Rama. There is no other way."

Rama "But-but the man-cub is-is like my own son. Surely he's entitled to the protection of the pack."

Akela: "But, Rama, even the strength of the pack is no match for the tiger."

Rama: "But the boy cannot survive alone in the jungle."

Bagheera then interjects to offer a potential solution to the quandary in which the pack finds itself.

Bagheera: "Akela. Perhaps I can be of help."

Akela: "You, Bagheera? How?"

Bagheera: "I know of a man-village where he'll be safe. Mowgli and I have taken many walks into the jungle together. I'm sure he'll go with me."

Akela: "So be it. Now there's no time to lose. Good luck."

---

**8.** The Jungle Book (Walt Disney Productions 1967); Rudyard Kipling, *The Jungle Book* (1894).

\* \* \*

For the reasons discussed, the court concludes that it lacks subject matter jurisdiction under 28 U.S.C. § 1581(i) to hear the instant action. Accordingly, the court grants defendants' motion to dismiss pursuant to USCIT Rule 12(b)(1). Pursuant to the court's order of November 21, 2022, *see* Order, ECF No. 26, which stays consideration of "plaintiff's motion to consolidate Court Nos. 21-00641 and 22-00256 pending resolution of the jurisdictional issue raised in the instant action ... after appeals, if any, are exhausted," the parties shall file a joint status report within 14 days of the date that the stay expires.

Judgment will enter accordingly.



**GRUPO ACERERO S.A. DE C.V.,**
**Grupo Simec S.A.B. de C.V.,**
**et al., Plaintiffs,**

**and**

**Gerdau Corsa, S.A.P.I. de C.V.,**
**Plaintiff-Intervenor,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Rebar Trade Action Coalition,**
**Defendant-Intervenor.**

**Slip-Op. 23-11**

**Consol. Court No. 1:22-cv-00202**

United States Court of International Trade.

January 27, 2023

**Background:** Importers brought separate actions, which were later consolidated, challenging Department of Commerce's final results assigning dumping margins to importers pursuant to antidumping duty order on concrete reinforcing bar (rebar) from Mexico. Commerce moved to correct the administrative record.

**Holdings:** The Court of International Trade, Vaden, J., held that:

(1) memorandum analyzing deficiencies with importer's questionnaire was part of administrative record;

(2) Commerce was not barred, under statute allowing Commerce to correct ministerial errors, from adding memorandum;

(3) omission of memorandum from administrative record would frustrate judicial review, as required to allow Commerce to correct record;

(4) failure of Commerce to include memorandum in its initial administrative record was harmless; and

(5) absent clear and convincing evidence to rebut presumption that government officials act in good faith, Commerce did not act in bad faith in failing to include memorandum in its initial administrative record.

Motion granted.

**1. Customs Duties ⚖84(1)**

The Court of International Trade (CIT) considers matters outside of the administrative record submitted by the agency when there is a reasonable basis to believe the administrative record is incomplete.

**2. Customs Duties ⚖84(2)**

A court may order completion or supplementation of the administrative record in Department of Commerce countervailing and antidumping duty proceedings in light of clear evidence that the record was not properly designated or the identification of reasonable grounds that documents considered by the agency were not included in the record.

***J.D. Irving, Ltd. v. United States***

**Court No. 21-00641**

**Judgment Issued January 25, 2023**

**(Appx18)**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**J.D. IRVING, LIMITED,**

      Plaintiff,

v.

**UNITED STATES AND U.S. DEPARTMENT OF COMMERCE,**

      Defendants.

**Before: Timothy M. Reif, Judge**

**Court No. 21-00641**

## <u>JUDGMENT</u>

This case having been submitted for decision, and the Court, after due deliberation, having rendered an opinion; now in conformity with that opinion, it is hereby

**ORDERED** that defendants' motion to dismiss the instant action pursuant to U.S. Court of International Trade Rule 12(b)(1) is granted; and it is further

**ORDERED** that the instant action is dismissed with prejudice.

<u>/s/      Timothy M. Reif</u>
               Judge

Dated: <u>January 25, 2023</u>
      New York, New York

*J.D. Irving, Ltd.  v. United States*

**570 F. Supp. 3d 1349**

**(Appx19-27)**

Government argues instead, with respect to both List 3 and List 4A, that the "contents" of the Supplemental 301 Report *"would have been* considered" by the USTR. Defs.' Mot. Correct R. at 1–2 (emphasis added). The Government offers no authority for including in the record a document that was not, itself, directly or indirectly considered by the USTR, even if its "contents" were, in some unexplained fashion, considered. On that point, however, the Government makes no showing that the contents of the Supplemental 301 Report *were* considered by the USTR; the Government merely surmises that they "would have been."[38]

Thus, the court will grant the Government's motion with respect to the June 2018 Presidential Statement and the accompanying certification and deny the Government's motion with respect to the Supplemental 301 Report.

CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that the Government's motion to dismiss (ECF No. 314) is **DENIED**; it is further

**ORDERED** that the Government's motion for judgment on the agency record (ECF No. 314) and Plaintiffs' cross-motion for judgment on the agency record (ECF No. 358) are each **GRANTED IN PART** and **DENIED IN PART**; it is further

**ORDERED** that *Final List 3* and *Final List 4* are remanded to the USTR for reconsideration or further explanation consistent with this opinion; it is further

**ORDERED** that the USTR shall file its remand results on or before June 30, 2022; it is further

**ORDERED** that, within 14 days of the USTR's filing of the remand results, the Parties shall file a joint status report and proposed schedule for the further disposition of this litigation; and it is further

**ORDERED** that the Government's partial consent motion to correct the administrative record (ECF No. 441) is **GRANTED IN PART** and **DENIED IN PART**.

/s/ Mark A. Barnett
  Mark A. Barnett, Chief Judge

/s/ Claire R. Kelly
  Claire R. Kelly, Judge

/s/ Jennifer Choe-Groves
  Jennifer Choe-Groves, Judge



**J.D. IRVING, LIMITED, Plaintiff,**

**v.**

**UNITED STATES and U.S. Department of Commerce, Defendants.**

**Slip Op. 22-40**
**Court No. 21-00641**

United States Court of International Trade.

May 2, 2022

**Background:** Canadian producer filed suit against United States, challenging instructions that Department of Commerce issued to Customs and Border Protection to collect cash deposits on producer's entries at 11.59% rate assigned in prior administrative review of antidumping duty order covering softwood lumber products from Canada. Producer moved for expedited briefing and consideration of its lawsuit.

---

**38.** That the Supplemental 301 Report was published on the USTR's website in November 2018, *see* Defs.' Mot. Correct R. at 2, alone does not demonstrate the USTR's direct or indirect consideration of the facts contained therein when deciding whether to impose the List 3 or List 4A duties.

**Holdings:** The Court of International Trade, Timothy M. Reif, J., held that producer lacked good cause to expedite briefing and consideration.

Motion denied.

**1. Customs Duties** ⊜84(2)

Good cause exists to expedite the briefing and consideration of an action in the Court of International Trade: (1) in a case in which failure to expedite would result in mootness or deprive the relief requested of much of its value, (2) in a case in which failure to expedite would result in extraordinary hardship to a litigant, or (3) actions where the public interest in enforcement of the statute is particularly strong. USCIT, Rule 3(g)(5).

**2. Customs Duties** ⊜84(2)

Canadian producer lacked good cause to expedite briefing and consideration of its action, challenging instructions that Department of Commerce issued to Customs and Border Protection to collect cash deposits on producer's entries at antidumping duty rate assigned in prior administrative review of antidumping duty order covering softwood lumber products from Canada, since decision not to expedite briefing and consideration would not deprive producer's requested declaratory relief and refund request of much of its value, public interest did not require expedited briefing and consideration absent any exigent circumstances, and producer argued that only one legal issue was involved, but government raised three legal issues for consideration. USCIT, Rule 3(g)(5).

———

Jay C. Campbell, White and Case LLP, of Washington, D.C., argued for plaintiff. With him on the brief was Walter Spak.

Kelly A. Krystyniak, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendants. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Patricia M. McCarthy, Director, and Claudia Burke, Assistant Director. Of counsel on the brief was Paul K. Keith, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

## OPINION

REIF, Judge:

Plaintiff, J.D. Irving, Limited, moves for the expedited briefing and consideration of its action against defendants, the United States and the U.S. Department of Commerce ("Commerce"), pursuant to U.S. Court of International Trade ("USCIT") Rule 3(g)(5). Pl.'s Mot. for Expedited Br. and Consideration ("Pl. Br."), ECF No. 5. In this action, plaintiff contests the antidumping duty ("AD") cash deposit instructions that Commerce issued to U.S. Customs and Border Protection ("Customs") on December 9, 2021. Compl. at 1, ECF No. 4; Cash Deposit Instructions for Certain Softwood Lumber from Canada, Message No. 1343410 (A-122-857) (Dec. 9, 2021) (Compl. Attach. 1) ("Commerce's Cash Deposit Instructions"); *Certain Softwood Lumber Products from Canada: Antidumping Duty Order and Partial Amended Final Determination* ("Softwood Lumber from Canada Order"), 83 Fed. Reg. 350 (Dep't of Commerce Jan. 3, 2018) (antidumping duty order). For the reasons discussed below, the court denies plaintiff's motion.

## BACKGROUND

Plaintiff is a Canadian producer and exporter of merchandise subject to the Soft-

wood Lumber from Canada Order, as well as the importer of record. Compl. at 5. Commerce published the Softwood Lumber from Canada Order on January 3, 2018.[1] *See* Softwood Lumber from Canada Order, 83 Fed. Reg. 350.

Commerce initiated a first administrative review ("AR 1") of the Softwood Lumber from Canada Order on April 1, 2019. *Certain Softwood Lumber Products from Canada: Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 12,209, 12,209-10 (Dep't of Commerce Apr. 1, 2019) (initiation notice). AR 1 covered entries of subject merchandise made between June 30, 2017, and December 31, 2018. *Certain Softwood Lumber Products from Canada: Final Results of Antidumping Duty Administrative Review; 2017-2018* ("AR 1 Final Results"), 85 Fed. Reg. 76,519, 76,519-20 (Dep't of Commerce Nov. 30, 2020) (final results). Plaintiff was not selected as a mandatory respondent in this review; accordingly, upon the publication of the AR 1 Final Results on November 30, 2020, Commerce assigned to plaintiff the non-selected companies' assessment rate of 1.57%. *See id.* at 76,520-21. Further, pursuant to section 751(a)(2)(C) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675(a)(2)(C) (2018),[2] Commerce instructed Customs to collect at this 1.57% rate cash deposits on plaintiff's entries made on or after the publication date of the AR 1 Final Results. *See id.* at 76,520.

Commerce initiated a second administrative review ("AR 2") of the Softwood Lumber from Canada Order on March 10, 2020. *Initiation of Antidumping and Counter-* *vailing Duty Administrative Reviews*, 85 Fed. Reg. 13,860, 13,862 (Dep't of Commerce Mar. 10, 2020) (initiation notice). AR 2 covered entries of subject merchandise made between January 1, 2019, and December 31, 2019. *Certain Softwood Lumber Products from Canada: Final Results of Antidumping Duty Administrative Review; 2019* ("AR 2 Final Results"), 86 Fed. Reg. 68,471, 68,471-73 (Dep't of Commerce Dec. 2, 2021) (final results). Plaintiff was not selected as a mandatory respondent in this review. Upon the publication of the AR 2 Final Results on December 2, 2021, Commerce assigned to plaintiff a recalculated non-selected companies' assessment rate of 11.59%. *See id.* at 68,472-73. In addition, Commerce instructed Customs to collect at this 11.59% rate cash deposits on plaintiff's entries made on or after the publication date of the AR 2 Final Results. *See id.* at 68,473; Commerce's Cash Deposit Instructions.

Following Commerce's initiation of an AR 2 on March 10, 2020, and prior to Commerce's publication of the AR 2 Final Results on December 2, 2021, Commerce initiated a third administrative review ("AR 3") of the Softwood Lumber from Canada Order. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 12,599, 12,601 (Dep't of Commerce Mar. 4, 2021) (initiation notice). Commerce initiated AR 3 — which covers entries of subject merchandise made between January 1, 2020, and December 31, 2020 — on March 4, 2021. *Id.* In contrast with AR 1 and AR 2, no parties requested that Commerce review

---

**1.** The anniversary month of Commerce's publication of the Softwood Lumber from Canada Order is January. *See* Softwood Lumber from Canada Order, 83 Fed. Reg. 350. Accordingly, plaintiff and other interested parties are entitled to request each January that Commerce conduct an administrative review to determine the antidumping duties to be applied to entries of subject merchandise covered by the respective review. *See* 19 U.S.C. § 1675(a); 19 C.F.R. § 351.213(b).

**2.** Further citations to the Tariff Act of 1930, as amended, are also to the relevant portions of Title 19 of the U.S. Code, 2018 edition.

plaintiff's entries that would have been subject to an AR 3. *See id.* at 12,603; Compl. at 10. Accordingly, Commerce instructed Customs to liquidate plaintiff's entries that would have been subject to an AR 3 at the 1.57% rate then in effect, which had been assigned to plaintiff in the AR 1 Final Results. *See* Automatic Liquidation Instructions for Certain Softwood Lumber Products for the Period 01/01/2020 Through 12/31/2020, Message No. 1106404 (A-122-857) (Apr. 16, 2021) (Compl. Attach. 7) ("Automatic Liquidation Instructions"); AR 1 Final Results, 85 Fed. Reg. at 76,520; 19 C.F.R. § 351.212(c)(1)(i). In addition, Commerce instructed Customs to continue to collect cash deposits on plaintiff's entries at this 1.57% rate. *See* 19 C.F.R. § 351.212(c)(1)(ii) ("If [Commerce] does not receive a timely request for an administrative review . . . , [Commerce] . . . will instruct [Customs] to . . . continue to collect the cash deposits previously ordered."); Automatic Liquidation Instructions; Cash Deposit Instructions for Certain Softwood Lumber Product from Canada, Message No. 0343402 (A-122-857) (Dec. 8, 2020).

On January 31, 2022, plaintiff requested that Commerce review plaintiff's entries subject to a fourth administrative review ("AR 4") of the Softwood Lumber from Canada Order. *See* Certain Softwood Lumber Products from Canada: Request for Administrative Review for J.D. Irving, Limited, Pub. Doc. No. 4207148-01 (A-122-857) (Jan. 31, 2022). Commerce initiated AR 4 — which covers entries of subject merchandise made between January 1, 2021, and December 31, 2021 — on March 9, 2022. *Initiation of Antidumping and Countervailing Duty Administrative Reviews* ("AR 4 Initiation Notice"), 87 Fed. Reg. 13,252, 13,252-54 (Dep't of Commerce Mar. 9, 2022) (initiation notice). Based on the publication date of Commerce's notice of initiation, plaintiff has a deadline of June 7, 2022, to withdraw its request for

an AR 4. *See* 19 C.F.R. § 351.213(d)(1) ("[Commerce] will rescind an administrative review . . . if a party that requested a review withdraws the request *within 90 days* of the date of publication of notice of initiation of the requested review." (emphasis supplied)).

In this action, plaintiff contests the instructions that Commerce issued to Customs on December 9, 2021, to collect cash deposits on plaintiff's entries at the 11.59% rate assigned in the AR 2 Final Results. *See* Compl. at 1; Commerce's Cash Deposit Instructions. Plaintiff contends that "Commerce acted arbitrarily and in a manner inconsistent with Congress'[ ] intent when it replaced" the 1.57% cash deposit rate assigned to plaintiff following its decision not to request an AR 3, with the 11.59% rate assigned to plaintiff in connection with the earlier AR 2. Compl. at 15. According to plaintiff, Commerce's instructions to replace the 1.57% rate with the 11.59% rate "calculated for an *earlier* period . . . inject[ ] uncertainty into the review-request process" and violate 19 U.S.C. § 1675(a) as well as Commerce's regulations. *Id.* at 11-12. Accordingly, plaintiff requests that the court: (1) declare that Commerce's Cash Deposit Instructions with respect to plaintiff's entries made on or after December 2, 2021, are unlawful; and (2) order Commerce to instruct Customs to reinstate the 1.57% cash deposit rate and to refund any excess cash deposits provided for entries made on or after December 2, 2021. *See id.* at 17.

Plaintiff filed its complaint on December 30, 2021. *Id.* On March 4, 2022, defendants filed a motion to dismiss the complaint, contending that: (1) the court does not possess subject matter jurisdiction to hear plaintiff's action; (2) plaintiff does not have standing to bring its claim; and (3) plaintiff fails to state a claim upon which relief can be granted pursuant to USCIT Rule

12(b)(6). Def.'s Mot. to Dismiss ("Def. Mot. to Dismiss") at 1-2, 14, ECF No. 16. In response, plaintiff argues that: (1) the court has subject matter jurisdiction to hear plaintiff's action pursuant to 28 U.S.C. § 1581(i);[3] (2) plaintiff has standing to bring its claim; and (3) plaintiff states a claim upon which relief can be granted. Pl.'s Resp. Opp'n to Def.'s Mot. to Dismiss at 1-2, 9, ECF No. 17.

### STANDARD OF REVIEW

[1] USCIT Rule 3(g)(5) permits the Court to expedite any "action that the court determines, based on motion and for good cause shown, warrants expedited treatment." The Court has concluded that "good cause" exists to expedite the briefing and consideration of an action:

> [1] in a case in which failure to expedite would result in mootness or deprive the relief requested of much of its value, [2] in a case in which failure to expedite would result in extraordinary hardship to a litigant, or [3] actions where the public interest in enforcement of the statute is particularly strong.

*Ontario Forest Indus. Ass'n v. United States*, 30 C.I.T. 1117, 1127, 444 F. Supp. 2d 1309, 1319 (2006) (citing H.R. REP. No. 98-985, at 6 (1984), *as reprinted in* 1984

---

3. Plaintiff states that "[n]ormally, the court would have jurisdiction to review [plaintiff's] claim — and to grant the relief [plaintiff] seeks — under 28 U.S.C. § 1581(c)." Compl. at 2. However, on December 28, 2021, other interested parties requested binational panel review of the AR 2 Final Results pursuant to Article 10.12 of the United States–Mexico–Canada Agreement ("USMCA"), thereby providing a USMCA panel with "exclusive review" of the AR 2 Final Results pursuant to 19 U.S.C. § 1516a(g)(2)(B). *Id.* at 3. Plaintiff argues, however, that USMCA panels do not possess equitable powers and that such a panel is not capable of providing plaintiff with the relief that it seeks in the instant action with respect to Commerce's Cash Deposit Instructions. *See id.* at 3-4. Accordingly, plaintiff contends that the court has jurisdiction to

U.S.C.C.A.N. 5779, 5784); *see also Husqvarna Constr. Prods. N. Am. v. United States*, Ct. No. 12-00205, Order (Aug. 9, 2012) ("*Husqvarna*") at 4, ECF No. 19.

### DISCUSSION

### 1. Positions of the parties

Plaintiff contends that "good cause" exists to expedite the briefing and consideration of this action. Pl. Br. at 1; USCIT R. 3(g)(5). Plaintiff maintains that the failure to expedite the briefing and consideration of this action would "deprive the relief requested of much of its value." Pl. Br. at 2 (citing *Ontario Forest*, 30 C.I.T. at 1127, 444 F. Supp. 2d at 1319). As discussed, plaintiff has until June 7, 2022, to withdraw its request for an AR 4. *See* AR 4 Initiation Notice, 87 Fed. Reg. 13,252; 19 C.F.R. § 351.213(d)(1). Plaintiff contends that "to receive the full value of the relief that it seeks, it is imperative" that the court rule on the substantive merits of this action prior to this deadline so that plaintiff may make an "informed decision" on whether to withdraw its request for an AR 4. Pl. Br. at 3. Plaintiff is of the view that the expedited briefing and consideration of this case is warranted so that plaintiff will know whether "the AD cash deposit rate

---

hear the instant action pursuant to 28 U.S.C. § 1581(i), as any relief that a USMCA panel might provide to plaintiff pursuant to Article 10.12 of the USMCA would be "manifestly inadequate." *Id.* at 4-5 (quoting *Intercontinental Chems., LLC v. United States*, 44 CIT ——, ——, 483 F. Supp. 3d 1232, 1238 (2020)); *see* United States–Mexico–Canada Agreement, art. 10.12 ¶¶ 2, 8, 9, July 1, 2020, OFF. OF THE U.S. TRADE REP., https://ustr.gov/trade-agreements/freetrade-agreements/united-states-mexico-canada-agreement/agreement-between; Annex II, Rules of Procedure for Article 10.12 (Binational Panel Reviews), R. 76 ¶ 1, OFF. OF THE U.S. TRADE REP., https://ustr.gov/sites/default/files/files/agreements/usmca/AnnexIIRulesProcedureUSMCABinational Panels.pdf (last visited Apr. 27, 2022).

going forward will be 1.57% or 11.59%" and can determine whether to participate in AR 4 based on the applicable rate. *Id.*

Plaintiff argues also that the "public interest" in the proper administration of 19 U.S.C. § 1675(a) and Commerce's implementing regulations is "particularly strong." *Id.* at 3-6 (citing *Ontario Forest*, 30 C.I.T. at 1127, 444 F. Supp. 2d at 1319). Plaintiff states that in 1984, Congress revised 19 U.S.C. § 1675(a), the statute regulating the AR and cash deposit process, to require that Commerce conduct an AR only "if a request for such a review has been received." *Id.* at 4 (quoting 19 U.S.C. § 1675(a)(1)); *see Antidumping and Countervailing Duties; Administrative Reviews on Request; Transition Provisions* ("AR Transition Provisions"), 50 Fed. Reg. 32,556, 32,556 (Dep't of Commerce Aug. 13, 1985). According to plaintiff, Congress intended for this revision to 19 U.S.C. § 1675(a) "to create *certainty* for U.S. producers, exporters, and importers alike, so they would not need to request reviews when satisfied with the current AD cash deposit rates in place." Pl. Br. at 5 (emphasis in original). Plaintiff contends that Commerce's Cash Deposit Instructions, which replace the cash deposit rate assigned to plaintiff with a rate calculated for an earlier AR, promote uncertainty and consequently are "contrary to Congress'[ ] express purpose for amending 19 U.S.C. § 1675(a)." *Id.* at 4-5. Accordingly, plaintiff argues that "the correct disposition of the legal issue" that plaintiff raises would serve the public interest by "benefit[ing] Commerce and the thousands of domestic producers, importers, and foreign producers/exporters participating in AD proceedings." *Id.* at 3-4.

Last, plaintiff argues that this action is "well-suited for expedited treatment" because plaintiff raises only one legal issue: "whether, in accordance with Congress'[ ] intent, an AD cash deposit rate established by operation of 19 C.F.R. § 351.212(c)(1) must remain in place until changed in an administrative review for a subsequent period." *Id.* at 6-8.[4]

In response, defendants argue that plaintiff's action relates solely to plaintiff's obligation to pay cash deposits at a particular rate, which "is no more than the same business decision that every importer must make when deciding whether to seek review of a POR before results of a prior review are released." Def.'s Resp. to Pl.'s Mot. to Expedite ("Def. Resp. Br.") at 2-3, ECF No. 11; *see* Def. Mot. to Dismiss at 3. Defendants assert that this obligation does not satisfy the Court's "good cause" requirement for the expedited briefing and consideration of an action. *See* Def. Resp. Br. at 2-3; USCIT R. 3(g)(5).

As to the public interest, defendants argue that plaintiff fails to provide a reason that "the usual statutory and regulatory provisions that have long governed the annual review/cash deposit process should not govern here." Def. Resp. Br. at 3; *see* Teleconference, ECF No. 13 at 22:36-23:09, 1:21:08-1:21:34. Defendants contend that Commerce's Cash Deposit Instructions follow what has been Commerce's consistent practice with respect to the assignment of cash deposit rates since Congress revised 19 U.S.C. § 1675(a). *See* Teleconference, ECF No. 13 at 34:51-35:14, 45:28-45:58.

---

**4.** Plaintiff does not contend that a decision by the court not to expedite the briefing "would result in mootness" under the first *Ontario Forest* circumstance, nor does plaintiff argue that the second *Ontario Forest* circumstance — that "failure to expedite would re-

sult in extraordinary hardship to a litigant" — applies with respect to this action. *Ontario Forest*, 30 C.I.T. at 1127, 444 F. Supp. 2d at 1319; Teleconference, ECF No. 13 at 10:10-11:02.

Last, in contrast to plaintiff's contention that this action is "well-suited for expedited treatment" because the action involves only one legal issue, Pl. Br. at 6-8, defendants raise several legal issues with respect to whether the court possesses subject matter jurisdiction to hear this action, whether plaintiff has standing to bring its claim and whether plaintiff states a claim upon which relief can be granted. *See* Def. Mot. to Dismiss at 1-2, 4-5.

### 2. Analysis

[2] Plaintiff does not establish that "good cause" exists to expedite the briefing and consideration of this action.[5] *Ontario Forest*, 30 C.I.T. at 1127, 444 F. Supp. 2d at 1319.

To start, the court's decision not to expedite the briefing and consideration of this action would not "deprive the relief requested of much of its value." *Id.* As discussed, plaintiff requests that the court: (1) declare that Commerce's Cash Deposit Instructions with respect to plaintiff's entries made on or after December 2, 2021, are unlawful; and (2) order Commerce to instruct Customs to reinstate the 1.57% cash deposit rate and to refund any excess cash deposits provided for entries made on or after December 2, 2021. *See* Compl. at 17.

With respect to plaintiff's request for declaratory relief, should the court rule in plaintiff's favor on the substantive merits of this action subsequent to plaintiff's deadline to withdraw its request for an AR 4 on June 7, 2022, that ruling would have the same effect on the "rights and other legal relations" between the parties as if the court had issued such a declaration prior to June 7, 2022. 28 U.S.C. § 2201(a); *see* 28 U.S.C. § 2643(c)(1) ("[T]he Court of International Trade may . . . order any

. . . form of relief that is appropriate in a civil action, including, but not limited to, declaratory judgments.").

Plaintiff's second request is that the court order Commerce to instruct Customs to reinstate the 1.57% cash deposit rate and to refund any excess cash deposits provided for entries made on or after December 2, 2021. *See* Compl. at 17. The Court previously has concluded that a party's requested relief is not deprived of much of its value if the party will, upon a decision in its favor on the substantive merits, receive a "refund plus interest of any excess [cash] deposits." *Husqvarna*, Ct. No. 12-00205, at 4-5. In the instant action, should the court rule in plaintiff's favor subsequent to the deadline of June 7, 2022, plaintiff still will be entitled to the full relief that it requests — the reinstatement of the 1.59% cash deposit rate as well as a refund, plus interest, of any excess cash deposits provided for entries made on or after December 2, 2021. For this reason, plaintiff's second request would not be deprived "of much of its value" should the court decide not to expedite the briefing and consideration of this action. *Ontario Forest*, 30 C.I.T. at 1127, 444 F. Supp. 2d at 1319.

Further, plaintiff argues that its inability to make an "informed decision" on whether to withdraw plaintiff's request for an AR 4 would deprive plaintiff's requested relief of much of its value. Pl. Br. at 3. This argument is not persuasive, as plaintiff's uncertainty in this respect is a "problem many (if not all) litigants face before the Court." *Ontario Forest*, 30 C.I.T. at 1128, 444 F. Supp. 2d at 1320. In fact, this uncertainty is inherent in the "retrospective" duty assessment system that the United States employs with respect to the

---

**5.** As discussed in note 4, *supra,* plaintiff does not raise an argument with respect to the circumstance set forth in *Ontario Forest* concerning "extraordinary hardship." *See Ontario Forest,* 30 C.I.T. at 1127, 444 F. Supp. 2d at 1319.

collection of antidumping and countervailing duties. 19 C.F.R. § 351.212(a). Plaintiff does not articulate how this uncertainty would deprive either form of relief that plaintiff requests "of much of its value." *Ontario Forest*, 30 C.I.T. at 1127, 444 F. Supp. 2d at 1319. Accordingly, "good cause" does not exist to expedite the briefing and consideration of plaintiff's action. USCIT R. 3(g)(5).

The court next considers whether the public interest involved in plaintiff's action is "particularly strong" and warrants the expedited briefing and consideration of this action. *Ontario Forest*, 30 C.I.T. at 1127, 444 F. Supp. 2d at 1319.

Plaintiff contends that Commerce's Cash Deposit Instructions in this case promote uncertainty and consequently are "contrary to Congress'[ ] express purpose for amending 19 U.S.C. § 1675(a)" in 1984. Pl. Br. at 4–5. Plaintiff argues that the public interest in this action is "particularly strong" because the "correct disposition of the legal issue" that plaintiff raises would "benefit[ ] not only the thousands of parties in AD proceedings — petitioners, importers, and respondents alike — but also Commerce." *Id.* at 3, 6. In response, defendants argue that 19 U.S.C. § 1675(a) and Commerce's implementing regulations, which Commerce applied in this case, have "governed the annual review/cash deposit process" for nearly four decades. Def. Resp. Br. at 3; *see* Teleconference, ECF No. 13 at 1:21:08-1:21:34. Defendants assert that plaintiff does not explain why those provisions "should not govern here,

such that an expedited proceeding is warranted." Def. Resp. Br. at 3.

In determining whether the public interest involved in an action is "particularly strong," the Court has examined whether the moving party demonstrates "any exigent circumstance" that distinguishes the party's case "from those of any other respondents in antidumping cases where the public policy [has] generally been held to be that they receive accurate rates." *Husqvarna*, Ct. No. 12-00205, at 4-5 (citing *Lasko Metal Prods. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994)).

Plaintiff does not point to such an "exigent circumstance" in this action. *Id.* Plaintiff contends that "thousands of parties in AD proceedings" — as well as Commerce — would benefit from the "correct disposition of the legal issue" that plaintiff raises with respect to 19 U.S.C. § 1675(a) and Commerce's implementing regulations. Pl. Br. at 3, 6. This contention, however, does not demonstrate any "exigen[cy]" with respect to plaintiff's action and does not "distinguish[ ]" this action from other cases in which parties have asserted that their respective interpretations of the applicable statutes and regulations would serve "the public policy . . . that [the parties] receive accurate rates." *Husqvarna*, Ct. No. 12-00205, at 5 (citing *Lasko Metal*, 43 F.3d at 1443). Rather, plaintiff's action contests Commerce's established practice with respect to the assignment of cash deposit rates pursuant to 19 U.S.C. § 1675(a) and Commerce's implementing regulations.[6] *See* AR Transition Provisions, 50 Fed. Reg. at 32,556-57,

---

**6.** For example, Commerce published an AD order on carbon and certain alloy steel wire rod from Canada on October 29, 2002. *Notice of Amended Final Determination of Sales at Less than Fair Value and Antidumping Duty Order: Carbon and Certain Alloy Steel Wire Rod from Canada*, 67 Fed. Reg. 65,944 (Dep't of Commerce Oct. 29, 2002) (antidumping duty order). One of the respondents covered by this order, Mittal Canada Inc. ("Mittal Canada") (formerly known as Ispat Sidbec,

Inc. or ISI), participated in an AR 2 of the order, but did not participate in an AR 3. *See Notice of Final Results of Antidumping Duty Administrative Review: Carbon and Certain Alloy Steel Wire Rod from Canada* ("Mittal AR 2 Final Results"), 71 Fed. Reg. 3,822, 3,822 (Dep't of Commerce Jan. 24, 2006) (final results); *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 69 Fed. Reg. 67,701, 67,702 (Dep't of Commerce Nov. 19, 2004) (initiation notice); *Notice of Final*

32,560. Accordingly, plaintiff's action does not involve a "particularly strong" public interest that warrants the expedited briefing and consideration that plaintiff requests. *Ontario Forest*, 30 C.I.T. at 1127, 444 F. Supp. 2d at 1319.

Last, "good cause" does not exist to expedite this action on the basis of plaintiff's contention that the action involves only one legal issue. *See* Pl. Br. at 6-8; USCIT R. 3(g)(5). To start, this contention does not constitute one of the circumstances set forth by the Court in *Ontario Forest* that warrants the expedited briefing and consideration of an action. *See Ontario Forest*, 30 C.I.T. at 1127, 444 F. Supp. 2d at 1319. Further, and in contrast to plaintiff's contention, defendants raise three legal issues in their motion to dismiss: (1) the court does not possess subject matter jurisdiction to hear plaintiff's action pursuant to USCIT Rule 12(b)(1); (2) plaintiff does not have standing to bring its claim; and (3) plaintiff fails to state a claim upon which relief can be granted pursuant to USCIT Rule 12(b)(6). Def. Mot. to Dismiss at 1-2, 4-5. Were the court to grant expedited briefing and consideration of this action, the court would consider these issues. The need to consider multiple legal issues undermines plaintiff's assertion that this action is "well-suited for expedited treatment." Pl. Br. at 8; *see also Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of the Treasury*, 2019 WL 4094563, at \*1-3 (D.D.C. Aug. 29, 2019) (denying the plaintiff's motion to expedite in view of the "jurisdictional questions" and other "threshold matters" that the defendants likely would raise in a motion to dismiss).

## CONCLUSION

In the singular *The Wizard of Oz*, Dorothy (portrayed by the incomparable Judy Garland), having arrived in Munchkinland, and with the Munchkins arrayed all around her, and having witnessed the abrupt arrivals and departures in poofs of smoke and floating bubbles, respectively, of Evillene (a.k.a. the Wicked Witch of the West) and Glinda (a.k.a. the Good Witch of the North), comments: "My! People come and go so quickly here!"[7]

\* \* \*

For the foregoing reasons, plaintiff does not establish that "good cause" exists to expedite the briefing and consideration of this action. USCIT R. 3(g)(5). Accordingly, the court denies plaintiff's motion.

**SO ORDERED.**



*Results of Antidumping Duty Administrative Review: Carbon and Certain Alloy Steel Wire Rod from Canada*, 72 Fed. Reg. 26,591, 26,591 (Dep't of Commerce May 10, 2007) (final results); *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Deferral of Administrative Reviews*, 70 Fed. Reg. 72,107, 72,108 (Dep't of Commerce Dec. 1, 2005) (initiation notice).

As in the instant action, Commerce published the final results of its AR 2 subsequent to Mittal Canada's decision not to request an AR 3. *See Mittal AR 2 Final Results*, 71 Fed. Reg. at 3,822; 19 C.F.R. § 351.213(b). Further, Commerce replaced the cash deposit rate in effect at the point Mittal Canada decided not to request an AR 3 with the rate determined in the AR 2 final results. *See* Cash Deposit Instructions for Carbon and Certain Alloy Steel Wire Rod from Canada, Message No. 6026204 (A-122-840) (Jan. 26, 2006); Liquidation Instructions for Carbon and Certain Alloy Steel Wire Rod from Canada, Message No. 5349202 (A-122-840) (Dec. 15, 2005); Cash Deposit Instructions for Carbon and Certain Alloy Steel Wire Rod from Canada, Message No. 4338206 (A-122-840) (Dec. 3, 2004).

**7.** The Wizard of Oz (Metro-Goldwyn-Mayer 1939); L. Frank Baum, The Wonderful Wizard of Oz (1900).

**19 U.S.C. § 1675**

**1982 Edition**

## § 1675. Administrative review of determinations

### (a) Periodic review of amount of duty

#### (1) In general

At least once during each 12-month period beginning on the anniversary of the date of publication of a countervailing duty order under this subtitle or under section 1303 of this title, an antidumping duty order under this subtitle or a finding under the Antidumping Act, 1921, or a notice of the suspension of an investigation, the administering authority, after publication of notice of such review in the Federal Register, shall—

(A) review and determine the amount of any net subsidy,

(B) review, and determine (in accordance with paragraph (2)), the amount of any antidumping duty, and

(C) review the current status of, and compliance with, any agreement by reason of which an investigation was suspended, and review the amount of any net subsidy or margin of sales at less than fair value involved in the agreement,

and shall publish the results of such review, together with notice of any duty to be assessed, estimated duty to be deposited, or investigation to be resumed in the Federal Register.

#### (2) Determination of antidumping duties

For the purpose of paragraph (1)(B), the administering authority shall determine—

(A) the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and included within that determination, and

(B) the amount, if any, by which the foreign market value of each such entry exceeds the United States price of the entry.

The administering authority, without revealing confidential information, shall publish notice of the results of the determination of antidumping duties in the Federal Register, and that determination shall be the basis for the assessment of antidumping duties on entries of the merchandise included within the determination and for deposits of estimated duties.

### (b) Review upon information or request

#### (1) In general

Whenever the administering authority or the Commission receives information concerning, or a request for the review of, an agreement accepted under section 1671c or 1673c of this title or an affirmative determination made under section 1671c(h)(2), 1671d(a), 1671d(b), 1673c(h)(2), 1673d(a), or 1673d(b) of this title, which shows changed circumstances sufficient to warrant a review of such determination, it shall conduct such a review after publishing notice of the review in the Federal Register. In reviewing its determination under section 1671c(h)(2) or 1673c(h)(2) of this title, the Commission shall consider whether, in the light of changed circumstances, an agreement accepted under section 1671c(c) or 1673c(c) of this title continues to eliminate completely the injurious effects of imports of the merchandise.

#### (2) Limitation on period for review

In the absence of good cause shown—

(A) the Commission may not review a determination under section 1671d(b) or 1673d(b) of this title, and

(B) the administering authority may not review a determination under section 1671d(a) or 1673d(a) of this title, or the suspension of an investigation suspended under section 1671c or 1673c of this title,

less than 24 months after the date of publication of notice of that determination or suspension.

### (c) Revocation of countervailing duty order or antidumping duty order

The administering authority may revoke, in whole or in part, a countervailing duty order or an antidumping duty order, or terminate a suspended investigation, after review under this section. Any such revocation or termination shall apply with respect to unliquidated entries of merchandise entered, or withdrawn from warehouse, for consumption on and after a date determined by the administering authority.

### (d) Hearings

Whenever the administering authority or the Commission conducts a review under this section it shall, upon the request of any interested party, hold a hearing in accordance with section 1677c(b) of this title in connection with that review.

### (e) Determination that basis for suspension no longer exists

If the determination of the Commission under the last sentence of subsection (b)(1) of this section is negative, the agreement shall be treated as not accepted, beginning on the date of the publication of the Commission's determination, and the administering authority and the Commission shall proceed, under section 1671c(i) or 1673c(i) of this title, as if the agreement had been violated on that date, except that no duty under any order subsequently issued shall be assessed on merchandise entered, or withdrawn from warehouse, for consumption before that date.

(June 17, 1930, ch. 497, title VII, § 751, as added July 26, 1979, Pub. L. 96–39, title I, § 101, 93 Stat. 175.)

#### References in Text

The Antidumping Act, 1921, referred to in subsec. (a)(1), is act May 27, 1921, ch. 14, title II, 42 Stat. 11, as amended, which was classified generally to sections 160 to 171 of this title, and was repealed by Pub. L. 96–39, title I, § 106(a), July 26, 1979, 93 Stat. 193.

#### Effective Date

Part effective Jan. 1, 1980, see section 107 of Pub. L. 96–39, set out as an Effective Date note under section 1671 of this title.

#### Section Referred to in Other Sections

This section is referred to in sections 1516a, 1671c, 1673c of this title.

**19 U.S.C. § 1675**

**1988 Edition**

SUBPART A—REVIEW OF AMOUNT OF DUTY AND AGREEMENTS OTHER THAN QUANTITATIVE RESTRICTION AGREEMENTS

## § 1675. Administrative review of determinations

### (a) Periodic review of amount of duty

#### (1) In general

At least once during each 12-month period beginning on the anniversary of the date of publication of a countervailing duty order under this subtitle or under section 1303 of this title, an antidumping duty order under this subtitle or a finding under the Antidumping Act, 1921, or a notice of the suspension of an investigation, the administering authority, if a request for such a review has been received and after publication of notice of such review in the Federal Register, shall—

(A) review and determine the amount of any net subsidy,

(B) review, and determine (in accordance with paragraph (2)), the amount of any antidumping duty, and

(C) review the current status of, and compliance with, any agreement by reason of which an investigation was suspended, and review the amount of any net subsidy or margin of sales at less than fair value involved in the agreement,

and shall publish the results of such review, together with notice of any duty to be assessed, estimated duty to be deposited, or investigation to be resumed in the Federal Register.

#### (2) Determination of antidumping duties

For the purpose of paragraph (1)(B), the administering authority shall determine—

(A) the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and included within that determination, and

(B) the amount, if any, by which the foreign market value of each such entry exceeds the United States price of the entry.

The administering authority, without revealing confidential information, shall publish notice of the results of the determination of antidumping duties in the Federal Register, and that determination shall be the basis for the assessment of antidumping duties on entries of the merchandise included within the determination and for deposits of estimated duties.

### (b) Review upon information or request

#### (1) In general

Whenever the administering authority or the Commission receives information concerning, or a request for the review of, an agreement accepted under section 1671c of this title (other than a quantitative restriction agreement described in subsection (a)(2) or (c)(3)) or 1673c of this title (other than a quantitative restriction agreement described in subsection (a)(2)) or an affirmative determination made under section 1671c(h)(2), 1671d(a), 1671d(b), 1673c(h)(2), 1673d(a), 1673d(b), 1676a(a)(1), or 1676a(a)(2) of this title, which shows changed circumstances sufficient to warrant a review of such determination, it shall conduct such a review after publishing notice of the review in the Federal Register. In reviewing its determination under section 1671c(h)(2) or 1673c(h)(2) of this title, the Commission shall consider whether, in the light of changed circumstances, an agreement accepted under section 1671c(c) or 1673c(c) of this title continues to eliminate completely the injurious effects of imports of the merchandise. During an investigation by the Commission, the party seeking revocation of an antidumping or countervailing duty order shall have the burden of persuasion with respect to whether there are changed circumstances sufficient to warrant revocation of the antidumping or countervailing duty order.

#### (2) Limitation on period for review

In the absence of good cause shown—

(A) the Commission may not review a determination under section 1671d(b) or 1673d(b) of this title, and

(B) the administering authority may not review a determination under section 1671d(a) or 1673d(a) of this title, or the suspension of an investigation suspended under section 1671c or 1673c of this title,

less than 24 months after the date of publication of notice of that determination or suspension.

### (c) Revocation of countervailing duty order or antidumping duty order

The administering authority may revoke, in whole or in part, a countervailing duty order or an antidumping duty order, or terminate a suspended investigation, after review under this section. The administering authority shall not revoke, in whole or in part, a countervailing duty order or terminate a suspended investigation on the basis of any export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the subsidy received. Any such revocation or termination shall apply with respect to unliquidated entries of merchandise entered, or withdrawn from warehouse, for consumption on and after a date determined by the administering authority.

### (d) Hearings

Whenever the administering authority or the Commission conducts a review under this section it shall, upon the request of any interested party, hold a hearing in accordance with section 1677c(b) of this title in connection with that review.

### (e) Determination that basis for suspension no longer exists

If the determination of the Commission under the last sentence of subsection (b)(1) of this section is negative, the agreement shall be treated as not accepted, beginning on the date of the publication of the Commission's determination, and the administering authority and the Commission shall proceed, under section 1671c(i) or 1673c(i) of this title, as if the agree-

ment had been violated on that date, except that no duty under any order subsequently issued shall be assessed on merchandise entered, or withdrawn from warehouse, for consumption before that date.

#### (f) Correction of ministerial errors

The administering authority shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section. Such procedures shall ensure opportunity for interested parties to present their views regarding any such errors. As used in this subsection, the term 'ministerial error' includes errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial.

(June 17, 1930, ch. 497, title VII, § 751, as added July 26, 1979, Pub. L. 96–39, title I, § 101, 93 Stat. 175, and amended Oct. 30, 1984, Pub. L. 98–573, title VI, § 611(a)(2), (3), 98 Stat. 3031; Oct. 22, 1986, Pub. L. 99–514, title XVIII, § 1886(a)(8), 100 Stat. 2922; Aug. 23, 1988, Pub. L. 100–418, title I, § 1333(b), 102 Stat. 1209.)

REFERENCES IN TEXT

The Antidumping Act, 1921, referred to in subsec. (a)(1), is act May 27, 1921, ch. 14, title II, 42 Stat. 11, as amended, which was classified generally to sections 160 to 171 of this title, and was repealed by Pub. L. 96–39, title I, § 106(a), July 26, 1979, 93 Stat. 193.

AMENDMENTS

1988—Subsec. (f). Pub. L. 100–418 added subsec. (f).
1986—Subsec. (b)(1). Pub. L. 99–514 inserted "or countervailing duty" after "antidumping" in two places in last sentence.
1984—Subsec. (a)(1). Pub. L. 98–573, § 611(a)(2)(A), inserted "if a request for such a review has been received and" in provisions preceding subpar. (A).
Subsec. (b)(1). Pub. L. 98–573, § 611(a)(2)(B), substituted "1671c of this title (other than a quantitative restriction agreement described in subsection (a)(2) or (c)(3)) or 1673c of this title (other than a quantitative restriction agreement described in subsection (a)(2))" for "1671c or 1673c of this title", inserted reference to section 1676a(a)(1) or 1676a(a)(2) of this title, and inserted provision that during an investigation by the Commission, the party seeking revocation of an antidumping order shall have the burden of persuasion with respect to whether there are changed circumstances sufficient to warrant revocation of the antidumping order.
Subsec. (c). Pub. L. 98–573, § 611(a)(3), inserted provision that the administering authority shall not revoke, in whole or in part, a countervailing duty order or terminate a suspended investigation on the basis of any export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the subsidy received.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, see section 626(b)(1) of Pub. L. 98–573, as amended, set out as a note under section 1671 of this title.

EFFECTIVE DATE

Part effective Jan. 1, 1980, see section 107 of Pub. L. 96–39, set out as a note under section 1671 of this title.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1516a, 1671b, 1671c, 1673c, 1677e, 1677f–1 of this title.

SUBPART B—CONSULTATIONS AND DETERMINATIONS REGARDING QUANTITATIVE RESTRICTION AGREEMENTS

### § 1676. Required consultations

#### (a) Agreements in response to subsidies

Within 90 days after the administering authority accepts a quantitative restriction agreement under section 1671c(a)(2) or (c)(3) of this title, the President shall enter into consultations with the government that is party to the agreement for purposes of—
(1) eliminating the subsidy completely, or
(2) reducing the net subsidy to a level that eliminates completely the injurious effect of exports to the United States of the merchandise.

#### (b) Modification of agreements on basis of consultations

At the direction of the President, the administering authority shall modify a quantitative restriction agreement as a result of consultations entered into under subsection (a) of this section.

#### (c) Special rule regarding agreements under section 1671c(c)(3) of this title

This chapter shall cease to apply to a quantitative restriction agreement described in section 1671c(c)(3) of this title at such time as that agreement ceases to have force and effect under section 1671c(f) of this title or violation is found under section 1671c(l) of this title.

(June 17, 1930, ch. 497, title VII, § 761, as added Oct. 30, 1984, Pub. L. 98–573, title VI, § 611(a)(4), 98 Stat. 3031.)

EFFECTIVE DATE

Section applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, see section 626(b)(1) of Pub. L. 98–573, as amended, set out as an Effective Date of 1984 Amendment note under section 1671 of this title.

### § 1676a. Required determinations

#### (a) In general

Before the expiration date, if any, of a quantitative restriction agreement accepted under section 1671c(a)(2) or 1671c(c)(3) of this title (if suspension of the related investigation is still in effect)—
(1) the administering authority shall, at the direction of the President, initiate a proceeding to determine whether any subsidy is being provided with respect to the merchandise subject to the agreement and, if being so provided, the net subsidy; and
(2) if the administering authority initiates a proceeding under paragraph (1), the Commis-

**19 U.S.C. § 1675**

**2020 Edition**

(i) makes a separate determination of the amount by which the normal value of such merchandise of the manufacturer exceeds the export price (or the constructed export price) of such merchandise of the manufacturer, and

(ii) specifically identifies the manufacturer by name with such amount in the affirmative dumping determination or in an antidumping duty order issued as a result of the affirmative dumping determination.

**(B) Exclusion**

Short life cycle merchandise of a manufacturer shall not be treated as being the subject of an affirmative dumping determination if—

(i) such merchandise of the manufacturer is part of a group of merchandise to which the administering authority assigns (in lieu of making separate determinations described in subparagraph (A)(i)(I)) an amount determined to be the amount by which the normal value of the merchandise in such group exceeds the export price (or the constructed export price) of the merchandise in such group, and

(ii) the merchandise and the manufacturer are not specified by name in the affirmative dumping determination or in any antidumping duty order issued as a result of such affirmative dumping determination.

**(4) Short life cycle merchandise**

The term ''short life cycle merchandise'' means any product that the Commission determines is likely to become outmoded within 4 years, by reason of technological advances, after the product is commercially available. For purposes of this paragraph, the term ''outmoded'' refers to a kind of style that is no longer state-of-the-art.

**(c) Transitional rules**

(1) For purposes of this section and section 1673b(b)(1)(B) and (C) of this title, all affirmative dumping determinations described in subsection (b)(2)(A) that were made after December 31, 1980, and before August 23, 1988, and all affirmative dumping determinations described in subsection (b)(2)(B) that were made after December 31, 1984, and before August 23, 1988, with respect to each category of short life cycle merchandise of the same manufacturer shall be treated as one affirmative dumping determination with respect to that category for that manufacturer which was made on the date on which the latest of such determinations was made.

(2) No affirmative dumping determination that—

(A) is described in subsection (b)(2)(A) and was made before January 1, 1981, or

(B) is described in subsection (b)(2)(B) and was made before January 1, 1985,

may be taken into account under this section or section 1673b(b)(1)(B) and (C) of this title.

(June 17, 1930, ch. 497, title VII, §739, as added Pub. L. 100–418, title I, §1323(a), Aug. 23, 1988, 102 Stat. 1195; amended Pub. L. 101–382, title I, §139(a)(2), Aug. 20, 1990, 104 Stat. 653; Pub. L.

103–465, title II, §233(a)(1)(D), (2)(A)(v), Dec. 8, 1994, 108 Stat. 4898.)

REFERENCES IN TEXT

The Harmonized Tariff Schedule of the United States, referred to in subsec. (a)(1)(B)(v), is not set out in the Code. See Publication of Harmonized Tariff Schedule note set out under section 1202 of this title.

PRIOR PROVISIONS

A prior section, act June 17, 1930, ch. 497, title VII, §739, as added July 26, 1979, Pub. L. 96–39, title I, §101, 93 Stat. 174, related to duties of customs officers, prior to repeal by Pub. L. 98–573, title VI, §610(a), Oct. 30, 1984, 98 Stat. 3031.

AMENDMENTS

1994—Subsec. (b)(2)(B)(ii), (3)(A)(i), (B)(i). Pub. L. 103–465 substituted ''normal value'' for ''foreign market value'' and ''export price (or the constructed export price)'' for ''United States price''.
1990—Subsec. (a)(1)(B)(v). Pub. L. 101–382 substituted ''Harmonized Tariff Schedule'' for ''Tariff Schedules''.

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

**§ 1673i. Repealed. Pub. L. 98–573, title VI, § 622(a)(1), Oct. 30, 1984, 98 Stat. 3039**

Section, act June 17, 1930, ch. 497, title VII, §740, as added July 26, 1979, Pub. L. 96–39, title I, §101, 93 Stat. 175, provided that the antidumping duty imposed by section 1673 of this title was to be treated as a normal customs duty for drawback purposes. See section 1677h of this title.

EFFECTIVE DATE OF REPEAL

Section repealed effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as an Effective Date of 1984 Amendment note under section 1671 of this title.

PART III—REVIEWS; OTHER ACTIONS REGARDING AGREEMENTS

CODIFICATION

The designation ''PART III'' was in the original ''Subtitle C'' and was editorially changed in order to conform the numbering format of this subtitle to the usages employed in the codification of the remainder of the Tariff Act of 1930 as originally enacted.

SUBPART A—REVIEW OF AMOUNT OF DUTY AND AGREEMENTS OTHER THAN QUANTITATIVE RESTRICTION AGREEMENTS

**§ 1675. Administrative review of determinations**

**(a) Periodic review of amount of duty**

**(1) In general**

At least once during each 12-month period beginning on the anniversary of the date of publication of a countervailing duty order under this subtitle or under section 1303[1] of this title, an antidumping duty order under this subtitle or a finding under the Antidumping Act, 1921, or a notice of the suspen-

---

[1] See References in Text note below.

sion of an investigation, the administering authority, if a request for such a review has been received and after publication of notice of such review in the Federal Register, shall—

    (A) review and determine the amount of any net countervailable subsidy,

    (B) review, and determine (in accordance with paragraph (2)), the amount of any antidumping duty, and

    (C) review the current status of, and compliance with, any agreement by reason of which an investigation was suspended, and review the amount of any net countervailable subsidy or dumping margin involved in the agreement,

and shall publish in the Federal Register the results of such review, together with notice of any duty to be assessed, estimated duty to be deposited, or investigation to be resumed.

**(2) Determination of antidumping duties**

  **(A) In general**

    For the purpose of paragraph (1)(B), the administering authority shall determine—

      (i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and

      (ii) the dumping margin for each such entry.

  **(B) Determination of antidumping or countervailing duties for new exporters and producers**

    **(i) In general**

    If the administering authority receives a request from an exporter or producer of the subject merchandise establishing that—

      (I) such exporter or producer did not export the merchandise that was the subject of an antidumping duty or countervailing duty order to the United States (or, in the case of a regional industry, did not export the subject merchandise for sale in the region concerned) during the period of investigation, and

      (II) such exporter or producer is not affiliated (within the meaning of section 1677(33) of this title) with any exporter or producer who exported the subject merchandise to the United States (or in the case of a regional industry, who exported the subject merchandise for sale in the region concerned) during that period,

the administering authority shall conduct a review under this subsection to establish an individual weighted average dumping margin or an individual countervailing duty rate (as the case may be) for such exporter or producer.

    **(ii) Time for review under clause (i)**

    The administering authority shall commence a review under clause (i) in the calendar month beginning after—

      (I) the end of the 6-month period beginning on the date of the countervailing duty or antidumping duty order under review, or

      (II) the end of any 6-month period occurring thereafter,

if the request for the review is made during that 6-month period.

    **(iii) Time limits**

    The administering authority shall make a preliminary determination in a review conducted under this subparagraph within 180 days after the date on which the review is initiated, and a final determination within 90 days after the date the preliminary determination is issued, except that if the administering authority concludes that the case is extraordinarily complicated, it may extend the 180-day period to 300 days and may extend the 90-day period to 150 days.

    **(iv) Determinations based on bona fide sales**

    Any weighted average dumping margin or individual countervailing duty rate determined for an exporter or producer in a review conducted under clause (i) shall be based solely on the bona fide United States sales of an exporter or producer, as the case may be, made during the period covered by the review. In determining whether the United States sales of an exporter or producer made during the period covered by the review were bona fide, the administering authority shall consider, depending on the circumstances surrounding such sales—

      (I) the prices of such sales;

      (II) whether such sales were made in commercial quantities;

      (III) the timing of such sales;

      (IV) the expenses arising from such sales;

      (V) whether the subject merchandise involved in such sales was resold in the United States at a profit;

      (VI) whether such sales were made on an arms-length basis; and

      (VII) any other factor the administering authority determines to be relevant as to whether such sales are, or are not, likely to be typical of those the exporter or producer will make after completion of the review.

  **(C) Results of determinations**

    The determination under this paragraph shall be the basis for the assessment of countervailing or antidumping duties on entries of merchandise covered by the determination and for deposits of estimated duties.

**(3) Time limits**

  **(A) Preliminary and final determinations**

    The administering authority shall make a preliminary determination under subparagraph (A), (B), or (C) of paragraph (1) within 245 days after the last day of the month in which occurs the anniversary of the date of publication of the order, finding, or suspension agreement for which the review under paragraph (1) is requested, and a final determination under paragraph (1) within 120 days after the date on which the preliminary de-

termination is published. If it is not practicable to complete the review within the foregoing time, the administering authority may extend that 245-day period to 365 days and may extend that 120-day period to 180 days. The administering authority may extend the time for making a final determination without extending the time for making a preliminary determination, if such final determination is made not later than 300 days after the date on which the preliminary determination is published.

**(B) Liquidation of entries**

If the administering authority orders any liquidation of entries pursuant to a review under paragraph (1), such liquidation shall be made promptly and, to the greatest extent practicable, within 90 days after the instructions to Customs are issued. In any case in which liquidation has not occurred within that 90-day period, the Secretary of the Treasury shall, upon the request of the affected party, provide an explanation thereof.

**(C) Effect of pending review under section 1516a**

In a case in which a final determination under paragraph (1) is under review under section 1516a of this title and a liquidation of entries covered by the determination is enjoined under section 1516a(c)(2) of this title or suspended under section 1516a(g)(5)(C) of this title, the administering authority shall, within 10 days after the final disposition of the review under section 1516a of this title, transmit to the Federal Register for publication the final disposition and issue instructions to the Customs Service with respect to the liquidation of entries pursuant to the review. In such a case, the 90-day period referred to in subparagraph (B) shall begin on the day on which the administering authority issues such instructions.

**(4) Absorption of antidumping duties**

During any review under this subsection initiated 2 years or 4 years after the publication of an antidumping duty order under section 1673e(a) of this title, the administering authority, if requested, shall determine whether antidumping duties have been absorbed by a foreign producer or exporter subject to the order if the subject merchandise is sold in the United States through an importer who is affiliated with such foreign producer or exporter. The administering authority shall notify the Commission of its findings regarding such duty absorption for the Commission to consider in conducting a review under subsection (c).

**(b) Reviews based on changed circumstances**

**(1) In general**

Whenever the administering authority or the Commission receives information concerning, or a request from an interested party for a review of—

(A) a final affirmative determination that resulted in an antidumping duty order under this subtitle or a finding under the Anti-

dumping Act, 1921, or in a countervailing duty order under this subtitle or section 1303 [1] of this title,

(B) a suspension agreement accepted under section 1671c or 1673c of this title, or

(C) a final affirmative determination resulting from an investigation continued pursuant to section 1671c(g) or 1673c(g) of this title,

which shows changed circumstances sufficient to warrant a review of such determination or agreement, the administering authority or the Commission (as the case may be) shall conduct a review of the determination or agreement after publishing notice of the review in the Federal Register.

**(2) Commission review**

In conducting a review under this subsection, the Commission shall—

(A) in the case of a countervailing duty order or antidumping duty order or finding, determine whether revocation of the order or finding is likely to lead to continuation or recurrence of material injury,

(B) in the case of a determination made pursuant to section 1671c(h)(2) or 1673c(h)(2) of this title, determine whether the suspension agreement continues to eliminate completely the injurious effects of imports of the subject merchandise, and

(C) in the case of an affirmative determination resulting from an investigation continued under section 1671c(g) or 1673c(g) of this title, determine whether termination of the suspended investigation is likely to lead to continuation or recurrence of material injury.

**(3) Burden of persuasion**

During a review conducted by the Commission under this subsection—

(A) the party seeking revocation of an order or finding described in paragraph (1)(A) shall have the burden of persuasion with respect to whether there are changed circumstances sufficient to warrant such revocation, and

(B) the party seeking termination of a suspended investigation or a suspension agreement shall have the burden of persuasion with respect to whether there are changed circumstances sufficient to warrant such termination.

**(4) Limitation on period for review**

In the absence of good cause shown—

(A) the Commission may not review a determination made under section 1671d(b) or 1673d(b) of this title, or an investigation suspended under section 1671c or 1673c of this title, and

(B) the administering authority may not review a determination made under section 1671d(a) or 1673d(a) of this title, or an investigation suspended under section 1671c or 1673c of this title,

less than 24 months after the date of publication of notice of that determination or suspension.

## (c) Five-year review

### (1) In general

Notwithstanding subsection (b) and except in the case of a transition order defined in paragraph (6), 5 years after the date of publication of—

(A) a countervailing duty order (other than a countervailing duty order to which subparagraph (B) applies or which was issued without an affirmative determination of injury by the Commission under section 1303[1] of this title), an antidumping duty order, or a notice of suspension of an investigation, described in subsection (a)(1),

(B) a notice of injury determination under section 1675b of this title with respect to a countervailing duty order, or

(C) a determination under this section to continue an order or suspension agreement,

the administering authority and the Commission shall conduct a review to determine, in accordance with section 1675a of this title, whether revocation of the countervailing or antidumping duty order or termination of the investigation suspended under section 1671c or 1673c of this title would be likely to lead to continuation or recurrence of dumping or a countervailable subsidy (as the case may be) and of material injury.

### (2) Notice of initiation of review

Not later than 30 days before the fifth anniversary of the date described in paragraph (1), the administering authority shall publish in the Federal Register a notice of initiation of a review under this subsection and request that interested parties submit—

(A) a statement expressing their willingness to participate in the review by providing information requested by the administering authority and the Commission,

(B) a statement regarding the likely effects of revocation of the order or termination of the suspended investigation, and

(C) such other information or industry data as the administering authority or the Commission may specify.

### (3) Responses to notice of initiation

#### (A) No response

If no interested party responds to the notice of initiation under this subsection, the administering authority shall issue a final determination, within 90 days after the initiation of a review, revoking the order or terminating the suspended investigation to which such notice relates. For purposes of this paragraph, an interested party means a party described in section 1677(9)(C), (D), (E), (F), or (G) of this title.

#### (B) Inadequate response

If interested parties provide inadequate responses to a notice of initiation, the administering authority, within 120 days after the initiation of the review, or the Commission, within 150 days after such initiation, may issue, without further investigation, a final determination based on the facts available, in accordance with section 1677e of this title.

### (4) Waiver of participation by certain interested parties

#### (A) In general

An interested party described in section 1677(9)(A) or (B) of this title may elect not to participate in a review conducted by the administering authority under this subsection and to participate only in the review conducted by the Commission under this subsection.

#### (B) Effect of waiver

In a review in which an interested party waives its participation pursuant to this paragraph, the administering authority shall conclude that revocation of the order or termination of the investigation would be likely to lead to continuation or recurrence of dumping or a countervailable subsidy (as the case may be) with respect to that interested party.

### (5) Conduct of review

#### (A) Time limits for completion of review

Unless the review has been completed pursuant to paragraph (3) or paragraph (4) applies, the administering authority shall make its final determination pursuant to section 1675(b) or (c) of this title within 240 days after the date on which a review is initiated under this subsection. If the administering authority makes a final affirmative determination, the Commission shall make its final determination pursuant to section 1675a(a) of this title within 360 days after the date on which a review is initiated under this subsection.

#### (B) Extension of time limit

The administering authority or the Commission (as the case may be) may extend the period of time for making their respective determinations under this subsection by not more than 90 days, if the administering authority or the Commission (as the case may be) determines that the review is extraordinarily complicated. In a review in which the administering authority extends the time for making a final determination, but the Commission does not extend the time for making a determination, the Commission's determination shall be made not later than 120 days after the date on which the final determination of the administering authority is published.

#### (C) Extraordinarily complicated

For purposes of this subsection, the administering authority or the Commission (as the case may be) may treat a review as extraordinarily complicated if—

(i) there is a large number of issues,

(ii) the issues to be considered are complex,

(iii) there is a large number of firms involved,

(iv) the orders or suspended investigations have been grouped as described in subparagraph (D), or

(v) it is a review of a transition order.

#### (D) Grouped reviews

The Commission, in consultation with the administering authority, may group orders

or suspended investigations for review if it considers that such grouping is appropriate and will promote administrative efficiency. Where orders or suspended investigations have been grouped, the Commission shall, subject to subparagraph (B), make its final determination under this subsection not later than 120 days after the date that the administering authority publishes notice of its final determination with respect to the last order or agreement in the group.

**(6) Special transition rules**

**(A) Schedule for reviews of transition orders**

**(i) Initiation**

The administering authority shall begin its review of transition orders in the 42d calendar month after the date such orders are issued. A review of all transition orders shall be initiated not later than the 5th anniversary after the date such orders are issued.

**(ii) Completion**

A review of a transition order shall be completed not later than 18 months after the date such review is initiated. Reviews of all transition orders shall be completed not later than 18 months after the 5th anniversary of the date such orders are issued.

**(iii) Subsequent reviews**

The time limits set forth in clauses (i) and (ii) shall be applied to all subsequent 5-year reviews of transition orders by substituting ''date of the determination to continue such orders'' for ''date such orders are issued''.

**(iv) Revocation and termination**

No transition order may be revoked under this subsection before the date that is 5 years after the date the WTO Agreement enters into force with respect to the United States.

**(B) Sequence of transition reviews**

The administering authority, in consultation with the Commission, shall determine such sequence of review of transition orders as it deems appropriate to promote administrative efficiency. To the extent practicable, older orders shall be reviewed first.

**(C) ''Transition order'' defined**

For purposes of this section, the term ''transition order'' means—

(i) a countervailing duty order under this subtitle or under section 1303[1] of this title,

(ii) an antidumping duty order under this subtitle or a finding under the Antidumping Act, 1921, or

(iii) a suspension of an investigation under section 1671c or 1673c of this title,

which is in effect on the date the WTO Agreement enters into force with respect to the United States.

**(D) Issue date for transition orders**

For purposes of this subsection, a transition order shall be treated as issued on the date the WTO Agreement enters into force with respect to the United States, if such order is based on an investigation conducted by both the administering authority and the Commission.

**(7) Exclusions from computations**

**(A) In general**

Subject to subparagraph (B), there shall be excluded from the computation of the 5-year period described in paragraph (1) and the periods described in paragraph (6) any period during which the importation of the subject merchandise is prohibited on account of the imposition, under the International Emergency Economic Powers Act [50 U.S.C. 1701 et seq.] or other provision of law, of sanctions by the United States against the country in which the subject merchandise originates.

**(B) Application of exclusion**

Subparagraph (A) shall apply only with respect to subject merchandise which originates in a country that is not a WTO member.

**(d) Revocation of order or finding; termination of suspended investigation**

**(1) In general**

The administering authority may revoke, in whole or in part, a countervailing duty order or an antidumping duty order or finding, or terminate a suspended investigation, after review under subsection (a) or (b). The administering authority shall not revoke, in whole or in part, a countervailing duty order or terminate a suspended investigation on the basis of any export taxes, duties, or other charges levied on the export of the subject merchandise to the United States which are specifically intended to offset the countervailable subsidy received.

**(2) Five-year reviews**

In the case of a review conducted under subsection (c), the administering authority shall revoke a countervailing duty order or an antidumping duty order or finding, or terminate a suspended investigation, unless—

(A) the administering authority makes a determination that dumping or a countervailable subsidy, as the case may be, would be likely to continue or recur, and

(B) the Commission makes a determination that material injury would be likely to continue or recur as described in section 1675a(a) of this title.

**(3) Application of revocation or termination**

A determination under this section to revoke an order or finding or terminate a suspended investigation shall apply with respect to unliquidated entries of the subject merchandise which are entered, or withdrawn from warehouse, for consumption on or after the date determined by the administering authority.

**(e) Hearings**

Whenever the administering authority or the Commission conducts a review under this sec-

tion, it shall, upon the request of an interested party, hold a hearing in accordance with section 1677c(b) of this title in connection with that review.

**(f) Determination that basis for suspension no longer exists**

If the determination of the Commission under subsection (b)(2)(B) is negative, the suspension agreement shall be treated as not accepted, beginning on the date of publication of the Commission's determination, and the administering authority and the Commission shall proceed, under section 1671c(i) or 1673c(i) of this title, as if the suspension agreement had been violated on that date, except that no duty under any order subsequently issued shall be assessed on merchandise entered, or withdrawn from warehouse, for consumption before that date.

**(g) Reviews to implement results of subsidies enforcement proceeding**

**(1) Violations of article 8 of the subsidies agreement**

If—

(A) the administering authority receives notice from the Trade Representative of a violation of Article 8 of the Subsidies Agreement,

(B) the administering authority has reason to believe that merchandise subject to an existing countervailing duty order or suspended investigation is benefiting from the subsidy or subsidy program found to have been in violation of Article 8 of the Subsidies Agreement, and

(C) no review pursuant to subsection (a)(1) is in progress,

the administering authority shall conduct a review of the order or suspended investigation to determine whether the subject merchandise benefits from the subsidy or subsidy program found to have been in violation of Article 8 of the Subsidies Agreement. If the administering authority determines that the subject merchandise is benefiting from the subsidy or subsidy program, it shall make appropriate adjustments in the estimated duty to be deposited or appropriate revisions to the terms of the suspension agreement.

**(2) Withdrawal of subsidy or imposition of countermeasures**

If the Trade Representative notifies the administering authority that, pursuant to Article 4 or Article 7 of the Subsidies Agreement—

(A)(i) the United States has imposed countermeasures, and

(ii) such countermeasures are based on the effects in the United States of imports of merchandise that is the subject of a countervailing duty order, or

(B) a WTO member country has withdrawn a countervailable subsidy provided with respect to merchandise subject to a countervailing duty order,

the administering authority shall conduct a review to determine if the amount of the estimated duty to be deposited should be adjusted or the order should be revoked.

**(3) Expedited review**

The administering authority shall conduct reviews under this subsection on an expedited basis, and shall publish the results of such reviews in the Federal Register.

**(h) Correction of ministerial errors**

The administering authority shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section. Such procedures shall ensure opportunity for interested parties to present their views regarding any such errors. As used in this subsection, the term "ministerial error" includes errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial.

(June 17, 1930, ch. 497, title VII, §751, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 175; amended Pub. L. 98–573, title VI, §611(a)(2), (3), Oct. 30, 1984, 98 Stat. 3031; Pub. L. 99–514, title XVIII, §1886(a)(8), Oct. 22, 1986, 100 Stat. 2922; Pub. L. 100–418, title I, §1333(b), Aug. 23, 1988, 102 Stat. 1209; Pub. L. 103–465, title II, §§220(a), 283(c), Dec. 8, 1994, 108 Stat. 4857, 4930; Pub. L. 106–36, title II, §2410, June 25, 1999, 113 Stat. 171; Pub. L. 114–125, title IV, §433, Feb. 24, 2016, 130 Stat. 171.)

REFERENCES IN TEXT

Section 1303 of this title, referred to in subsecs. (a)(1), (b)(1)(A), and (c)(1)(A), (6)(C)(i), is defined in section 1677(26) of this title to mean section 1330 as in effect on the day before Jan. 1, 1995.

The Antidumping Act, 1921, referred to in subsecs. (a)(1), (b)(1)(A), and (c)(6)(C)(ii), is act May 27, 1921, ch. 14, title II, 42 Stat. 11, as amended, which was classified generally to sections 160 to 171 of this title, and was repealed by Pub. L. 96–39, title I, §106(a), July 26, 1979, 93 Stat. 193.

The International Emergency Economic Powers Act, referred to in subsec. (c)(7)(A), is title II of Pub. L. 95–223, Dec. 28, 1977, 91 Stat. 1626, as amended, which is classified generally to chapter 35 (§1701 et seq.) of Title 50, War and National Defense. For complete classification of this Act to the Code, see Short Title note set out under section 1701 of Title 50 and Tables.

AMENDMENTS

2016—Subsec. (a)(2)(B)(iii), (iv). Pub. L. 114–125 added cl. (iv), redesignated former cl. (iv) as (iii), and struck out former cl. (iii). Prior to amendment, text of cl. (iii) read as follows: "The administering authority shall, at the time a review under this subparagraph is initiated, direct the Customs Service to allow, at the option of the importer, the posting, until the completion of the review, of a bond or security in lieu of a cash deposit for each entry of the subject merchandise."

1999—Subsec. (c)(7). Pub. L. 106–36 added par. (7).

1994—Pub. L. 103–465, §283(c), added subsec. (g) and redesignated former subsec. (g) as (h).

Pub. L. 103–465, §220(a), amended section generally, substituting present provisions for provisions relating to administrative review of determinations, which provided for periodic review of amount of duty in subsec. (a), review upon information or request in subsec. (b), revocation of countervailing duty order or antidumping duty order in subsec. (c), hearings in subsec. (d), determination that basis for suspension no longer existed in subsec. (e), and correction of ministerial errors in subsec. (f).

1988—Subsec. (f). Pub. L. 100–418 added subsec. (f).

1986—Subsec. (b)(1). Pub. L. 99–514 inserted ''or countervailing duty'' after ''antidumping'' in two places in last sentence.

1984—Subsec. (a)(1). Pub. L. 98–573, § 611(a)(2)(A), inserted ''if a request for such a review has been received and'' in provisions preceding subpar. (A).

Subsec. (b)(1). Pub. L. 98–573, § 611(a)(2)(B), substituted ''1671c of this title (other than a quantitative restriction agreement described in subsection (a)(2) or (c)(3)) or 1673c of this title (other than a quantitative restriction agreement described in subsection (a)(2))'' for ''1671c or 1673c of this title'', inserted reference to section 1676a(a)(1) or 1676a(a)(2) of this title, and inserted provision that during an investigation by the Commission, the party seeking revocation of an antidumping order shall have the burden of persuasion with respect to whether there are changed circumstances sufficient to warrant revocation of the antidumping order.

Subsec. (c). Pub. L. 98–573, § 611(a)(3), inserted provision that the administering authority shall not revoke, in whole or in part, a countervailing duty order or terminate a suspended investigation on the basis of any export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the subsidy received.

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, see section 626(b)(1) of Pub. L. 98–573, as amended, set out as a note under section 1671 of this title.

EFFECTIVE DATE

Part effective Jan. 1, 1980, see section 107 of Pub. L. 96–39, set out as a note under section 1671 of this title.

TRANSFER OF FUNCTIONS

For transfer of functions, personnel, assets, and liabilities of the United States Customs Service of the Department of the Treasury, including functions of the Secretary of the Treasury relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 203(1), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6. For establishment of U.S. Customs and Border Protection in the Department of Homeland Security, treated as if included in Pub. L. 107–296 as of Nov. 25, 2002, see section 211 of Title 6, as amended generally by Pub. L. 114–125, and section 802(b) of Pub. L. 114–125, set out as a note under section 211 of Title 6.

SUSPENSION OF THE AVAILABILITY OF BONDS TO NEW SHIPPERS

Pub. L. 109–280, title XIV, § 1632(a), Aug. 17, 2006, 120 Stat. 1165, provided that: ''Clause (iii) of section 751(a)(2)(B) of the Tariff Act of 1930 (19 U.S.C. 1675(a)(2)(B)(iii)) shall not be effective during the period beginning on April 1, 2006, and ending on June 30, 2009.''

URUGUAY ROUND AGREEMENTS: ENTRY INTO FORCE

The Uruguay Round Agreements, including the World Trade Organization Agreement and agreements an-nexed to that Agreement, as referred to in section 3511(d) of this title, entered into force with respect to the United States on Jan. 1, 1995. See note set out under section 3511 of this title.

PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101–1147 and 1171–1177] or title XVIII [§§ 1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

## § 1675a. Special rules for section 1675(b) and 1675(c) reviews

### (a) Determination of likelihood of continuation or recurrence of material injury

#### (1) In general

In a review conducted under section 1675(b) or (c) of this title, the Commission shall determine whether revocation of an order, or termination of a suspended investigation, would be likely to lead to continuation or recurrence of material injury in a reasonably foreseeable time. The Commission shall consider the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked or the suspended investigation is terminated. The Commission shall take into account—

(A) its prior injury determinations, including the volume, price effect, and impact of imports of the subject merchandise on the industry before the order was issued or the suspension agreement was accepted,

(B) whether any improvement in the state of the industry is related to the order or the suspension agreement,

(C) whether the industry is vulnerable to material injury if the order is revoked or the suspension agreement is terminated, and

(D) in an antidumping proceeding under section 1675(c) of this title, the findings of the administering authority regarding duty absorption under section 1675(a)(4) of this title.

#### (2) Volume

In evaluating the likely volume of imports of the subject merchandise if the order is revoked or the suspended investigation is terminated, the Commission shall consider whether the likely volume of imports of the subject merchandise would be significant if the order is revoked or the suspended investigation is terminated, either in absolute terms or relative to production or consumption in the United States. In so doing, the Commission shall consider all relevant economic factors, including—

(A) any likely increase in production capacity or existing unused production capacity in the exporting country,

(B) existing inventories of the subject merchandise, or likely increases in inventories,

(C) the existence of barriers to the importation of such merchandise into countries other than the United States, and

**19 C.F.R. § 353.22**

**1990 Edition**

not later than 135 days after the date of publication of the preliminary determination, unless the Secretary finds compelling reasons to deny the request.

(2) If the Secretary decides to postpone the final determination under paragraph (b)(1) of this section, the Secretary will notify all parties to the proceeding and will publish in the FEDERAL REGISTER notice of "Postponement of Final Antidumping Duty Determination," stating the reason for the postponement.

(c) *Commission access to information.* The Secretary will make available to the Commission and to employees of the Commission directly involved in the proceeding all information upon which the Secretary based the final determination and which the Commission may consider relevant to its injury determination.

(d) *Effect of negative final determination.* An investigation terminates, without further comment or action, upon publication in the FEDERAL REGISTER of the Secretary's or the Commission's negative final determination. If the Secretary previously ordered suspension of liquidation, the Secretary will order the suspension ended on the date of publication of the notice of negative final determination and will instruct the Customs Service to release any cash deposit or bond.

(e) *Disclosure.* Promptly after making the final determination, the Secretary will provide to parties to the proceeding which request disclosure a further explanation of the calculation methodology used in making the determination.

§ 353.21 Antidumping duty order.

Not later than seven days after receipt of notice of the Commission's affirmative final determination under section 735 of the Act, the Secretary will publish in the FEDERAL REGISTER an "Antidumping Duty Order" that:

(a) Instructs the Customs Service to assess antidumping duties on the merchandise, in accordance with the Secretary's instructions at the completion of each administrative review requested under § 353.22(a) or, if not requested, in accordance with the Secretary's instructions under § 353.22(e);

(b) For each entry of the merchandise entered, or withdrawn from warehouse, for consumption on or after the date of publication of the order, instructs the Customs Service to require a cash deposit of estimated antidumping duties equal to the amount of the estimated weighted-average dumping margin stated in the Secretary's final determination;

(c) Excludes from the application of the order any producer or reseller for which the Secretary finds that there was no weighted-average dumping margin during the period for which the Department measured dumping in the investigation; and

(d) Orders the suspension of liquidation ended for all entries of the merchandise entered, or withdrawn from warehouse, for consumption before the date of publication of the Commission's final determination, and instructs the Customs Service to release the cash deposit or bond on those entries, if in its final determination, the Commission found a threat of material injury or material retardation of the establishment of an industry, unless the Commission in its final determination also found that, absent the suspension of liquidation ordered under § 353.15(a), it would have found material injury.

§ 353.22 Administrative review of orders and suspension agreements.

(a) *Request for Administrative Review; Withdrawal of Request for Review.* (1) Each year during the anniversary month of the publication of an order (the calendar month in which the anniversary of the date of publication of the order or finding occurs), an interested party, as defined in paragraph (k)(2), (k)(3), (k)(4), (k)(5), or (k)(6) of § 353.2, may request in writing that the Secretary conduct an administrative review of specified individual producers or resellers covered by an order, if the requesting person states why the person desires the Secretary to review those particular producers or resellers.

(2) During the same month, a producer or reseller covered by an order may request in writing that the Secre-

tary conduct an administrative review of only that person.

(3) During the same month, an importer of the merchandise may request in writing that the Secretary conduct an administrative review of only a producer or reseller of the merchandise imported by that importer.

(4) Each year during the anniversary month of the publication of a suspension of investigation (the calendar month in which the anniversary of the date of publication of the suspension of investigation occurs), an interested party, as defined in § 353.2(k), may request in writing that the Secretary conduct an administrative review of all producers or resellers covered by an agreement on which suspension of investigation was based.

(5) The Secretary may permit a party that requests a review under paragraph (a) of this section to withdraw the request not later than 90 days after the date of publication of notice of initiation of the requested review. The Secretary may extend this time limit if the Secretary decides that it is reasonable to do so. When a request for review is withdrawn, the Secretary will publish in the FEDERAL REGISTER notice of "Termination of Antidumping Duty Administrative Review" or, if appropriate, "Partial Termination of Antidumping Duty Administrative Review."

(b) *Period under review.* (1) Except as provided in paragraph (b)(2) of this section, an administrative review under paragraph (a) of this section normally will cover, as appropriate, entries, exports, or sales of the merchandise during the 12 months immediately preceding the most recent anniversary month.

(2) For requests received during the first anniversary month after publication of an order or suspension of investigation, the review under paragraph (a) of this section will cover, as appropriate, entries, exports, or sales during the period from the date of suspension of liquidation under this part or suspension of investigation to the end of the month immediately preceding the first anniversary month.

(c) *Procedures.* After receipt of a timely request under paragraph (a) of this section, or on the Secretary's own

initiative when appropriate, the Secretary will:

(1) Not later than 15 days after the anniversary month, publish in the FEDERAL REGISTER notice of "Initiation of Antidumping Duty Administrative Review;"

(2) Normally not later than 30 days after the date of publication of the notice of initiation, send to appropriate interested parties or a sample of interested parties questionnaires requesting factual information for the review;

(3) Conduct, if appropriate, a verification under § 353.36;

(4) Issue preliminary results of review, based on the available information, that include:

(i) The factual and legal conclusions on which the preliminary results are based; -

(ii) The weighted-average dumping margin, if any, during the period of review for each person reviewed; and

(iii) For an agreement, the Secretary's preliminary conclusions with respect to the status of, and compliance with, the agreement;

(5) Publish in the FEDERAL REGISTER notice of "Preliminary Results of Antidumping Duty Administrative Review," including the weighted-average dumping margins, if any, and an invitation for argument consistent with § 353.38, and notify all parties to the proceeding;

(6) Promptly after issuing the preliminary results, provide to parties to the proceeding which request disclosure a further explanation of the calculation methodology used in reaching the preliminary results;

(7) Not later than 365 days after the anniversary month, issue final results of review that include:

(i) The factual and legal conclusions on which the final results are based;

(ii) The weighted-average dumping margin, if any, during the period of review for each person reviewed; and

(iii) For an agreement, the Secretary's conclusions with respect to the status of, and compliance with, the agreement;

(8) Publish in the FEDERAL REGISTER notice of "Final Results of Antidumping Duty Administrative Review," including the weighted-average dumping

margins, if any, and notify all parties to the proceeding;

(9) Promptly after issuing the final results, provide to parties to the proceeding which request disclosure a further explanation of the calculation methodology used in reaching the final results; and

(10) Promptly after publication of the notice of final results, instruct the Customs Service to assess antidumping duties on the merchandise described in paragraph (b) of this section and to collect a cash deposit of estimated antidumping duties on future entries.

(d) *Possible cancellation or revision of suspension agreement.* If during an administrative review the Secretary determines or has reason to believe that a signatory exporter has violated a suspension agreement or that the agreement no longer meets the requirements of § 353.18, the Secretary will take appropriate action under § 353.19. The Secretary may suspend the time limit in paragraph (c)(7) of this section while taking action under § 353.19(b).

(e) *Automatic assessment of duty.* (1) For orders, if the Secretary does not receive a timely request under paragraph (a)(1), (a)(2), or (a)(3) of this section, the Secretary, without additional notice, will instruct the Customs Service to assess antidumping duties on the merchandise described in paragraph (b) of this section at rates equal to the cash deposit of, or bond for, estimated antidumping duties required on that merchandise at the time of entry, or withdrawal from warehouse, for consumption and to continue to collect the cash deposits previously ordered.

(2) If the Secretary receives a timely request under paragraph (a)(1), (a)(2), or (a)(3) of this section, the Secretary in accordance with paragraph (e)(1) of this section will instruct the Customs Service to assess antidumping duties, and to continue to collect the cash deposits, on the merchandise not covered by the request.

(f) *Changed circumstances review.* (1) If the Secretary concludes from available information, including information in a request under this paragraph for an administrative review, that changed circumstances sufficient

to warrant a review exist, the Secretary will:

(i) Publish in the FEDERAL REGISTER notice of "Initiation of Changed Circumstances Antidumping Duty Administrative Review;"

(ii) If necessary, send to appropriate interested parties, or a sample of interested parties, questionnaires requesting factual information for the review;

(iii) Conduct, if appropriate, a verification under § 353.36;

(iv) Issue preliminary results of review based on the available information that include the factual and legal conclusions on which the preliminary results are based and any action the Secretary proposes based on the preliminary results;

(v) Publish in the FEDERAL REGISTER notice of "Preliminary Results of Changed Circumstances Antidumping Duty Administrative Review," including an invitation for argument consistent with § 353.38;

(vi) Notify all parties to the proceeding of the preliminary results;

(vii) Promptly after issuing the preliminary results, provide to parties to the proceeding which request disclosure a further explanation of the preliminary results;

(viii) Not later than 270 days after the date of the Secretary's initiation of the review, issue final results of review that include the factual and legal conclusions on which the final results are based and any action, including action under paragraph (c)(9) of this section and § 353.25(d), that the Secretary will take based on the final results;

(ix) Publish in the FEDERAL REGISTER notice of "Final Results of Changed Circumstances Antidumping Duty Administrative Review;"

(x) Notify all parties to the proceeding; and

(xi) Promptly after issuing the final results, provide to parties to the proceeding which request disclosure a further explanation of the final results.

(2) Changed circumstances reviews may be requested at any time, including periods other than anniversary months.

(3) The Secretary will not initiate an administrative review under paragraph (f) of this section before the end

162

of the second annual anniversary month (the calendar month in which the anniversary of the date of publication of the order or suspension occurs) after the date of publication of the Secretary's affirmative preliminary determination or suspension of investigation, unless the Secretary finds that good cause exists.

(4) If the Secretary concludes that expedited action is warranted, the Secretary may combine the notices identified in paragraphs (f)(1)(i) and (f)(1)(v) of this section in a notice of "Initiation and Preliminary Results of Changed Circumstances Antidumping Duty Administrative Review." In that event, the notification required in paragraph (f)(1)(vi) of this section will be given to all interested parties included in the Department's service list described in § 353.31(h).

(g) *Expedited review.* (1) Not later than seven days after publication of an antidumping duty order, a producer or reseller may request in writing that the Secretary conduct an expedited administrative review for that producer's or reseller's shipments of the merchandise entered, or withdrawn from warehouse, for consumption:

(i) On or after the date of publication of the Secretary's affirmative preliminary determination or, if the Secretary's preliminary determination was negative, the Secretary's final determination, and

(ii) Before the date of publication of the Commission's final determination.

(2) The request must be accompanied by information the Secretary deems necessary to calculate the dumping margin, if any.

(3) If, based upon the information submitted with the request, the Secretary concludes that the dumping margin may be determined not later than 90 days after the date of publication of the order, the Secretary may conduct an expedited administrative review of the requesting producer or reseller.

(4) If the Secretary decides to conduct an expedited review, the Secretary will:

(i) Publish in the FEDERAL REGISTER notice of "Initiation of Expedited Antidumping Duty Administrative Review," which will include an invita-

tion for argument consistent with § 353.38, and notify all parties to the proceeding;

(ii) Instruct the Customs Service to accept, in lieu of the cash deposit of estimated antidumping duties under § 353.21(b), a bond for each entry of the merchandise entered, or withdrawn from warehouse, for consumption on or after the date of publication of the notice of initiation and through the date not later than 90 days after the date of publication of the order;

(iii) Conduct a verification under § 353.36;

(iv) Provide to parties to the proceeding which request disclosure an explanation of the calculation methodology used for the Secretary's analysis;

(v) Issue final results of review that include:

(A) The factual and legal conclusions on which the final results are based; and

(B) The weighted-average dumping margin, if any, during the period of review for each person reviewed;

(vi) Publish in the FEDERAL REGISTER notice of "Final Results of Expedited Antidumping Duty Administrative Review," including the weighted-average dumping margins, if any, and notify all parties to the proceeding;

(vii) Promptly after issuing the final results, provide to parties to the proceeding which request disclosure an explanation of the calculation methodology used for the Secretary's analysis; and

(viii) Promptly after publication of the notice of final results, instruct the Customs Service to assess antidumping duties on the merchandise described in paragraph (g)(1) of this section and to collect a cash deposit of estimated antidumping duties on future entries.

[54 FR 12769, Mar. 28, 1989; 54 FR 13294, Mar. 31, 1989.]

**§ 353.23  Provisional measures deposit cap.**

This section applies to the merchandise entered, or withdrawn from warehouse, for consumption before the date of publication of the Commission's notice of affirmative final determination. If the cash deposit or bond required under the Secretary's affirm-

**19 C.F.R. § 351.212**

**2020 Edition**

(j) *Commission access to information.* If the final determination is affirmative, the Secretary will make available to the Commission and to employees of the Commission directly involved in the proceeding the information upon which the Secretary based the final determination and that the Commission may consider relevant to its injury determination (*see* section 705(c)(1)(A) or section 735(c)(1)(A) of the Act).

(k) *Effect of negative final determination.* An investigation terminates upon publication in the FEDERAL REGISTER of the Secretary's or the Commission's negative final determination, and the Secretary will take the relevant actions described in section 705(c)(2) or section 735(c)(2) of the Act (whichever is applicable).

## § 351.211  Antidumping order and countervailing duty order.

(a) *Introduction.* The Secretary issues an order when both the Secretary and the Commission (except in certain countervailing duty investigations) have made final affirmative determinations. The issuance of an order ends the investigative phase of a proceeding. Generally, upon the issuance of an order, importers no longer may post bonds as security for antidumping or countervailing duties, but instead must make a cash deposit of estimated duties. An order remains in effect until it is revoked. This section contains rules regarding the issuance of orders in general, as well as special rules for orders where the Commission has found a regional industry to exist.

(b) *In general.* Not later than seven days after receipt of notice of an affirmative final injury determination by the Commission under section 705(b) or section 735(b) of the Act, or, in a countervailing duty proceeding involving subject merchandise from a country not entitled to an injury test (*see* § 351.101(b)), simultaneously with publication of an affirmative final countervailing duty determination by the Secretary, the Secretary will publish in the FEDERAL REGISTER an "Antidumping Order" or "Countervailing Duty Order" that:

(1) Instructs the Customs Service to assess antidumping duties or countervailing duties (whichever is applicable) on the subject merchandise, in accordance with the Secretary's instructions at the completion of each review requested under § 351.213(b) (administrative review), § 351.214(b) (new shipper review), or § 351.215(b) (expedited antidumping review), or if a review is not requested, in accordance with the Secretary's assessment instructions under § 351.212(c);

(2) Instructs the Customs Service to require a cash deposit of estimated antidumping or countervailing duties at the rates included in the Secretary's final determination; and

(3) Orders the suspension of liquidation ended for all entries of the subject merchandise entered, or withdrawn from warehouse, for consumption before the date of publication of the Commission's final determination, and instructs the Customs Service to release the cash deposit or bond on those entries, if in its final determination, the Commission found a threat of material injury or material retardation of the establishment of an industry, unless the Commission in its final determination also found that, absent the suspension of liquidation ordered under section 703(d)(2) or section 733(d)(2) of the Act, it would have found material injury (*see* section 706(b) or section 736(b) of the Act).

## § 351.212  Assessment of antidumping and countervailing duties; provisional measures deposit cap; interest on certain overpayments and underpayments.

(a) *Introduction.* Unlike the systems of some other countries, the United States uses a "retrospective" assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported. Generally, the amount of duties to be assessed is determined in a review of the order covering a discrete period of time. If a review is not requested, duties are assessed at the rate established in the completed review covering the most recent prior period or, if no review has been completed, the cash deposit rate applicable at the time merchandise was entered. This section contains rules regarding the assessment of duties, the provisional measures deposit cap, and interest on

239

over- or undercollections of estimated duties.

(b) *Assessment of antidumping and countervailing duties as the result of a review*—(1) *Antidumping duties.* If the Secretary has conducted a review of an antidumping order under § 351.213 (administrative review), § 351.214 (new shipper review), or § 351.215 (expedited antidumping review), the Secretary normally will calculate an assessment rate for each importer of subject merchandise covered by the review. The Secretary normally will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes. The Secretary then will instruct the Customs Service to assess antidumping duties by applying the assessment rate to the entered value of the merchandise.

(2) *Countervailing duties.* If the Secretary has conducted a review of a countervailing duty order under § 351.213 (administrative review) or § 351.214 (new shipper review), the Secretary normally will instruct the Customs Service to assess countervailing duties by applying the rates included in the final results of the review to the entered value of the merchandise.

(c) *Automatic assessment of antidumping and countervailing duties if no review is requested.* (1) If the Secretary does not receive a timely request for an administrative review of an order (*see* paragraph (b)(1), (b)(2), or (b)(3) of § 351.213), the Secretary, without additional notice, will instruct the Customs Service to:

(i) Assess antidumping duties or countervailing duties, as the case may be, on the subject merchandise described in § 351.213(e) at rates equal to the cash deposit of, or bond for, estimated antidumping duties or countervailing duties required on that merchandise at the time of entry, or withdrawal from warehouse, for consumption; and

(ii) To continue to collect the cash deposits previously ordered.

(2) If the Secretary receives a timely request for an administrative review of an order (*see* paragraph (b)(1), (b)(2), or (b)(3) of § 351.213), the Secretary will instruct the Customs Service to assess antidumping duties or countervailing duties, and to continue to collect cash deposits, on the merchandise not covered by the request in accordance with paragraph (c)(1) of this section.

(3) The automatic assessment provisions of paragraphs (c)(1) and (c)(2) of this section will not apply to subject merchandise that is the subject of a new shipper review (*see* § 351.214) or an expedited antidumping review (*see* § 351.215).

(d) *Provisional measures deposit cap.* This paragraph applies to subject merchandise entered, or withdrawn from warehouse, for consumption before the date of publication of the Commission's notice of an affirmative final injury determination or, in a countervailing duty proceeding that involves merchandise from a country that is not entitled to an injury test, the date of the Secretary's notice of an affirmative final countervailing duty determination. If the amount of duties that would be assessed by applying the rates included in the Secretary's affirmative preliminary or affirmative final antidumping or countervailing duty determination ("provisional duties") is different from the amount of duties that would be assessed by applying the assessment rate under paragraphs (b)(1) and (b)(2) of this section ("final duties"), the Secretary will instruct the Customs Service to disregard the difference to the extent that the provisional duties are less than the final duties, and to assess antidumping or countervailing duties at the assessment rate if the provisional duties exceed the final duties.

(e) *Interest on certain overpayments and underpayments.* Under section 778 of the Act, the Secretary will instruct the Customs Service to calculate interest for each entry on or after the publication of the order from the date that a cash deposit is required to be deposited for the entry through the date of liquidation of the entry.

(f) *Special rule for regional industry cases*—(1) *In general.* If the Commission, in its final injury determination, found a regional industry under section 771(4)(C) of the Act, the Secretary may direct that duties not be assessed on

240

subject merchandise of a particular exporter or producer if the Secretary determines that:

(i) The exporter or producer did not export subject merchandise for sale in the region concerned during or after the Department's period of investigation;

(ii) The exporter or producer has certified that it will not export subject merchandise for sale in the region concerned in the future so long as the antidumping or countervailing duty order is in effect; and

(iii) No subject merchandise of the exporter or producer was entered into the United States outside of the region and then sold into the region during or after the Department's period of investigation.

(2) *Procedures for obtaining an exception from the assessment of duties*—(i) *Request for exception.* An exporter or producer seeking an exception from the assessment of duties under paragraph (f)(1) of this section must request, subject to the provisions of § 351.213 or § 351.214, an administrative review or a new shipper review to determine whether subject merchandise of the exporter or producer in question should be excepted from the assessment of duties under paragraph (f)(1) of this section. The exporter or producer making the request may request that the review be limited to a determination as to whether the requirements of paragraph (f)(1) of this section are satisfied. The request for a review must be accompanied by:

(A) A certification by the exporter or producer that it did not export subject merchandise for sale in the region concerned during or after the Department's period of investigation, and that it will not do so in the future so long as the antidumping or countervailing duty order is in effect; and

(B) A certification from each of the exporter's or producer's U.S. importers of the subject merchandise that no subject merchandise of that exporter or producer was entered into the United States outside such region and then sold into the region during or after the Department's period of investigation.

(ii) *Limited review.* If the Secretary initiates an administrative review or a new shipper review based on a request for review that includes a request for an exception from the assessment of duties under paragraph (f)(2)(i) of this section, the Secretary, if requested, may limit the review to a determination as to whether an exception from the assessment of duties should be granted under paragraph (f)(1) of this section.

(3) *Exception granted.* If, in the final results of the administrative review or the new shipper review, the Secretary determines that the requirements of paragraph (f)(1) of this section are satisfied, the Secretary will instruct the Customs Service to liquidate, without regard to antidumping or countervailing duties (whichever is appropriate), entries of subject merchandise of the exporter or producer concerned.

(4) *Exception not granted.* If, in the final results of the administrative review or the new shipper review, the Secretary determines that the requirements of paragraph (f)(1) are not satisfied, the Secretary:

(i) Will issue assessment instructions to the Customs Service in accordance with paragraph (b) of this section; or

(ii) If the review was limited to a determination as to whether an exception from the assessment of duties should be granted, the Secretary will instruct the Customs Service to assess duties in accordance with paragraph (f)(1) or (f)(2) of this section, whichever is appropriate (automatic assessment if no review is requested).

**§ 351.213 Administrative review of orders and suspension agreements under section 751(a)(1) of the Act.**

(a) *Introduction.* As noted in § 351.212(a), the United States has a "retrospective" assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported. Although duty liability may be determined in the context of other types of reviews, the most frequently used procedure for determining final duty liability is the administrative review procedure under section 751(a)(1) of the Act. This section contains rules regarding requests for administrative reviews and the conduct of such reviews.

**19 C.F.R. § 351.213**

**2020 Edition**

subject merchandise of a particular exporter or producer if the Secretary determines that:

(i) The exporter or producer did not export subject merchandise for sale in the region concerned during or after the Department's period of investigation;

(ii) The exporter or producer has certified that it will not export subject merchandise for sale in the region concerned in the future so long as the antidumping or countervailing duty order is in effect; and

(iii) No subject merchandise of the exporter or producer was entered into the United States outside of the region and then sold into the region during or after the Department's period of investigation.

(2) *Procedures for obtaining an exception from the assessment of duties*—(i) *Request for exception.* An exporter or producer seeking an exception from the assessment of duties under paragraph (f)(1) of this section must request, subject to the provisions of § 351.213 or § 351.214, an administrative review or a new shipper review to determine whether subject merchandise of the exporter or producer in question should be excepted from the assessment of duties under paragraph (f)(1) of this section. The exporter or producer making the request may request that the review be limited to a determination as to whether the requirements of paragraph (f)(1) of this section are satisfied. The request for a review must be accompanied by:

(A) A certification by the exporter or producer that it did not export subject merchandise for sale in the region concerned during or after the Department's period of investigation, and that it will not do so in the future so long as the antidumping or countervailing duty order is in effect; and

(B) A certification from each of the exporter's or producer's U.S. importers of the subject merchandise that no subject merchandise of that exporter or producer was entered into the United States outside such region and then sold into the region during or after the Department's period of investigation.

(ii) *Limited review.* If the Secretary initiates an administrative review or a new shipper review based on a request for review that includes a request for an exception from the assessment of duties under paragraph (f)(2)(i) of this section, the Secretary, if requested, may limit the review to a determination as to whether an exception from the assessment of duties should be granted under paragraph (f)(1) of this section.

(3) *Exception granted.* If, in the final results of the administrative review or the new shipper review, the Secretary determines that the requirements of paragraph (f)(1) of this section are satisfied, the Secretary will instruct the Customs Service to liquidate, without regard to antidumping or countervailing duties (whichever is appropriate), entries of subject merchandise of the exporter or producer concerned.

(4) *Exception not granted.* If, in the final results of the administrative review or the new shipper review, the Secretary determines that the requirements of paragraph (f)(1) are not satisfied, the Secretary:

(i) Will issue assessment instructions to the Customs Service in accordance with paragraph (b) of this section; or

(ii) If the review was limited to a determination as to whether an exception from the assessment of duties should be granted, the Secretary will instruct the Customs Service to assess duties in accordance with paragraph (f)(1) or (f)(2) of this section, whichever is appropriate (automatic assessment if no review is requested).

**§ 351.213 Administrative review of orders and suspension agreements under section 751(a)(1) of the Act.**

(a) *Introduction.* As noted in § 351.212(a), the United States has a "retrospective" assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported. Although duty liability may be determined in the context of other types of reviews, the most frequently used procedure for determining final duty liability is the administrative review procedure under section 751(a)(1) of the Act. This section contains rules regarding requests for administrative reviews and the conduct of such reviews.

241

(b) *Request for administrative review.* (1) Each year during the anniversary month of the publication of an anti-dumping or countervailing duty order, a domestic interested party or an interested party described in section 771(9)(B) of the Act (foreign government) may request in writing that the Secretary conduct an administrative review under section 751(a)(1) of the Act of specified individual exporters or producers covered by an order (except for a countervailing duty order in which the investigation or prior administrative review was conducted on an aggregate basis), if the requesting person states why the person desires the Secretary to review those particular exporters or producers.

(2) During the same month, an exporter or producer covered by an order (except for a countervailing duty order in which the investigation or prior administrative review was conducted on an aggregate basis) may request in writing that the Secretary conduct an administrative review of only that person.

(3) During the same month, an importer of the merchandise may request in writing that the Secretary conduct an administrative review of only an exporter or producer (except for a countervailing duty order in which the investigation or prior administrative review was conducted on an aggregate basis) of the subject merchandise imported by that importer.

(4) Each year during the anniversary month of the publication of a suspension of investigation, an interested party may request in writing that the Secretary conduct an administrative review of all producers or exporters covered by an agreement on which the suspension of investigation was based.

(c) *Deferral of administrative review*—(1) *In general.* The Secretary may defer the initiation of an administrative review, in whole or in part, for one year if:

(i) The request for administrative review is accompanied by a request that the Secretary defer the review, in whole or in part; and

(ii) None of the following persons objects to the deferral: the exporter or producer for which deferral is requested, an importer of subject merchandise of that exporter or producer, a domestic interested party and, in a countervailing duty proceeding, the foreign government.

(2) *Timeliness of objection to deferral.* An objection to a deferral of the initiation of administrative review under paragraph (c)(1)(ii) of this section must be submitted within 15 days after the end of the anniversary month in which the administrative review is requested.

(3) *Procedures and deadlines.* If the Secretary defers the initiation of an administrative review, the Secretary will publish notice of the deferral in the FEDERAL REGISTER. The Secretary will initiate the administrative review in the month immediately following the next anniversary month, and the deadline for issuing preliminary results of review (*see* paragraph (h)(1) of this section) and submitting factual information (*see* § 351.302(b)(2)) will run from the last day of the next anniversary month.

(d) *Rescission of administrative review*—(1) *Withdrawal of request for review.* The Secretary will rescind an administrative review under this section, in whole or in part, if a party that requested a review withdraws the request within 90 days of the date of publication of notice of initiation of the requested review. The Secretary may extend this time limit if the Secretary decides that it is reasonable to do so.

(2) *Self-initiated review.* The Secretary may rescind an administrative review that was self-initiated by the Secretary.

(3) *No shipments.* The Secretary may rescind an administrative review, in whole or only with respect to a particular exporter or producer, if the Secretary concludes that, during the period covered by the review, there were no entries, exports, or sales of the subject merchandise, as the case may be.

(4) *Notice of rescission.* If the Secretary rescinds an administrative review (in whole or in part), the Secretary will publish in the FEDERAL REGISTER notice of "Rescission of Antidumping (Countervailing Duty) Administrative Review" or, if appropriate, "Partial Rescission of Antidumping (Countervailing Duty) Administrative Review."

(e) *Period of review*—(1) *Antidumping proceedings.* (i) Except as provided in paragraph (e)(1)(ii) of this section, an administrative review under this section normally will cover, as appropriate, entries, exports, or sales of the subject merchandise during the 12 months immediately preceding the most recent anniversary month.

(ii) For requests received during the first anniversary month after publication of an order or suspension of investigation, an administrative review under this section will cover, as appropriate, entries, exports, or sales during the period from the date of suspension of liquidation under this part or suspension of investigation to the end of the month immediately preceding the first anniversary month.

(2) *Countervailing duty proceedings.* (i) Except as provided in paragraph (e)(2)(ii) of this section, an administrative review under this section normally will cover entries or exports of the subject merchandise during the most recently completed calendar year. If the review is conducted on an aggregate basis, the Secretary normally will cover entries or exports of the subject merchandise during the most recently completed fiscal year for the government in question.

(ii) For requests received during the first anniversary month after publication of an order or suspension of investigation, an administrative review under this section will cover entries or exports, as appropriate, during the period from the date of suspension of liquidation under this part or suspension of investigation to the end of the most recently completed calendar or fiscal year as described in paragraph (e)(2)(i) of this section.

(f) *Voluntary respondents.* In an administrative review, the Secretary will examine voluntary respondents in accordance with section 782(a) of the Act and §351.204(d).

(g) *Procedures.* The Secretary will conduct an administrative review under this section in accordance with §351.221.

(h) *Time limits*—(1) *In general.* The Secretary will issue preliminary results of review (*see* §351.221(b)(4)) within 245 days after the last day of the anniversary month of the order or sus-

pension agreement for which the administrative review was requested, and final results of review (*see* §351.221(b)(5)) within 120 days after the date on which notice of the preliminary results was published in the FEDERAL REGISTER.

(2) *Exception.* If the Secretary determines that it is not practicable to complete the review within the time specified in paragraph (h)(1) of this section, the Secretary may extend the 245-day period to 365 days and may extend the 120-day period to 180 days. If the Secretary does not extend the time for issuing preliminary results, the Secretary may extend the time for issuing final results from 120 days to 300 days.

(i) *Possible cancellation or revision of suspension agreement.* If during an administrative review the Secretary determines or has reason to believe that a signatory has violated a suspension agreement or that the agreement no longer meets the requirements of section 704 or section 734 of the Act (whichever is applicable), the Secretary will take appropriate action under section 704(i) or section 734(i) of the Act and §351.209. The Secretary may suspend the time limit in paragraph (h) of this section while taking action under §351.209.

(j) *Absorption of antidumping duties.* (1) During any administrative review covering all or part of a period falling between the first and second or third and fourth anniversary of the publication of an antidumping order under §351.211, or a determination under §351.218(d) (sunset review), the Secretary, if requested by a domestic interested party within 30 days of the date of publication of the notice of initiation of the review, will determine whether antidumping duties have been absorbed by an exporter or producer subject to the review if the subject merchandise is sold in the United States through an importer that is affiliated with such exporter or producer. The request must include the name(s) of the exporter or producer for which the inquiry is requested.

(2) For transition orders defined in section 751(c)(6) of the Act, the Secretary will apply paragraph (j)(1) of this section to any administrative review initiated in 1996 or 1998.

(3) In determining under paragraph (j)(1) of this section whether antidumping duties have been absorbed, the Secretary will examine the antidumping duties calculated in the administrative review in which the absorption inquiry is requested.

(4) The Secretary will notify the Commission of the Secretary's determination if:

(i) In the case of an administrative review other than one to which paragraph (j)(2) of this section applies, the administrative review covers all or part of a time period falling between the third and fourth anniversary month of an order; or

(ii) In the case of an administrative review to which paragraph (j)(2) of this section applies, the Secretary initiated the administrative review in 1998.

(k) *Administrative reviews of countervailing duty orders conducted on an aggregate basis*—(1) *Request for zero rate.* Where the Secretary conducts an administrative review of a countervailing duty on an aggregate basis under section 777A(e)(2)(B) of the Act, the Secretary will consider and review requests for individual assessment and cash deposit rates of zero to the extent practicable. An exporter or producer that desires a zero rate must submit:

(i) A certification by the exporter or producer that it received zero or *de minimis* net countervailable subsidies during the period of review;

(ii) If the exporter or producer received a countervailable subsidy, calculations demonstrating that the amount of net countervailable subsidies received was *de minimis* during the period of review;

(iii) If the exporter is not the producer of the subject merchandise, certifications from the suppliers and producers of the subject merchandise that those persons received zero or *de minimis* net countervailable subsidies during the period of the review; and

(iv) A certification from the government of the affected country that the government did not provide the exporter (or the exporter's supplier) or producer with more than *de minimis* net countervailable subsidies during the period of review.

(2) *Application of country-wide subsidy rate.* With the exception of assessment and cash deposit rates of zero determined under paragraph (k)(1) of this section, if, in the final results of an administrative review under this section of a countervailing duty order, the Secretary calculates a single country-wide subsidy rate under section 777A(e)(2)(B) of the Act, that rate will supersede, for cash deposit purposes, all rates previously determined in the countervailing duty proceeding in question.

(l) *Exception from assessment in regional industry cases.* For procedures relating to a request for the exception from the assessment of antidumping or countervailing duties in a regional industry case, see § 351.212(f).

§ 351.214 **New shipper reviews under section 751(a)(2)(B) of the Act.**

(a) *Introduction.* The URAA established a new procedure by which so-called "new shippers" can obtain their own individual dumping margin or countervailable subsidy rate on an expedited basis. In general, a new shipper is an exporter or producer that did not export, and is not affiliated with an exporter or producer that did export, to the United States during the period of investigation. This section contains rules regarding requests for new shipper reviews and procedures for conducting such reviews. In addition, this section contains rules regarding requests for expedited reviews by noninvestigated exporters in certain countervailing duty proceedings and procedures for conducting such reviews.

(b) *Request for new shipper review*—(1) *Requirement of sale or export.* Subject to the requirements of section 751(a)(2)(B) of the Act and this section, an exporter or producer may request a new shipper review if it has exported, or sold for export, subject merchandise to the United States.

(2) *Contents of request.* A request for a new shipper review must contain the following:

(i) If the person requesting the review is both the exporter and producer of the merchandise, a certification that the person requesting the review did not export subject merchandise to the United States (or, in the case of a regional industry, did not export the subject merchandise for sale in the region

244

(Form 19)

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

### CAFC Court No. 2023-1652
### <u>J.D. Irving, Ltd. v. US</u>

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes 11,187 words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: May 22, 2023                    Signature:    <u>/s/ Jay C. Campbell</u>

                                      Name:        <u>Jay C. Campbell</u>

## CERTIFICATE OF SERVICE

### <u>J.D. Irving, Ltd. v. US</u>
### CAFC Court No. 2023-1652

I hereby certify that on May 22, 2023 the foregoing document filed on behalf of J.D. Irving, Ltd. was served upon the following parties by operation of the Court's electronic filing system.

Eric E. Laufgraben
U.S. Department of Justice
Eric.E.Laufgraben@usdoj.gov

Paul Keith
U.S. Department of Commerce
Paul.Keith@trade.gov

Date: May 22, 2023                /s/ Jay C. Campbell
                                  Jay C. Campbell
                                  WHITE & CASE LLP
                                  701 Thirteenth Street, NW
                                  Washington, DC 20005
                                  (202) 626-3600